UNITED STATES U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHELDON GOLDSTEIN,

                Plaintiff,

        -against-

MONTEFIORE MEDICAL CENTER and
MATTHIAS EIKERMANN,

                Defendants.

Case No. 22-cv-06723

**DEFENDANTS' RULE 56.1
STATEMENT OF UNDISPUTED
MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendants Montefiore Medical Center ("Montefiore") and Matthias Eikermann ("Dr. Eikermann") (collectively referred herein as Defendants) respectfully submit that the following material facts are not in dispute.

**Background.**

1.      Montefiore, which is located in the Bronx, New York, is a comprehensive non-profit medical center and healthcare management company. Montefiore is comprised of several hospitals, a network of neighborhood health centers, a range of ambulatory specialty services, home health care, and rehabilitation centers. *See* Declaration of Dr. Matthias Eikermann, sworn to on September 23, 2024 ("Eikermann Decl.") ¶6.[1]

---

[1] References to "Pl. Dep. xxx" refer to the transcript of Plaintiff's deposition taken on May 17, 2023 and August 29, 2023 and attached as Exhibit A to the Declaration of William Anthony, sworn to on September 25, 2024 ("Anthony Decl."); "Eikermann Dep. xxx" refers to the transcripts of Dr. Matthias Eikermann's deposition taken on January 11, 2024 and February 12, 2024 and attached as Anthony Decl. Exhibit B; "Leff Dep. xxx" refers to the transcript of Dr. Jonathan Leff's deposition taken on February 15, 2024 and attached as Anthony Decl. Exhibit C; "Vydynathan Dep. xxx" refers to the transcript of Dr. Amaresh Vydynathan deposition taken on December 20, 2023 and attached as Anthony Decl. Exhibit D.

2.      Montefiore maintains non-discrimination and anti-harassment policies, which include methods to report incidents of discrimination and harassment. *See* Anthony Decl. Ex. E. (P000104-P000110).

3.      Montefiore also maintains a Non-Discrimination Against and Accommodation of Individuals with Disabilities Policy which sets forth the procedure for requesting an accommodation and states that Montefiore will provide reasonable accommodations, provided the accommodation does not constitute an undue hardship or pose a threat to the health and safety of the individual or others in the workplace. *See* Anthony Decl. Ex. F (D000661-D000662).

4.      As per the Non-Discrimination Against and Accommodation of Individuals with Disabilities Policy, individuals who require an accommodation should contact Employee and Labor Relations, Occupational Health Services (OHS) to request an accommodation. *Id.*

**Montefiore Hires Plaintiff**

5.      On September 30, 2013, Elise Delphin, former Chair of the Department of Anesthesiology, hired Dr. Sheldon Goldstein ("Plaintiff" or "Dr. Goldstein") and he began working as a full-time salaried attending physician in the Department of Anesthesiology. *See* Pl. Dep. 50:5-7 and Anthony Decl. Ex. G (D000328-D000331).

6.      As per Plaintiff's offer letter, Montefiore recommended to the Dean of the Albert Einstein College of Medicine ("Einstein") that he be appointed to the faculty with the rank of Professor in the Department of Anesthesiology. *See Id*.

7.      At the time of Plaintiff's hire, and during his employment, Plaintiff was the CEO for Coagulation Sciences, LLC, an independent, non-Montefiore company he formed for the purpose of developing a new type of blood testing device. Pl. Dep. 51:19-52:18.

8.      Shortly after Plaintiff began his employment, Dr. Delphin provided Plaintiff a certain amount of non-clinical time per month, which varied from one day a month to three or four

days per month, but "over the eight and half years", he averaged one day a month. Pl. Dep. 55:20-25; 56:20-57:4.

9.      In 2020, Dr. Delphin took away Plaintiff's non-clinical time because Plaintiff needed to be "more productive." Pl. Dep. 57:17-22; 58:8-10.

10.     Dr. Tracey Straker, Division Director of the General Anesthesia Department was Plaintiff's direct supervisor since July of 2015.  Pl. Dep. 58:3-7;  Declaration of Tracey Straker, dated September 23, 2024 ("Straker Decl.") ¶6.

**Promotion Process.**

11.     Einstein has processes and procedures for individuals seeking a promotion to Professor on the Clinical Educator Track.  Pl. Dep. 82:11-25; 83:2-13; Leff. Dep. 57:15-22; 71:23-72:8; and Anthony Decl. Ex. H (D000677-D000708).

12.     The Chair of the Committee for Academic Promotions ("CAP") was (and is) Dr. Jonathan Leff, Professor, Vice Chair of Professional Affairs, Chief of Cardiac Anesthesiology, Co-Director of the Cardiovascular Center at Montefiore.  Leff Dep. 34:4-17.

13.     In early July of any given year, Dr. Leff, or his administrator, sends an email to the Anesthesia Department regarding the senior promotion process and the deadline for the submission of materials.  Pl. Dep. 84:5-13; Leff Dep. 58:3-59:14.

14.     Applicants are encouraged to submit a CV and teaching portfolio.  Leff Dep. 58:14-18; and Anthony Decl. Ex. H (D000677-D000708).

15.     Montefiore also recommends applicants meet with Dr. Penny Grossman, Senior Project Coordinator, Associate Professor, Departments of Family & Social Medicine and Pediatrics, for assistance with preparation of application materials.  Pl. Dep. 97:13-98:5.  Dr. Grossman was (and is) not a member of the CAP.  Pl. Dep. 97:13-16.

3

16.     All associate professors and professors are generally invited to serve on the CAP. Leff Dep. 96:16-25.

17.     Once the members of the CAP are finalized, Dr. Leff provides them with relevant materials regarding the process (such as Moving Up At Einstein, a faculty guide to preparing for promotion with the Checklist), along with all the applicants' submissions. Leff Dep. 98:16-99:23.

18.     Dr. Leff also assigns a primary reviewer for each applicant. The primary reviewer is responsible for presenting their candidate at the CAP committee meeting with recommendations. Leff Dep. 98:16-99:23.

19.     A meeting is then held where the CAP discusses the submissions and decides which individuals should be presented for promotion to the Einstein Office of Academic Appointments. Leff Dep. 51:6-21.

20.     The CAP uses the clinical educator checklist as a guide for evaluating a candidate for promotion. Leff Dep. 73:5-18.

21.     The individual also needs a letter of support from the Chair. Leff Dep. 55:23-56:2.

22.     Applications for promotions are submitted to Einstein once a year in mid-October. Leff Dep. 52:12-16.

**Plaintiff Application for Promotions in 2020**

23.     In 2020, Plaintiff submitted an application for promotion from Associate Professor to Professor on the Clinician Educator Track. Pl. Dep. 81:16-82:3 and Anthony Decl. Ex. I (P00005-P00046).

24.     Dr. Grossman reviewed Plaintiff's promotion materials prior to his submission. Pl. Dep. 22-25; 96:4-6 and Anthony Decl. Ex. J (D008029-D008032).

25.     In 2020, the members of the CAP were: Dr. David Adams, Dr. Delphin, Dr. Karina

Gritsenko, Dr. Vilma Joseph, Dr. Galina Leyvi, Dr. Marina Moguilevitch, Dr. Irene Osborn, Dr.

Sujatha Rachachandran, Dr. Shamantha Reddy, Dr. Naum Shaparin, Dr. Straker and Samantha

Rawana.  Anthony Decl. Ex. K (D000931-D000932).

26.     Naum Shaparin was assigned to present Plaintiff to the CAP. Leff. Dep. 124:124:4-

8; and Anthony Decl. Exs. K (D000931-D000932); and L (D008258-D008259).

27.     At the CAP meeting, Dr. Shaparin recommended that Plaintiff not be submitted for

promotion, which was ***unanimously*** supported by the CAP, and "blocked" by Dr. Delphin, the

Chair of the Department, as per Plaintiff.   Pl. Dep. 85:19-22; Leff. Dep. 124:4-9; 126:21-23 and

Anthony Decl. Exs. J (D008032); K (D000931-D000932); and L (D008258-D008259).

28.     The CAP voiced concerns that "too many of [Plaintiff's] writing submissions are

pending review and/or approval and that this CV is not showing enough progression as an

academic."  Anthony Decl. Ex. K (D000931-D000932).

29.     On July 15, 2020, Dr. Leff communicated this decision via email to Dr. Goldstein,

copying Dr. Delphin.  Pl.  Dep. 89:16-90:2; and Anthony Decl. Ex. M (D000514-D000515).

30.     Dr. Leff's July 15, 2020 email acknowledged some of the strengths in Plaintiff's

submission, and then set for the following major areas in need of further work:

- The Einstein promotion committee required a minimal [sic] of 10 peer reviewed publications for this promotion.  While reviewing your CV the committee noted that you have 1 publication in the last 10 years.  This will not be sufficient at the level of Professor.  The Einstein Promotions committee looks for academic growth and progress throughout a career and this gap is difficult for the committee to explain.
- Abstracts are much less important at the level of Professor and should be understated or removed.  The committee also noted that none of the abstracts have produced publications.
- The Einstein Promotions Committee will consider your grants, although not a necessary part on the [Clinical Educator Track].  These grants can be beneficial if they were completed and produced published results.  The large grant for

coagulation is potentially an issue since it's listed as a grant funded by a company in which you have a financial role.

- There are too many items listed as "in progress" or "in submission" and "further data analysis", which cannot be kept on the documents.
- You list a number of studies for which you are the primary investigator but very few which have been completed or developed into peer reviewed publications.

Anthony Decl. Ex. M (D000514-D000515).

31.    Thereafter, on August 25, 2020, Plaintiff submitted a lengthy email to Dr. Leff requesting that the Promotions Committee reconvene to reconsider its decision.  Pl. Dep. 92:8-11 and Anthony Decl. Ex. M (D000511-D000514).

32.    On that same day, Dr. Leff responded via email that the decision was unanimous and would remain final.  Pl. Dep. 98:13-99:6; and Anthony Decl. Ex. M (D000511).

33.    Plaintiff never complained or filed a complaint to anyone at Montefiore as a result of his not receiving the promotion in 2020.  Pl. Dep. 100:7-10.

34.    In 2021, Plaintiff submitted his materials to be considered for a promotion from Associate Professor to Professor on the Clinician Educator Track.  *See* Pl. Dep. 102:7-19; and Anthony Decl. Ex. N (P000047-P000095).

35.    The CAP never reviewed Plaintiff's 2021 promotion materials.  Pl. Dep. 39: 17-21; Leff. Dep. 176:3-13; 177:2-7; and Eikermann Decl.¶18.

**Dr. Naum Shaparin Becomes Interim Chair of Anesthesiology Department**

36.    In January 2021, Dr. Naum Shaparin was appointed interim chair upon Dr. Delphin's retirement. Pl. Dep. 110: 4-7; and Leff Dep. 38:3-14.

37.    On January 6, 2021 at 12:08pm, a few days after Dr. Shaparin assumed the position as interim Chair, Plaintiff sent him an email (attaching an email he had sent to prior leadership in March of 2020 to which he never received a response) requesting to deliver two Ground Rounds talks.  Anthony Decl. Ex. O (D003414-D003417).

38.     A few hours later, Plaintiff sent Dr. Shaparin another email stating "could you at least be in touch with Jon and try to arrange two Ground Rounds by July? So when I re-apply for promotion I will have more as you suggested?" He further stated, "It may seem a bit unusual to deliver two GR in six months, but note that despite my requests the department has not provided me a GR slot since September 6, 2017." *Id.*

39.     Thereafter, Plaintiff met with Dr. Shaparin to request non-clinical time, which Dr. Shaparin denied, and as per Plaintiff stated "We're in a pandemic. I have to run the clinical service. I am not giving non-clinical time." Pl. Dep. 110:8-15; 111:11-25 and Anthony Decl. Ex. P (D007828-D007832).

40.     On January 20, 2021, after his meeting with Dr. Shaparin, Plaintiff expressed via email to Dr. Straker that he was "angry" that after four publications in a year it is still "no non-clinical time for Goldstein." Pl. Dep. 110:16-111:25 and Anthony Decl. Ex. Q (D008019-D008020).

41.     In this same email, Plaintiff also stated to Dr. Straker that he thinks "it best that you work to keep me off overnight call through March schedule. The medical eval should be done early March. If that turns out okay I still plan to push for no overnight call, however I would be willing to concede an occasional M2 at Moses on a Friday. I also feel that makes me a bit more valuable to the dept." Anthony Decl. Ex. Q (D008019-D008020).

42.     On March 4, 2021, upon learning that others were receiving non-clinical time, Plaintiff sent an email to Dr. Straker complaining that Dr. Shaparin's refusal to give him non-clinical time was "being done against me with blatant intent." Anthony Decl. Ex. R (D008025).

43.     In response to Plaintiff's email, Dr. Straker told him to stop being paranoid and explained the rationale as to why the others received the non-clinical time. *Id.*

7

44.     On April 12, 2021, Plaintiff emailed Dr. Shaparin and Dr. Straker asking whether Dr. Shaparin would petition the promotions committee to allow Plaintiff to submit his application for the 2021 promotion 6 months later than every other applicant in the entire medical school. Anthony Decl. Ex. S (D003646-D003648).

45.     In this email, Plaintiff  acknowledged that Dr. Delphin and Dr. Adams refused to advance his application in May of 2020. *Id.*

46.     Dr. Shaparin denied this request stating that Plaintiff would need to re-apply like everyone in the coming months for the 2022 cycle.  *Id.*

**Montefiore Receives Employee Complaints Concerning Dr. Goldstein**

47.     In early January 2021, Montefiore became aware of employee complaints concerning Plaintiff where Plaintiff exhibited a pattern of inappropriate communication and unprofessional behavior. Anthony Decl. Exs. T (D0002937-002943); U (D000650-D000651); and V (D007789-D007790).

48.      Montefiore also received a MIDAS report through its anonymous reporting system which detailed Dr. Goldstein's inappropriate language and unprofessional treatment of staff in front of others, including patients.  *See* Anthony Decl. Ex. U (D000650-D000651).

49.     Specifically, when approached by a fourth-year OB GYN resident about a case, Plaintiff stated "This is bullshit" "It's not my problem that your team didn't get the tests done," I am not dealing with this bullshit anymore."  It was reported that thereafter, Plaintiff engaged in a loud argument with the attending physician in front of patients where the nursing staff had to tell Plaintiff to take it outside.  *Id.*

50.    As a result, in March of 2021, it was recommended by Andrew Felder, Doris Poma and Dr. Shaparin that Plaintiff be sent for coaching.  Pl. Dep. 124: 19-21 and Anthony Decl. Exs. W (D003932); and X (D007791-D007797).

51.    Plaintiff was unable to start the coaching until after May 4 because he was on leave. Anthony Decl. Ex. X (D007793-D007797).

**Dr. Goldstein Requests a Reasonable Accommodation Not to Take Overnight Calls and Montefiore Grants the Accommodation**

52.    Plaintiff, like all other general anesthesiologists in his department (including the Chair) was required to take overnight calls in the hospital.  Pl. Dep. 62:4-8; Eikermann Dep. 161:23-25; Vydynathan Dep. 44:15-19; 106:11-13; 108:20-22; and Straker Decl. ¶12

53.    An overnight call "is a call that starts typically at 5 o'clock when other people are supposed to go home and it goes from [5:00pm to 7:00am].  During [that] time … you are supposed to make yourself available to take care of patients who need your help. That might be sometimes in person in the hospital or sometimes from home."  Eikermann Dep. 161: 10-18; Straker Decl. ¶12.

54.    Glenn Mann, the former Director of Scheduling and Director of Pediatric Anesthesia was responsible for making the schedules for the Anesthesiology Department in 2021 and 2022.  Straker Decl. ¶8; Pl. Dep. 78:3-5; 211:2-5; and Eikermann Dep. 214:6-8, 214:18-19.

55.    Work schedules usually came out about a month in advance, or three and a half to five weeks in advance for any given month.  Pl. Dep. 62:9-14: 211: 15-18; and Straker Decl. ¶9.

56.    The Holiday schedule, however, (was) and is assigned the year before via a Lottery System.  In August of the preceding year, anesthesiologists are required to rank in order of preference the Holidays they wished to work the following year.  By October, the anesthesiologists

would then be informed the holidays they were assigned via the Lottery System for the following

year.  Straker Decl. ¶10;  and Pl. Dep. 211:25-212:1.

57.    For purposes of the schedule:

- M:Regular day shift at Moses Hospital.

- W: Regular day shift at Weiler Hospital.

- W3: Weiler 3rd call, which meant arrive at 12:00pm and work until Weiler Hospital was down to only using 2 operating rooms for the shift.

- M-moon: Moonlighting shift at Moses Hospital, which meant arrive in the morning before your scheduled afternoon shift.

- VAC: Vacation.

- ABS: Absent.

- M3:Moses 3rd call, which meant arrive in the morning and work until Moses Hospital was down to using 4 operating rooms.

- WORa: In-House call at Weiler Hospital which was from 7:00am to 7:00pm.

- WORp: Night call for Weiler Hospital which is taken at home with a beeper.

- M2 on a weekend: Back up call at home on a weekend for Moses Hospital.

- M2 on a weekday: Regular call during the day at Moses Hospital, which typically meant working from 12pm until Moses Hospital was down to only using 2 operating rooms for the shift.

- MORa: In-House call at Moses Hospital which was from 7:00am to 7:00pm.

Straker Decl. ¶ 13; Eikermann Dep. 189:15-21; and Anthony Decl. Ex. Y (D000817-D000833).

58.    On April 19, 2021, Dr. Michael Thorpy emailed Dr. Straker and Dr. Eikermann a

medical note stating that Plaintiff should not be taking overnight call because his required regular

sleep wake patterns for optimal health.  Anthony Decl. Ex. Z (D000767-D000768); and Straker

Decl. ¶14.

10

59.    Plaintiff was informed he would need to go through the official HR accommodation process.  Anthony Decl. Ex. AA (D000772).

60.    The next day, Dr. Shaparin and Mr. Felder met with Plaintiff who agreed to take his overnight calls scheduled for "tomorrow and Saturday", however he would no longer take overnight call starting in May.  Anthony Decl. Ex. AA (D000771).

61.    Montefiore granted Plaintiff's reasonable accommodation as follows:

> Accommodation Detail: Dr Goldstein will fulfill his overnight call obligations in the month of April 2021. Dr Goldstein will not be assigned any overnight call in May or June 2021. If necessary, need for accommodation in subsequent months will be considered in June 2021. In May and June, the number of calls Dr Goldstein will be required to take will not change from normal. In order to fulfill the normal obligatory quantity, Dr. Goldstein will take late calls and daytime weekend calls rather than overnight calls.

*See* Anthony Decl. Ex. BB (P00098-000099); Cmplt.,¶34; Eikermann Dep. 164:15-20; and Straker Decl. ¶15.

62.    Plaintiff was not required to take overnight calls in May, June or July.  Pl. Dep. 214:10-12. and Anthony Decl. Ex. Y (D000817-D000833); Straker Decl. ¶17.

63.    On June 30, 2021, Mr. Felder emailed Plaintiff to see if Montefiore could put him back on overnight call in August.  Anthony Decl. Ex. CC (D005805-D005806).

64.    The next day Dr. Thorpy sent Dr. Eikermann, Mr. Felder and Dr. Straker another medical notice stating that Plaintiff has chronic, severe obstructive sleep apnea and is on a BiPAP and he should not be taking overnight call.  Anthony Decl. Ex. DD (D000774-D000775); and Straker Decl. ¶18.

65.    Plaintiff was not scheduled to work overnight calls from July through December of 2021.  Pl. Dep. 216:10-12; Anthony Decl. Ex. Y (D000817-D000833); and Straker Decl. ¶19 .

66.    In December of 2021, Plaintiff learned he was scheduled to work two overnight calls in January.  Anthony Decl. Exs. EE (D000778-D000780);  FF (D008218-D008219); and Straker Decl. ¶20.

67.     As a result, on December 28, 2021, Dr. Thorpy submitted another note stating that Plaintiff should not be taking overnight call.  Anthony Decl. Ex. EE (D000779-D000780); and Straker Decl. ¶21 .

68.     Plaintiff, however, agreed to cover the two January overnight calls and requested that the Saturday and Sunday daytime formula be instituted starting in February.   Anthony Decl. Ex. EE (D000778-D000779); and Straker Decl. ¶22.

69.     On December 29, 2021, Dr. Straker emailed Plaintiff about the President's Day weekend coverage for which he was assigned M2 coverage for the Saturday through Monday (2/19-2/21) via the Lottery, and asked Plaintiff whether he was able to keep this commitment. Anthony Decl. Exs. EE (D000781-D000782); FF (D008218-D008219); and Straker Decl. ¶23.

70.     Even though Plaintiff was assigned M2 (backup call at home with a beeper) three days in a row, if he was called in as a backup, as per Montefiore protocol, Plaintiff would not have been allowed to cover in-house for any consecutive days, so at most he would have been required to cover two days, but never two days in a row.  Straker Decl. ¶24.

71.     Plaintiff responded stating "I understand the situation.  I appreciate this was assigned by the lottery in the past, so rest assured I will cover the M2 for the holiday weekend. Anthony Decl. Ex. EE (D000781-D000782); and Straker Decl. ¶24.

**Dr. Eikermann Becomes Chair of the Anesthesiology Department**

72.     On April 15, 2021, Dr. Eikermann became the Chair of the Anesthesiology Department. Eikermann Dep. 44:14-25; and Eikermann Decl. ¶6.

73.     On April 12, 2021, prior to Dr. Eikermann's first day, Plaintiff emailed Dr. Straker asking if she would discuss the following with Dr. Eikermann prior to Plaintiff's meeting with him on April 28th: (1) putting Plaintiff forth for promotion to Full Professor; (2) giving Plaintiff

"consistent and substantial" non-clinical time; (3) Plaintiff's health issue that impacts on call.   Pl.

Dep. 129: 4-23; and Anthony Decl. Ex. P (D007828-D007832).

74.    Plaintiff attached "background" to his April 12, 2021 email stating that he did not

intend to complain to [Eikermann] about the past, well, at least not a lot", further stating that he

"is pretty sure [his] loss of non-clinical time was just after the orthopedic injury [he] sustained,

when the mattress flipped up and threw [him] against the chair."  Anthony Decl. Ex. P (D007828-

7832).

75.    On April 28, 2021, the morning of Plaintiff's meeting with Dr. Eikermann, Plaintiff

sent an email to Dr. Grossman stating:

> I hope you can convince Dr. Eikermann to put me forward in this cycle.
> The grossly unfair preferences for certain people should be in the past, gone
> with the last chair.  If I am not treated fairly by this Chair, I am prepared.
> My NJ license is reactivated, my Florida license just came through, and a
> chair I know quite well just invited me to apply for Vice Chair at his
> program.

*See* Anthony Decl. Ex.  J (D008029-D008032).

76.    On April 28, 2021, Dr. Eikermann had his first meeting with Dr. Goldstein.  At this

meeting, Dr. Goldstein was "direct" and requested the following: (1) a promotion from Associate

Professor to Professor on the Clinician Educator Track; (2) non-clinical time; (3) appointment to

the Vice Chair of Faculty Development (the position which was held by Dr. Leff); and (4)

reinstatement of an employee who was taken off leadership by Dr. Delphin.  Anthony Decl. Ex.

GG (D005100); and Eikermann Decl.¶8.

77.    Dr. Eikermann listened to Dr. Goldstein's requests, and advised Dr. Goldstein that

he would look into them, discuss with other members of the Executive Team and get back to him.

Eikermann Decl.¶10.

78.    At that time the members of the Executive Team were: Dr. Eikermann, Tracey Straker, Jonathan Leff, Andrew Felder, Naum Shaparin and Sujatha Ramachandran, Vice Chair for Education and Residency Program Director, Associate Professor of Anesthesiology. Eikermann Dep. 349:8-16; and Eikermann Decl. ¶11.

79.    After Plaintiff's meeting with Dr. Eikermann, he sent an email to Dr. Grossman advising her that Dr. Eikermann plans to discuss his promotion with the current vice chair.  He further stated "[t]he Vice chair and others in the dept. routinely insist on very strict criteria for people who are not in the club."  *See* Anthony Decl. Ex. J  (D008029).

80.    During his deposition, Plaintiff testified that what he meant by "in the club" were "people who were from Columbia got preferences. People who were from Cornell got preferences" and "some preference was given to minorities and to women."  Pl. Dep. 150:14-151:14.

81.    On  May 16, 2021, Plaintiff emailed Dr. Straker to advise her that his "grand rounds were a big hit."  Anthony Decl. Ex. HH (D005601).

82.    During Dr. Eikermann's meetings with the Executive Committee, Dr. Eikermann learned the reasons why Dr. Goldstein did not receive the promotion in 2020 and why Dr. Delphin took away his non-clinical time.  He also learned about Dr. Goldstein's other company, and that Montefiore believed Dr. Goldstein was using non-clinical time to help further this company, as opposed to using his non-clinical time for the benefit of Montefiore.  Eikermann Decl. ¶12.

83.    Dr. Eikermann also learned about the prior complaints concerning Dr. Goldstein and that Dr. Goldstein was scheduled to receive formal coaching from Nancy Jacoby, an outside coach.   Anthony Decl. Ex. II (D008529-D008530); and  Eikermann Decl.¶13.

84.    Dr. Goldstein received two coaching sessions.  Pl. Dep. 346: 17-19.

85.    Dr. Eikermann discontinued Plaintiff's coaching sessions after Plaintiff's coach indicated that she believed the coaching would not be successful. Eikermann Dep. 298:19-300:16.

86.    On June 2, 2021, Dr. Eikermann sent an email to Plaintiff, copying the Executive Committee, attaching a letter written by a patient complimenting the outstanding services provided by Plaintiff.  In this email, Dr. Eikermann states "Sheldon, I am very grateful for your excellent skills, dedication to detail, and human interactions you had with this patient."  Anthony Decl.  Ex. JJ (D008037).

87.    At the end of July through the beginning of September 2021, as a result of the receipt of employee complaints discussed above, repeated concerns about his attitude and communication style, his defensive behavior and lack of productivity, Dr. Eikermann began discussing with Dr. Leff, Mr. Felder, Ms. Poma, Dr. Straker, and Montefiore's Legal Department issuing Dr. Goldstein a Focused Professional Practice Evaluation ("FPPE").   Anthony Decl. Ex. KK (D006037-D006039); and Eikermann Decl. ¶16

88.    As Dr. Eikermann was still relatively new, he decided to hold off issuing the FPPE until he was able to personally evaluate Dr. Goldstein's work performance, attitude and interactions over an extended period of time.  Anthony Decl. Ex. LL (D008517-D008523); and Eikermann Decl.¶17.

89.    Around the same time, Dr. Eikermann was also having discussions with Dr. Jeffrey Weiss, Senior Vice President for Medical Affairs and Montefiore's Legal Department to decide whether Dr. Goldstein's application for promotion should be considered as a result of his personnel issues.  Anthony Decl. Ex. LL (D008517-D008523); and Eikermann Decl. ¶18.

**Plaintiff's October 3, 2021 Meeting with Dr. Eikermann, Dr. Leff and Dr. Straker**

90.    On October 3, 2021, Plaintiff secretly tape recorded his meeting with Dr. Eikermann, Dr. Leff and Dr. Straker. Pl. Dep. 332:7-333:8; 335:16-24; 336:2-12;  Eikermann Decl.¶¶19-20; and Anthony Decl. Exs. MM (Audio); and NN (Goldstein Recording TR000051-TR000085).

91.    Plaintiff testified at his deposition that he recorded the conversation because "over time Eikermann's behavior suggested that he was targeting me and potentially manufacturing false claims about me and I did not trust him."  Pl. Dep. 336:13-17.

92.    Plaintiff, when asked at his deposition, if he believed Dr. Eikermann was aggressive during the October 3, 2021 meeting, Plaintiff first stated yes, and then changed his response to "I don't know that I would use the word aggressive, I would use the word unpleasant to the point of nasty, or just incorrect." Pl.  Dep. 337:21-23; 341:20-342:2.

93.    Plaintiff's response, however, as to why he believed Dr. Eikermann was being aggressive, was "he said things were contrary to fact, clearly indicating that he was targeting me and trying to manufacture claims to exit me from the department." Pl.  Dep. 337:24-338:10.

94.    During this October 3, 2021 meeting, Dr. Eikermann highlighted Plaintiff's strengths stating that Plaintiff was a great clinician, very experienced, good clinician scientist, and talented with research.   Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 4:4-9; 17; 5:1-3).

95.    Dr. Eikermann also informed Plaintiff at this October 3, 2021 meeting that he would not be considered for promotion in 2021.  Pl. Dep. 342:20-343:2; and Eikermann Decl. ¶21.

96.    Contrary to Plaintiff's deposition testimony, Dr. Eikermann never "boasted" or stated during this meeting that "I prevented you from being promoted", nor did Dr. Eikermann

"make clear that he was the only who was responsible for it." Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085).

97.    Dr. Eikermann informed Plaintiff of Montefiore's concern with respect to his significant amount of non-clinical days, and the potential conflict of interest with Plaintiff's company, indicating that Plaintiff should not use Montefiore's resources to promote Plaintiff's own company. Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 5:10-25; 7:15-9:1).

98.    Dr. Eikermann then raised concerns regarding Plaintiff's professionalism and how he responds to feedback, stating "some people perceive [Plaintiff's] response as sometimes not as nice or even aggressive. Pl. Dep. 343:2-7; Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 9:1-9, 13-15).

99.    Dr. Eikermann advised Plaintiff to meet with him every three months and that he would try to help him, stating "and you can count in [sic] me that I will support you." Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp.10:16-21).

100.    In response, Plaintiff stated "I'm appreciative of meeting with you about every three months. I think that would be terrific." Plaintiff was also "pleased" that Dr. Eikermann gave him some ideas about how to ensure he would get promoted next year." Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 13:1-7).

101.    At the end of the conversation, Dr. Eikermann informed Plaintiff that he told Dr. Leff not to send Plaintiff a rejection letter for this year, because he wanted to meet with Plaintiff and he specifically stated: "we support you and whatever you feel that we really deeply care about you because we think you are good and you're—you're a resources. We don't want to lose you.

We want to help you. Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 24: 15-18; 25:11-12).

102.    While Dr. Eikermann recognized Plaintiff's objective qualifications, he advised Plaintiff that he could not be promoted if he had ongoing performance issues. Anthony Decl. Ex. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at p. 25:20-22).

103.    At no time during this conversation did Dr. Eikermann raise his voice, become aggressive, call him names, and/or refer to Plaintiff's disability. Anthony Decl. Ex. MM (audio).

**Montefiore Receives Another Employee Complaint Regarding Plaintiff**

104.    On November 2, 2021, Dr. Nicole Nevadunsky emailed a complaint about Plaintiff's inappropriate behavior towards her, residents and a sub-intern during a procedure. She also attached statements from those that witnessed the incident. *See* Anthony Decl. OO (D000624-627); and Eikermann Decl.¶22.

105.    More specifically, Dr. Nevadunsky stated that Plaintiff "treated them in a pejorative manner, demanding IV fluid bags, products throughout the case and orders to be executed in the emergency room before he would allow the patient to be brought up, including administration of a K-centra." In addition, she stated "sadly he has had a track record of poor professionalism." *Id.* *at* D000627.

106.    On November 4, 2021, Dr. Mikhail Chernov*, former Associate Professor of Anesthesiology and Clinical Site Director, emailed the complaint to Plaintiff and asked him to respond in writing. *Id.* at D000624.

107.    Plaintiff responded a few hours later to Dr. Chernov, copying Dr. Straker, stating that he was heading for a conference for the weekend and may not respond until Monday or Tuesday of the following week. *Id.* at D000624.

108.    Plaintiff, however, did provide some "brief points" refuting the complaint and stated that he was going to report Dr. Nevandunsky to both MIDAS (the anonymous reporting procedure) and HR. *id*.

109.    On November 9, 2021, Plaintiff provided his written response to Dr. Nevadunsky's complaint. Anthony Decl. Ex. PP (D000631-D000636).  Plaintiff did not accept responsibility for anything that occurred, instead stating "all the problems in the OR were caused by Dr. Nevadunsky. *id*.

110.    Thereafter, on November 29, 2021, Plaintiff filed a complaint both with MIDAS and Human Resources, regarding Dr. Nevadunsky's complaint stating that Dr. Nevadunsky's complaint included multiple statements that were clear defamation.  Plaintiff Dep. 160:1-17; and Anthony Decl. Ex. QQ (D006981-D006982).

**Plaintiff's November 30, 2021 Meeting With Dr. Eikermann, Dr. Straker and Mr. Felder**

111.    On November 30, 2021, Plaintiff once again, secretly tape recorded his meeting with Dr. Eikermann, Dr. Straker and Mr. Felder.  Plaintiff Dep. 172:23-173:1;  Eikermann Decl.¶23-24; Anthony Decl. Exs. RR (audio); and SS (Goldstein Recording TR000001-TR000050).

112.    During this November 30, 2021 meeting, Dr. Eikermann did not call Plaintiff names, curse at him, refer to his disability or speak to him in an aggressive manner.  Pl. Dep. 181:13-19; and Ex RR (audio).

113.    Dr. Eikermann, however discussed the complaint filed against Plaintiff by Dr. Nevadunsky's, and  stated that Plaintiff had "too many complaints", and that he "cannot have more complaints, to which Plaintiff responded "No, I agree with you there." Anthony Decl.  Exs. RR (audio); and SS (Goldstein Recording TR000001-TR000050 at p. 7:9-15).

114.    Dr. Eikermann then presented Plaintiff with the FPPE, dated September 10, 2021, which included a Performance Improvement Plan to help remediate these issues. Plaintiff Dep. 177:13-15; 180: 20-181:7; Anthony Decl. Ex. TT (D000508-D000510); and Eikermann Decl.¶25.

115.    As set forth in the FPPE, there were concerns regarding Plaintiff's communication style, and lack of acknowledgement when approached with negative feedback. Anthony Decl. Ex. TT (D000508-D000510).

116.    The FPPE also provided that upon review of Plaintiff's academic productivity related to research efforts, leadership had determined that the majority of his allocated non-clinical time had not resulted in a sustained number of peer reviewed publications commensurate with an eight-year timeframe and there were also concerns surrounding a conflict of interest with his other company (Coagulation Sciences LLC). Both of these topics previously were addressed with Plaintiff at the October 3, 2021 meeting. *See* Anthony Decl. Exs. TT (D000508-D000510); MM (audio); and NN (Goldstein Recording TR000051-TR000085).

117.    The Performance Improvement Plan, included the following expectations and interventions:

1.  Plaintiff would not be assigned non-clinical time for the 2021-2022 academic year, and it was expected that he would focus solely on clinical work, except for his survey project.
2.  Plaintiff would collaborate with his mentee and complete his advanced survey project.
3.  There will be no other mentoring of faculty and trainees in areas where there is a potential conflict of interest with the company Coagulation Sciences LLC.
4.  Plaintiff would not be considered a candidate for promotion to Professor of Anesthesiology during the coming year.
5.  Plaintiff was required to take and complete courses in Effective Communication, Workplace Conflict and Mastering Emotional Intelligence within six months.

*See* Anthony Decl. Ex. TT (D000508-D000510).

118.    During the November 30, 2021, meeting, Dr. Eikermann told Plaintiff that he would support him and that Plaintiff can go to him with issues.  Pl. Dep. 187:11-14; and Eikermann Decl. ¶26.

119.    Dr. Eikermann also explained to Plaintiff that he did not stay in the chain of commands when he reported Dr. Nevandusky to the Chief of Human Resources.  While, Plaintiff can report someone to HR, when it comes to a specific medical issue he should go through Dr. Eikermann, which was confirmed by Mr. Felder.  Anthony Decl. Exs. RR (audio); and SS (Goldstein Recording TR000001-TR000050 at pp. 23: 24; 24:1-12; 25:2-4).

120.    Mr. Felder further explained to Plaintiff that there are "absolutely" times to go to HR.  Pl. Dep. 188: 8-13 and Anthony Decl. Exs. RR (audio); and SS (Goldstein Recording TR000001-TR000050 at p. 28:13-18).

121.    After the November 30, 2021 meeting, Plaintiff emailed Dr. Eikermann, copying Dr. Straker and Mr. Felder stating "I will gladly complete the courses you suggested. Furthermore I appreciate that you offered to provide some direct tips as necessary to help me move forward and upward." Anthony Decl. Ex. UU (D007857).

122.    Following the November 30, 2021 meeting, Plaintiff and Dr. Eikermann communicated regularly via email, telephone and in person.   *See e.g.* Anthony Decl. Exs. VV (D007015-D007018);  WW  (D007123-D007124);  XX  (D007173-D007174);  YY  (D007252-D007253); and Eikermann Decl. ¶27.

123.    Plaintiff made an effort to take the requisite courses, even seeking out courses on his own, and Dr. Eikermann continued to express his support stating "we are committed to helping you develop your full professional potential in our Department." Anthony Decl. Ex. VV (D007015-D007018).

124.    On January 2, 2022, Plaintiff emailed Dr. Straker advising her of a recent success in the operating room and that Dr. Eikermann acknowledged it as well.  Anthony Decl. Ex. ZZ (D008173-D008174).

125.    Dr. Straker responded letting Plaintiff know that Dr Eikermann had sent this to the Executive Committee. *Id.*

126.    On February 1, 2022, over two months after the November meeting, Dr. Goldstein provided Dr. Eikermann a written response to the FPPE.  Anthony Decl. AAA (D000516-D000518).

127.    Plaintiff's written response focused on how his use of non-clinical time benefited Montefiore and why there was no conflict of issue with him being the CEO of his company.  *Id.*

128.    He also referenced "the good conversation" he had with Eikermann on January 19, 2022 and the positive feedback he received from Grand Rounds which he delivered after receipt of the FPPE, undermining his allegation that Dr. Eikermann prevented him from speaking during grand rounds as alleged in his Complaint paragraph 37(h).  *Id.* and Pl. Dep. 206:8-16.

129.    Nowhere in his written response does Plaintiff discuss his problems dealing with others or accepting feedback.  Anthony Decl. AAA (D000516-D000518).

**Goldstein Resigns**

130.    On February 13, 2022, Plaintiff provided Dr. Eikermann with his notice of resignation effective April 13, 2022.  Anthony Decl. BBB (D000507);  and Eikermann Decl. ¶28.

131.    When Dr. Eikermann inquired as to Dr. Goldstein's plans after Montefiore, he mentioned he had a few job opportunities, including one in Florida, but had not made any decisions.  Eikermann Decl. ¶29.

132.     Dr. Eikermann never advised Plaintiff that he was searching for a basis to terminate his employment, as alleged in his Complaint.  Complaint at ¶ 37(g); Pl. Dep., 245:16-18; and Eikermann Decl. ¶30.


Dated: September 25, 2024
        New York, New York

/s/  *William J. Anthony*
William J. Anthony
Melissa Friedland
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY  10022.3298
212.583.9600

*Attorneys for Defendants*