UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHELDON GOLDSTEIN,

               Plaintiff,

        -against-

MONTEFIORE MEDICAL CENTER and
MATTHIAS EIKERMANN,

               Defendants.

Case No. 22-cv-06723

**PLAINTIFF'S COUNTER-STATEMENT TO DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

      Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Plaintiff Sheldon Goldstein ("Plaintiff" or "Dr. Goldstein") submits Plaintiff's Counter-Statement to Defendants'[1] Rule 56.1 Statement of Undisputed Material Facts. ("Plaintiff's Counter-Statement"). Following his Preliminary Statement, as indicated below, Plaintiff admits and denies the following material facts submitted by Defendants and denies that the cited material facts are not in dispute. Plaintiff's Statement of Additional Material Facts follows thereafter.[2]

**Preliminary Statement to Plaintiff's Counter-Statement**

      Starting in 2013, Plaintiff was a board-certified anesthesiologist in good standing at Montefiore. In fact, in 2020, Dr. Goldstein was considered well-qualified for and close to promotion from Associate Professor to Professor. Glatter Decl. Ex1[3] (D000931-D000951 at D000931-D00932 and D000951-D000952). This trend continued on March 9, 2021 when Plaintiff received the signed Biennial Medical Staff Member/Provider Evaluation rating him "excellent" in all categories, including appearance/professional demeanor, interpersonal relations, and professional ethics/integrity. Glatter Decl. Ex. 2 (D000071-

---

[1] Defendants are Montefiore Medical Center ("Montefiore") and Matthias Eikermann ("Dr. Eikermann") (collectively referred herein as "Defendants").

[2] Through page 46 of this document, double-spaced references numbered 1-132 are Defendants' Rule 56.1 Statement of Undisputed Material Facts, and all single-spaced, indented paragraphs are Plaintiff's Responses thereto ("Plaintiff's Response Nos. __"). Plaintiff's Statement of Additional Material Facts ("Plaintiff's Material Fact __") begins on page 47 of this document.

[3] "Glatter Decl. Ex. __" refers to Exhibits attached to the Declaration of Denise Rubin Glatter, sworn to November 1, 2024. "Goldstein Decl. ¶__" refers to the Declaration of Dr. Sheldon Goldstein, sworn to November 1, 2024.

D000075).

This all changed on April 19, 2021 when Plaintiff requested a medically required reasonable accommodation due to a disability such that he could no longer take overnight call. Rather than simply limiting their discussion to addressing necessary schedule changes, within the hours and days following Plaintiff's request for an accommodation, Defendants immediately marshalled every conceivable issue or whisper of an issue they ever had or perceived with Plaintiff. *See* Plaintiff's Response No. 82, *infra*, and Glatter Decl. Ex. 3 (D003912-D003934); Plaintiff's Material Facts 23-31. It was through this effort, just four days into his new tenure as Chairman of the Anesthesiology Department, that Defendants "introduced" Plaintiff to Dr. Eikermann.

Notwithstanding no intervening events, Dr. Goldstein's April 19, 2021 reasonable accommodation request and renewal of that request on July 1, 2021, initiated a series of actions such that at the end of July 2021 Defendants engaged in the highly irregular step—within weeks of his second reasonable accommodation request—of failing to even submit Plaintiff for promotion. *See* Plaintiff's Response Nos. 89, 96; Plaintiff's Material Facts 39-41. Instead of considering him for promotion, also at the end of July 2021, Defendants initiated a performance improvement plan (defined within as an "FPPE"). *See* Plaintiff's Response Nos. 87, 88. Rather than issuing the FPPE to promptly remedy any performance matters, Defendants instead held the FPPE *for four (4) months* seemingly waiting for the right "opportunity" to issue it. *See* Plaintiff's Response Nos. 87, 88. Plaintiff's Material Facts 35-38.

In so doing, Defendants contrived and amplified minor matters into purported performance issues, and identified issues of which there was no mention in connection with denial of his 2020 promotion or his stellar March 9, 2021 Biennial Medical Staff Member/Provider Evaluation. Glatter Decl. Ex. 1 D000931-D000951 at D000931-D00932 and D000951-D000952); Glatter Decl. Ex. 4 (D002589-D002590); Glatter Decl. Ex 2 (D000071-D000075); Plaintiff's Material Facts 42-51. Without any supporting documentation, Defendants falsely challenged Plaintiff's use of non-clinical days over more than *eight* years and baselessly suggested he had used that time for the benefit of his own company. *See* Plaintiff's Response No. 97; Plaintiff's Material Fact 42. Defendants challenged Plaintiff's professionalism and how he responded to feedback. *See* Plaintiff's Response No. 98; Plaintiff's Material Fact 42. Defendants elevated a previously resolved January 8, 2021 incident in which HR said Plaintiff "could have spoken more nicely" to suggest a "pattern of inappropriate communication and unprofessional behavior." *See* Plaintiff's Response Nos. 47 and 98; Plaintiff's Material Fact 42. Likewise, Defendants bootstrapped a November 1, 2021 event, which was never fully-investigated, as the springboard for issuing the FPPE against Plaintiff. *See* Plaintiff's Response Nos. 104 and 105; Plaintiff Material Fact 42.

In addition to the genuine disputes of material fact created by the foregoing, there is also a material issue of fact regarding which version of the FPPE was actually issued to Plaintiff. *See* Plaintiff's Response No. 114; Plaintiff Material Facts 52-55. This is a critical issue because the date referenced in the FPPE for follow up with Plaintiff led Plaintiff to believe he would be terminated on or before April 15, 2021. The mountain of contrived criticisms

against Plaintiff which emerged following Plaintiff's request for reasonable accommodation due to disability were retaliatory, rendered his situation unbearable, and, for the many reasons detailed *supra*, effected a constructive discharge against Plaintiff because he believed he faced inevitable, involuntary "for cause" termination. *See* Plaintiff's Material Facts 42-51, 56-61. Accordingly, he voluntarily resigned his employment with Montefiore on February 13, 2022 to avoid further damage to his career from an involuntary "for cause" termination of his employment. For these reasons, and other detailed herein, there are disputed material issues of fact precluding summary judgment.

**Background.**

1.      Montefiore, which is located in the Bronx, New York, is a comprehensive non-profit medical center and healthcare management company. Montefiore is comprised of several hospitals, a network of neighborhood health centers, a range of ambulatory specialty services, home health care, and rehabilitation centers. *See* Declaration of Dr. Matthias Eikermann, sworn to on September 23, 2024 ("Eikermann Decl.") ¶6.[4]

**Plaintiff's Response to No. 1:** Admit.

2.      Montefiore maintains non-discrimination and anti-harassment policies, which include methods to report incidents of discrimination and harassment. *See* Anthony Decl. Ex. E. (P000104-P000110).

**Plaintiff's Response to No. 2:** Admit.

3.      Montefiore also maintains a Non-Discrimination Against and Accommodation of Individuals with Disabilities Policy which sets forth the procedure for requesting an accommodation and states that Montefiore will provide reasonable accommodations, provided the

---

[4] Unless otherwise specified as "Glatter Decl. Ex. __" or "Goldstein Decl. Ex. __", exhibit references are the same as those identified by Defendants as "Anthony Decl. Ex. __." Accordingly, references to "Pl. Dep. xxx" refer to the transcript of Plaintiff's deposition taken on May 17, 2023 and August 29, 2023 and attached as Exhibit A to the Declaration of William Anthony, sworn to on September 25, 2024 ("Anthony Decl."); "Eikermann Dep. xxx" refers to the transcripts of Dr. Matthias Eikermann's deposition taken on January 11, 2024 and February 12, 2024 and attached as Anthony Decl. Exhibit B; "Leff Dep. xxx" refers to the transcript of Dr. Jonathan Leff's deposition taken on February 15, 2024 and attached as Anthony Decl. Exhibit C.

accommodation does not constitute an undue hardship or pose a threat to the health and safety of the individual or others in the workplace. *See* Anthony Decl. Ex. F (D000661-D000662).

> **Plaintiff's Response to No. 3:** Admit, but clarify to add that the policy states:
>
> "If the accommodation requested by the Associate: is related to the Associate's disability; the need for the accommodation is documented, where appropriate; the accommodation meets the requested need; the accommodation does not require the elimination of an essential function of the Associate's job; the accommodation enables the Associate to perform the essential functions of the job; the accommodation does not pose a direct threat to the Associate or others; and the accommodation does not cause an undue hardship on the conduct of Montefiore's business, Montefiore will grant the requested accommodation or an alternative accommodation that enables the Associate to perform the essential functions of the Associate's job. *See* Anthony Decl. Ex. F at D000662.

4.     As per the Non-Discrimination Against and Accommodation of Individuals with Disabilities Policy, individuals who require an accommodation should contact Employee and Labor Relations, Occupational Health Services (OHS) to request an accommodation. *Id.*

> **Plaintiff's Response to No. 4:** Admit, but clarify to add that, per Montefiore policy, an individual who requires an accommodation may also contact a supervisor, or recruiter. *See* Anthony Decl. Ex. F at D000662.

## Montefiore Hires Plaintiff

5.     On September 30, 2013, Elise Delphin, former Chair of the Department of Anesthesiology, hired Dr. Sheldon Goldstein ("Plaintiff" or "Dr. Goldstein") and he began working as a full-time salaried attending physician in the Department of Anesthesiology. *See* Pl. Dep. 50:5-7 and Anthony Decl. Ex. G (D000328-D000331).

> **Plaintiff's Response to No. 5:** Admit inasmuch as it accurately reflects the language contained in Plaintiff's offer letter.

6.     As per Plaintiff's offer letter, Montefiore recommended to the Dean of the Albert Einstein College of Medicine ("Einstein") that he be appointed to the faculty with the rank of Professor in the Department of Anesthesiology. *See Id*.

> **Plaintiff's Response to No. 6:** Admit.

7.    At the time of Plaintiff's hire, and during his employment, Plaintiff was the CEO for Coagulation Sciences, LLC, an independent, non-Montefiore company he formed for the purpose of developing a new type of blood testing device.  Pl. Dep. 51:19-52:18.

**Plaintiff's Response to No. 7:** Admit and further state that Montefiore was aware of his position with and interest in Coagulation Sciences, LLC, as reflected in his 2013 offer letter Glatter Decl. Ex. 5 (D007838-D007853 at D007841).

Plaintiff regularly updated Montefiore about his activities and any work for Coagulation Sciences, LLC that was performed at Montefiore was subject to regular review by Montefiore's Internal Review Board ("IRB").  *See* Goldstein Decl. ¶¶ 23-31. *See also* Glatter Decl. Ex. 5 (D007838-D007853 at D007844-D007851), bearing the relevant IRB approval number and date in the upper right corner.

8.    Shortly after Plaintiff began his employment, Dr. Delphin provided Plaintiff a certain amount of non-clinical time per month, which varied from one day a month to three or four days per month, but "over the eight and half years", he averaged one day a month.  Pl. Dep. 55:20-25; 56:20-57:4.

**Plaintiff's Response to No. 8:** Admit, but clarify that Plaintiff's non-clinical time was decreased in 2020.  Pl. Dep. 57:17-20.

9.    In 2020, Dr. Delphin took away Plaintiff's non-clinical time because Plaintiff needed to be "more productive." Pl. Dep. 57:17-22; 58:8-10.

**Plaintiff's Response to No. 9:** Deny, inasmuch as Plaintiff cannot know precisely why Dr. Delphin took away non-clinical time from Plaintiff, except admit that, according to Dr. Straker speculated that this was the reason why.

10.    Dr. Tracey Straker, Division Director of the General Anesthesia Department was Plaintiff's direct supervisor since July of 2015.  Pl. Dep. 58:3-7;  Declaration of Tracey Straker, dated September 23, 2024 ("Straker Decl.") ¶6.

**Plaintiff's Response to No. 10:** Admit.

**Promotion Process.**

11.    Einstein has processes and procedures for individuals seeking a promotion to Professor on the Clinical Educator Track.  Pl. Dep. 82:11-25; 83:2-13; Leff. Dep. 57:15-22; 71:23-72:8; and Anthony Decl. Ex. H (D000677-D000708).

**Plaintiff's Response to No. 11:** Admit.

12.    The Chair of the Committee for Academic Promotions ("CAP") was (and is) Dr. Jonathan Leff, Professor, Vice Chair of Professional Affairs, Chief of Cardiac Anesthesiology, Co-Director of the Cardiovascular Center at Montefiore.  Leff Dep. 34:4-17.

**Plaintiff's Response to No. 12:** Deny.

Dr. Leff's testifies that "I'm the vice chair of professional affairs. I'm the chief of cardiac anesthesiology. And I have a hospital appointment as codirector of the Cardiovascular Center at Montefiore." The cited testimony does not reference the Chair of CAP position. Leff Dep. 34:4-17

13.    In early July of any given year, Dr. Leff, or his administrator, sends an email to the Anesthesia Department regarding the senior promotion process and the deadline for the submission of materials.  Pl. Dep. 84:5-13; Leff Dep. 58:3-59:14.

**Plaintiff's Response to No. 13:** Deny.

Testimony is that an email is sent, but not when.  Reference to July is, "At the time it's usually around that July timeline, give or take, early July, that we'll be starting to look for people who want to be considered for senior promotion. We set a date for them to turn it into the department and that's usually towards the end of July, beginning of August, around that time."  Leff Dep. 58:4-17.

14.    Applicants are encouraged to submit a CV and teaching portfolio.  Leff Dep. 58:14-18; and Anthony Decl. Ex. H (D000677-D000708).

**Plaintiff's Response to No. 14:** Admit.

15.    Montefiore also recommends applicants meet with Dr. Penny Grossman, Senior Project Coordinator, Associate Professor, Departments of Family & Social Medicine and

Pediatrics, for assistance with preparation of application materials. Pl. Dep. 97:13-98:5. Dr. Grossman was (and is) not a member of the CAP. Pl. Dep. 97:13-16.

**Plaintiff's Response to No. 15:** Admit.

16.    All associate professors and professors are generally invited to serve on the CAP. Leff Dep. 96:16-25.

**Plaintiff's Response to No. 16:** Admit, but clarify that not all associate professors and/or professors serve on the CAP. Leff Dep. 96:21-97:1.

17.    Once the members of the CAP are finalized, Dr. Leff provides them with relevant materials regarding the process (such as Moving Up At Einstein, a faculty guide to preparing for promotion with the Checklist), along with all the applicants' submissions. Leff Dep. 98:16-99:23.

**Plaintiff's Response to No. 17:** Admit.

18.    Dr. Leff also assigns a primary reviewer for each applicant. The primary reviewer is responsible for presenting their candidate at the CAP committee meeting with recommendations. Leff Dep. 98:16-99:23.

**Plaintiff's Response to No. 18:** Admit.

19.    A meeting is then held where the CAP discusses the submissions and decides which individuals should be presented for promotion to the Einstein Office of Academic Appointments. Leff Dep. 51:6-21.

**Plaintiff's Response to No. 19:** Deny.

The cited testimony only states that an applicant's materials are submitted to a committee. There is no reference to a meeting in the cited testimony.

20.    The CAP uses the clinical educator checklist as a guide for evaluating a candidate for promotion. Leff Dep. 73:5-18.

**Plaintiff's Response to No. 20:** Admit.

21.    The individual also needs a letter of support from the Chair. Leff Dep. 55:23-56:2.

**Plaintiff's Response to No. 21:** Deny.

Contrary to this assertion, the referenced testimony actually says that "[t]here is no policy on it."

22. Applications for promotions are submitted to Einstein once a year in mid-October. Leff

Dep. 52:12-16.

**Plaintiff's Response to No. 22:** Admit, except clarify that the mid-October timeline only applies to existing Montefiore physicians.

Physicians or faculty members who start during the year might be subjected to different timing. Leff Dep. 52:12-16.

**Plaintiff Application for Promotions in 2020**

23.    In 2020, Plaintiff submitted an application for promotion from Associate Professor

to Professor on the Clinician Educator Track. Pl. Dep. 81:16-82:3 and Anthony Decl. Ex. I

(P00005-P00046).

**Plaintiff's Response to No. 23:** Admit.

24.    Dr. Grossman reviewed Plaintiff's promotion materials prior to his submission. Pl.

Dep. 22-25; 96:4-6 and Anthony Decl. Ex. J (D008029-D008032).

**Plaintiff's Response to No. 24:** Deny.

Cited testimony and exhibit suggests that Dr. Grossman reviewed Plaintiff's promotion materials after his submission in 2020 and before his submission in 2021. Pl. Dep. 96:4-6; Anthony Decl. Ex. J D008029-32.

25.    In 2020, the members of the CAP were: Dr. David Adams, Dr. Delphin, Dr. Karina

Gritsenko, Dr. Vilma Joseph, Dr. Galina Leyvi, Dr. Marina Moguilevitch, Dr. Irene Osborn, Dr.

Sujatha Rachachandran, Dr. Shamantha Reddy, Dr. Naum Shaparin, Dr. Straker and Samantha

Rawana. Anthony Decl. Ex. K (D000931-D000932).

**Plaintiff's Response to No. 25:** Admit, but the cited exhibit reflects attendees at a meeting. It does not indicate membership.

26.     Naum Shaparin was assigned to present Plaintiff to the CAP. Leff. Dep. 124:124:4-8; and Anthony Decl. Exs. K (D000931-D000932); and L (D008258-D008259).

**Plaintiff's Response to No. 26:** Admit.

27.     At the CAP meeting, Dr. Shaparin recommended that Plaintiff not be submitted for promotion, which was ***unanimously*** supported by the CAP, and "blocked" by Dr. Delphin, the Chair of the Department, as per Plaintiff.   Pl. Dep. 85:19-22; Leff. Dep. 124:4-9; 126:21-23 and Anthony Decl. Exs. J (D008032); K (D000931-D000932); and L (D008258-D008259).

**Plaintiff's Response to No. 27:** Admit, *but see* Plaintiff's Response to No. 28.

28.     The CAP voiced concerns that "too many of [Plaintiff's] writing submissions are pending review and/or approval and that this CV is not showing enough progression as an academic." Anthony Decl. Ex. K (D000931-D000932).

**Plaintiff's Response to No. 28:** Admit, but add the additional context that, prior to this statement, the CAP also stated, "While Dr. Goldstein technically meets all guidelines, he needs at least 5-6 more recent publications." Anthony Decl. Ex. K (D000931-D000932).

29.     On July 15, 2020, Dr. Leff communicated this decision via email to Dr. Goldstein, copying Dr. Delphin.  Pl.  Dep. 89:16-90:2; and Anthony Decl. Ex. M (D000514-D000515).

**Plaintiff's Response to No. 29:** Admit.

30.     Dr. Leff's July 15, 2020 email acknowledged some of the strengths in Plaintiff's submission, and then set for the following major areas in need of further work:

- The Einstein promotion committee required a minimal [sic] of 10 peer reviewed publications for this promotion.  While reviewing your CV the committee noted that you have 1 publication in the last 10 years.  This will not be sufficient at the level of Professor.  The Einstein Promotions committee looks for academic growth and progress throughout a career and this gap is difficult for the committee to explain.
- Abstracts are much less important at the level of Professor and should be understated or removed.  The committee also noted that none of the abstracts have produced publications.
- The Einstein Promotions Committee will consider your grants, although not a necessary part on the [Clinical Educator Track].  These grants can be beneficial

if they were completed and produced published results.  The large grant for coagulation is potentially an issue since it's listed as a grant funded by a company in which you have a financial role.

- There are too many items listed as "in progress" or "in submission" and "further data analysis", which cannot be kept on the documents.
- You list a number of studies for which you are the primary investigator but very few which have been completed or developed into peer reviewed publications.

Anthony Decl. Ex. M (D000514-D000515).

**Plaintiff's Response to No. 30:** Admit, but state that No. 30 omits the important context that preceded the above-referenced list.

Specifically, the list follows the statement, "[a] few points were identified as areas in need of further work which are outlined below. We look forward to working with you in achieving your academic promotion in the future."

31.    Thereafter, on August 25, 2020, Plaintiff submitted a lengthy email to Dr. Leff requesting that the Promotions Committee reconvene to reconsider its decision.  Pl. Dep. 92:8-11 and Anthony Decl. Ex. M (D000511-D000514).

**Plaintiff's Response to No. 31:** Admit that Dr. Goldstein sent an e-mail to Dr. Leff requesting that the Committee for Academic Promotions reconvene to reconsider its decision.  Otherwise denied.

32.    On that same day, Dr. Leff responded via email that the decision was unanimous and would remain final.  Pl. Dep. 98:13-99:6; and Anthony Decl. Ex. M (D000511).

**Plaintiff's Response to No. 32:** Admit.

33.    Plaintiff never complained or filed a complaint to anyone at Montefiore as a result of his not receiving the promotion in 2020.  Pl. Dep. 100:7-10.

**Plaintiff's Response to No. 33:** Admit.

34.    In 2021, Plaintiff submitted his materials to be considered for a promotion from Associate Professor to Professor on the Clinician Educator Track.  *See* Pl. Dep. 102:7-19; and Anthony Decl. Ex. N (P000047-P000095).

**Plaintiff's Response to No. 34:** Admit.

35.     The CAP never reviewed Plaintiff's 2021 promotion materials.  Pl. Dep. 39: 17-21; Leff. Dep. 176:3-13; 177:2-7; and Eikermann Decl.¶18.

**Plaintiff's Response to No. 35:** Admit.


**Dr. Naum Shaparin Becomes Interim Chair of Anesthesiology Department**

36.     In January 2021, Dr. Naum Shaparin was appointed interim chair upon Dr. Delphin's retirement. Pl. Dep. 110: 4-7; and Leff Dep. 38:3-14.

**Plaintiff's Response to No. 36:** Admit that Dr. Naum Shaparin was appointed interim Chair when Dr. Delphin retired, but note the cited testimony does not specify the date when Dr. Shaparin was appointed.

37.     On January 6, 2021 at 12:08pm, a few days after Dr. Shaparin assumed the position as interim Chair, Plaintiff sent him an email (attaching an email he had sent to prior leadership in March of 2020 to which he never received a response) requesting to deliver two Ground Rounds talks.  Anthony Decl. Ex. O (D003414-D003417).

**Plaintiff's Response to No. 37:** Admit that on January 6, 2021 Dr. Goldstein sent an e-mail to Dr. Shaparin forwarding his prior request to deliver grand rounds talks.

38.     A few hours later, Plaintiff sent Dr. Shaparin another email stating "could you at least be in touch with Jon and try to arrange two Ground Rounds by July? So when I re-apply for promotion I will have more as you suggested?" He further stated, "It may seem a bit unusual to deliver two GR in six months, but note that despite my requests the department has not provided me a GR slot since September 6, 2017." *Id.*

**Plaintiff's Response to No. 38:** Admit.

39.     Thereafter, Plaintiff met with Dr. Shaparin to request non-clinical time, which Dr. Shaparin denied, and as per Plaintiff stated "We're in a pandemic. I have to run the clinical service.

I am not giving non-clinical time." Pl. Dep. 110:8-15; 111:11-25 and Anthony Decl. Ex. P (D007828-D007832).

> **Plaintiff's Response to No. 39:** Admit, but note that the correct citations are Glatter Decl. Ex. 6 (D008025) and Pl. Dep. 114:1-116:17.

40.    On January 20, 2021, after his meeting with Dr. Shaparin, Plaintiff expressed via email to Dr. Straker that he was "angry" that after four publications in a year it is still "no non-clinical time for Goldstein." Pl. Dep. 110:16-111:25 and Anthony Decl. Ex. Q (D008019-D008020).

> **Plaintiff's Response to No. 40:** Admit.

41.    In this same email, Plaintiff also stated to Dr. Straker that he thinks "it best that you work to keep me off overnight call through March schedule. The medical eval should be done early March. If that turns out okay I still plan to push for no overnight call, however I would be willing to concede an occasional M2 at Moses on a Friday. I also feel that makes me a bit more valuable to the dept." Anthony Decl. Ex. Q (D008019-D008020).

> **Plaintiff's Response to No. 41:** Admit, except note that the cited language is incomplete.
>
> Dr. Goldstein goes on to state that the scheduling would "also make[] the making of the schedule easier for Glenn. M2 at Moses can be hard, but it is not overnight (I only had one of those!)."

42.    On March 4, 2021, upon learning that others were receiving non-clinical time, Plaintiff sent an email to Dr. Straker complaining that Dr. Shaparin's refusal to give him non-clinical time was "being done against me with blatant intent." Anthony Decl. Ex. R (D008025).

> **Plaintiff's Response to No. 42:** Admit.

43.    In response to Plaintiff's email, Dr. Straker told him to stop being paranoid and explained the rationale as to why the others received the non-clinical time. *Id.*

> **Plaintiff's Response to No. 43:** Admit.

44.    On April 12, 2021, Plaintiff emailed Dr. Shaparin and Dr. Straker asking whether Dr. Shaparin would petition the promotions committee to allow Plaintiff to submit his application for the 2021 promotion 6 months later than every other applicant in the entire medical school. Anthony Decl. Ex. S (D003646-D003648).

**Plaintiff's Response to No. 44:** Deny, except admit that, in an email on April 12, 2021, Dr. Goldstein requested that Dr. Shaparin write a letter in support of his application for the current AECOM cycle based on meeting—and exceeding—the number of publications required for promotion. But, it was Dr. Shaparin who wrote, "If I am understanding his email correctly, he wants me to petition the dean/promotions committee to allow him to submit his application, 6 months later than ever [sic] other applicant in the entire medical school this cycle, for consideration for 2021 promotion." *See* Anthony Decl. Ex. S at D003646.

45.    In this email, Plaintiff acknowledged that Dr. Delphin and Dr. Adams refused to advance his application in May of 2020. *Id.*

**Plaintiff's Response to No. 45:** Admit.

46.    Dr. Shaparin denied this request stating that Plaintiff would need to re-apply like everyone in the coming months for the 2022 cycle. *Id.*

**Plaintiff's Response to No. 46:** Admit.

**Montefiore Receives Employee Complaints Concerning Dr. Goldstein**

47.    In early January 2021, Montefiore became aware of employee complaints concerning Plaintiff where Plaintiff exhibited a pattern of inappropriate communication and unprofessional behavior. Anthony Decl. Exs. T (D0002937-002943); U (D000650-D000651); and V (D007789-D007790).

**Plaintiff's Response to No. 47:** Deny.

There was *only one incident*, not "a pattern of inappropriate communication and unprofessional behavior" as characterized by Defendants. The MIDAS Report to which Defendants refer in No. 48 below (and cite to the same document as above Anthony Decl. Ex. U D000650-D000651), is a reference to this *same incident*. This is clear from the face of the documents cited by Defendants and Plaintiff will unify these references as the "January 8, 2021 incident." *See* Plaintiff's Material Facts Nos. 14-21, *infra*

13

48.     Montefiore also received a MIDAS report through its anonymous reporting system which detailed Dr. Goldstein's inappropriate language and unprofessional treatment of staff in front of others, including patients. *See* Anthony Decl. Ex. U (D000650-D000651).

**Plaintiff's Response to No. 48:** Deny.

While Plaintiff admits there was a MIDAS report, it pertained to the *same* January 8, 2021 incident report as detailed above in Plaintiff's Response No. 47. Indeed, Defendants cite to the same document Anthony Decl. Ex. U (D000650-D000651). Accordingly, the reference to "Montefiore *also* receiv[ing] a MIDAS report" is intentionally misleading. In short, the MIDAS report was the impetus for the events identified in Plaintiff's Response to No. 47. This is clear because the MIDAS report is dated January 8, 2021. Anthony Decl. Ex. U (D000650-D000651) The January 11 and 12, 2021 statements of other anesthesiologists make clear the MIDAS report was not considered a serious matter. *See* Plaintiff's Material Facts Nos. 14-21, *infra.*

49.     Specifically, when approached by a fourth-year OB GYN resident about a case, Plaintiff stated "This is bullshit" "It's not my problem that your team didn't get the tests done," I am not dealing with this bullshit anymore." It was reported that thereafter, Plaintiff engaged in a loud argument with the attending physician in front of patients where the nursing staff had to tell Plaintiff to take it outside. *Id.*

**Plaintiff's Response to No. 49:** Admit these statements were recounted in the MIDAS report pertaining to the January 8, 2021 incident, but deny there were raised voices or profanity. Goldstein Decl. ¶ 14. As recounted in Plaintiff's Response Nos. 47 and 48, the MIDAS report related to the same January 8, 2021 incident and was the impetus for the events identified in Plaintiff's Response to No. 47. This is clear because the MIDAS report is dated January 8, 2021. Anthony Decl. Ex. U (D000650-D000651). The January 11 and 12, 2021 statements of other anesthesiologists make clear the MIDAS report was not considered a serious matter. Indeed, on or about February 2021, an HR employee called Plaintiff and told him HR concluded, he "could have spoken more nicely to the OB/GYN resident." Goldstein Decl. ¶ 15. He never received any writing from HR or anyone else in connection with the January 8, 2021 incident nor did Defendants ever produce anything in the course of this litigation. Goldstein Decl. ¶ 15.

50.     As a result, in March of 2021, it was recommended by Andrew Felder, Doris Poma and Dr. Shaparin that Plaintiff be sent for coaching. Pl. Dep. 124: 19-21 and Anthony Decl. Exs. W (D003932); and X (D007791-D007797).

14

**Plaintiff's Response to No. 50:** Deny.

There was little additional attention to the January 8, 2021 incident, and it was not the impetus for sending Plaintiff to coaching. This is clear because on March 9, 2021, Plaintiff received a Biennial Medical Staff Member/Provider Evaluation. The evaluation was signed by the Anesthesiology Department Chair, Naum Shaparin, on March 9, 2021, two months *after* the January 8, 2021 incident and rated Plaintiff "excellent" in all categories, including appearance/professional demeanor, interpersonal relations, and professional ethics/integrity. Glatter Decl. Ex. 2 (D000071-D000075)

Further, the only feedback Plaintiff received regarding the January 8, 2021 incident prior to his April 19, 2021 request for reasonable accommodation was, at some point, someone in HR called him and told him he "could have spoken more nicely," Pl. Dep. 122:4-20; *see also* Goldstein Decl. ¶ 15.

Plaintiff's testimony cited by Defendants states simply that Dr. Eikermann referred him to coaching. However, Dr. Eikermann did not start working for Montefiore until April 15, 2021 (Eikermann Decl. ¶ 6), yet January 8, 2021 incident occurred *three months prior* on January 8, 2021. Anthony Decl. Ex. U (D000650-D000651).

From the face of Anthony Decl. Ex. X (D007791-D007797), the reason coaching for Plaintiff's referral to coaching is not apparent. Plaintiff was unable to start the coaching until after May 4 because he was on leave.  Anthony Decl. Ex. X (D007793-D007797).

51.    Plaintiff was unable to start the coaching until after May 4 because he was on

leave.  Anthony Decl. Ex. X (D007793-D007797).

**Plaintiff's Response to No. 51:** Admit that Plaintiff was not available until May 4, but deny that he did not start coaching until May 4 because he was "on leave."

Reference to the complete sequence of emails cited above shows coaching was not presented to him until April 21, 2021 Anthony Decl. Ex. X at D007793-D007797. This was completely contemporaneous with his reasonable accommodation request, as addressed in greater detail in Plaintiff's Response Nos. 82 and 83, *supra*.

**Dr. Goldstein Requests a Reasonable Accommodation Not to Take Overnight Calls and Montefiore Grants the Accommodation**

52.    Plaintiff, like all other general anesthesiologists in his department (including the

Chair) was required to take overnight calls in the hospital.  Pl. Dep. 62:4-8; Eikermann Dep.

161:23-25; Vydynathan Dep. 44:15-19; 106:11-13; 108:20-22; and Straker Decl. ¶12.

**Plaintiff's Response to No. 52:** Admit that general anesthesiologists take overnight calls in the hospital, but deny the cited evidence supports that it is "required."

The cited deposition testimony refers to each of the deponents testifying they take call, and the Straker Declaration simply says they were scheduled for overnight call.

53.    An overnight call "is a call that starts typically at 5 o'clock when other people are supposed to go home and it goes from [5:00pm to 7:00am]. During [that] time … you are supposed to make yourself available to take care of patients who need your help. That might be sometimes in person in the hospital or sometimes from home." Eikermann Dep. 161: 10-18; Straker Decl. ¶12.

**Plaintiff's Response to No. 53:** Admit.

54.    Glenn Mann, the former Director of Scheduling and Director of Pediatric Anesthesia was responsible for making the schedules for the Anesthesiology Department in 2021 and 2022. Straker Decl. ¶8; Pl. Dep. 78:3-5; 211:2-5; and Eikermann Dep. 214:6-8, 214:18-19.

**Plaintiff's Response to No. 54:** Admit.

55.    Work schedules usually came out about a month in advance, or three and a half to five weeks in advance for any given month. Pl. Dep. 62:9-14: 211: 15-18; and Straker Decl. ¶9.

**Plaintiff's Response to No. 55:** Admit.

56.    The Holiday schedule, however, (was) and is assigned the year before via a Lottery System. In August of the preceding year, anesthesiologists are required to rank in order of preference the Holidays they wished to work the following year. By October, the anesthesiologists would then be informed the holidays they were assigned via the Lottery System for the following year. Straker Decl. ¶10; and Pl. Dep. 211:25-212:1.

**Plaintiff's Response to No. 56:** Deny.

Although the holiday schedule is supposed to be assigned as indicated in No. 56, that is not always the case, and Plaintiff received requests much closer to holidays to be on call, as reference to the fuller sequence of his testimony shows. Pl. Dep. 211:25-212:16.

57.    For purposes of the schedule:

- M:Regular day shift at Moses Hospital.

- W: Regular day shift at Weiler Hospital.

- W3: Weiler 3rd call, which meant arrive at 12:00pm and work until Weiler Hospital was down to only using 2 operating rooms for the shift.

- M-moon: Moonlighting shift at Moses Hospital, which meant arrive in the morning before your scheduled afternoon shift.

- VAC: Vacation.

- ABS: Absent.

- M3:Moses 3rd call, which meant arrive in the morning and work until Moses Hospital was down to using 4 operating rooms.

- WORa: In-House call at Weiler Hospital which was from 7:00am to 7:00pm.

- WORp: Night call for Weiler Hospital which is taken at home with a beeper.

- M2 on a weekend: Back up call at home on a weekend for Moses Hospital.

- M2 on a weekday: Regular call during the day at Moses Hospital, which typically meant working from 12pm until Moses Hospital was down to only using 2 operating rooms for the shift.

- MORa: In-House call at Moses Hospital which was from 7:00am to 7:00pm.

Straker Decl. ¶ 13; Eikermann Dep. 189:15-21; and Anthony Decl. Ex. Y (D000817-D000833).

**Plaintiff's Response to No. 57:** Admit, but note that W3 requires the attending physician keep one's phone on until 7:00 am and may require return to Weiler Hospital. M2 Hospital, typically means working from 12:00 pm and keeping one's phone on until 7:00 am the next morning with a return to Moses Hospital more likely than a return to Weiler Hospital on a W3 call. Pl. Dep. 229:3-5; 230:2-21. Goldstein Decl. ¶¶ 19-20.

58.     On April 19, 2021, Dr. Michael Thorpy emailed Dr. Straker and Dr. Eikermann a medical note stating that Plaintiff should not be taking overnight call because his required regular sleep wake patterns for optimal health.  Anthony Decl. Ex. Z (D000767-D000768); and Straker Decl. ¶14.

**Plaintiff's Response to No. 58**: Admit.

17

59.    Plaintiff was informed he would need to go through the official HR accommodation process.  Anthony Decl. Ex. AA (D000772).

**Plaintiff's Response to No. 59:** Deny.

Plaintiff does not recall the exact procedure. Pl. Dep. 209:24-2:10:12

60.    The next day, Dr. Shaparin and Mr. Felder met with Plaintiff who agreed to take his overnight calls scheduled for "tomorrow and Saturday", however he would no longer take overnight call starting in May.  Anthony Decl. Ex. AA (D000771).

**Plaintiff's Response to No. 60:** Admit, but deny that the parties "met" as the face of the cited email refers to speaking with Plaintiff, not meeting with him.

61. Montefiore granted Plaintiff's reasonable accommodation as follows:

Accommodation Detail: Dr Goldstein will fulfill his overnight call obligations in the month of April 2021. Dr Goldstein will not be assigned any overnight call in May or June 2021. If necessary, need for accommodation in subsequent months will be considered in June 2021. In May and June, the number of calls Dr Goldstein will be required to take will not change from normal. In order to fulfill the normal obligatory quantity, Dr. Goldstein will take late calls and daytime weekend calls rather than overnight calls.

*See* Anthony Decl. Ex. BB (P00098-000099); Cmplt.,¶34; Eikermann Dep. 164:15-20; and Straker Decl. ¶15.

**Plaintiff's Response to No. 61:** Admit.

62.    Plaintiff was not required to take overnight calls in May, June or July.  Pl. Dep. 214:10-12.  and Anthony Decl. Ex. Y (D000817-D000833); Straker Decl. ¶17.

**Plaintiff's Response to No. 62:** Admit.

63.    On June 30, 2021, Mr. Felder emailed Plaintiff to see if Montefiore could put him back on overnight call in August.  Anthony Decl. Ex. CC (D005805-D005806).

**Plaintiff's Response to No. 63:** Admit.

64.     The next day Dr. Thorpy sent Dr. Eikermann, Mr. Felder and Dr. Straker another medical notice stating that Plaintiff has chronic, severe obstructive sleep apnea and is on a BiPAP and he should not be taking overnight call.  Anthony Decl. Ex. DD (D000774-D000775); and Straker Decl. ¶18.

**Plaintiff's Response to No. 64:** Admit.

65.     Plaintiff was not scheduled to work overnight calls from July through December of 2021.  Pl. Dep. 216:10-12; Anthony Decl. Ex. Y (D000817-D000833); and Straker Decl. ¶19 .

**Plaintiff's Response to No. 65:** Deny.

Although, Plaintiff testified he was not put on call from July through December of 2021 (Pl. Dep. 216:10-12) mere pages before in the transcript he testified there were previously scheduled holiday calls which had been assigned  in advance, remained assigned, and were never revisited despite his accommodation due to his chronic sleep apnea. Pl. Dep. 214:13-216:14.

66.     In December of 2021, Plaintiff learned he was scheduled to work two overnight calls in January.  Anthony Decl. Exs. EE (D000778-D000780);  FF (D008218-D008219); and Straker Decl. ¶20.

**Plaintiff's Response to No. 66:** Admit and note January 2022 schedule was sent out much later than the usual month in advance. Pl. Dep. 62:9-17.

67.     As a result, on December 28, 2021, Dr. Thorpy submitted another note stating that Plaintiff should not be taking overnight call.  Anthony Decl. Ex. EE (D000779-D000780); and Straker Decl. ¶21 .

**Plaintiff's Response to No. 67:** Admit and further state Dr. Thorpy sent the December 28, 2021 letter because it was medically necessary for Plaintiff not to take overnight call because he "requires a regular sleep-wake pattern" due to "chronic, severe obstructive sleep apnea . . . ."

68.    Plaintiff, however, agreed to cover the two January overnight calls and requested that the Saturday and Sunday daytime formula be instituted starting in February.    Anthony Decl. Ex. EE (D000778-D000779); and Straker Decl. ¶22.

**Plaintiff's Response to No. 68:** Admit.

Clarification is required to explain that Plaintiff only agreed to cover the two January overnight calls because of pressure he felt that he would be terminated following the November 30, 2021 meeting at which Dr. Eikermann (with Mr. Felder present) delivered an FPPE, a Focused Professional Practice Evaluation.[5]  On the heels of the delivery of the FPPE and notwithstanding his documented medical need for reasonable accommodation (as expressed on April 19, 2021 and July 1, 2021, and again on December 28, 2021), Plaintiff felt extreme pressure to work these overnight calls. *See* Goldstein Decl. ¶ 21; Anthony Decl. Ex. Z (D000767-D000768); Anthony Decl. Ex. DD (D000774-D000775); Anthony Decl. Ex. EE (D000779-D000780).

69.    On December 29, 2021, Dr. Straker emailed Plaintiff about the President's Day weekend coverage for which he was assigned M2 coverage for the Saturday through Monday (2/19-2/21) via the Lottery, and asked Plaintiff whether he was able to keep this commitment. Anthony Decl. Exs. EE (D000781-D000782); FF (D008218-D009); and Straker Decl. ¶23.

**Plaintiff's Response to No. 69:** Admit.

Clarification is required to explain that Plaintiff only agreed to cover the two January overnight calls because of extreme pressure he felt to work these overnight calls and his concern that he would be terminated following the November 30, 2021 meeting at which Dr. Eikermann (with Mr. Felder present) delivered the FPPE. On the heels of the delivery of the FPPE and notwithstanding his documented medical need for reasonable accommodation (as expressed on April 19, 2021 and July 1, 2021, and again on December 28, 2021), Plaintiff felt extreme pressure to work these overnight calls. *See* Goldstein Decl. ¶ 45; Glatter Decl. Ex. 16; Anthony Decl. Ex. Z (D000767-D000768); Anthony Decl. Ex. DD (D000774-D000775); Anthony Decl. Ex. EE (D000779-D000780).

70.    Even though Plaintiff was assigned M2 (backup call at home with a beeper) three days in a row, if he was called in as a backup, as per Montefiore protocol, Plaintiff would not have

---

[5] At the November 30, 2021 meeting, Dr. Eikermann refers to this document as a "FFPE," a Focused Faculty Professional Evaluation. *See* Anthony Decl. Ex. SS at 20:5-7.

been allowed to cover in-house for any consecutive days, so at most he would have been required to cover two days, but never two days in a row. Straker Decl. ¶24.

**Plaintiff's Response to No. 70:** Denied.

Straker Decl. at ¶24 does not support this statement. Also, Straker Decl. at ¶24 references D000781-782, which also does not support this statement and makes no reference to limitations upon coverage for two days in a row and refers only to Plaintiff's willingness to provide coverage despite his documented medical need for reasonable accommodation.

71.    Plaintiff responded stating "I understand the situation. I appreciate this was assigned by the lottery in the past, so rest assured I will cover the M2 for the holiday weekend. Anthony Decl. Ex. EE (D000781-D000782); and Straker Decl. ¶24.

**Plaintiff's Response to No. 71:** Admit.

Clarification is required to explain that Plaintiff only agreed to cover the two January overnight calls because of pressure he felt and his concern that he would be terminated following the November 30, 2021 meeting at which Dr. Eikermann (with Mr. Felder present) delivered the FPPE. On the heels of the delivery of the FPPE and notwithstanding his need for reasonable accommodation (as expressed on April 19, 2021 and July 1, 2021, and again on December 28, 2021), Plaintiff felt the need to accept these overnight calls. *See* Goldstein Decl. ¶ 45; Glatter Decl. ex. 16; Anthony Decl. Ex. Z (D000767-D000768); Anthony Decl. Ex. DD (D000774-D000775); Anthony Decl. Ex. EE (D000779-D000780).

**Dr. Eikermann Becomes Chair of the Anesthesiology Department**

72.    On April 15, 2021, Dr. Eikermann became the Chair of the Anesthesiology Department. Eikermann Dep. 44:14-25; and Eikermann Decl. ¶6.

**Plaintiff's Response to No. 72:** Admit.

73.    On April 12, 2021, prior to Dr. Eikermann's first day, Plaintiff emailed Dr. Straker asking if she would discuss the following with Dr. Eikermann prior to Plaintiff's meeting with him on April 28th: (1) putting Plaintiff forth for promotion to Full Professor; (2) giving Plaintiff "consistent and substantial" non-clinical time; (3) Plaintiff's health issue that impacts on call. Pl. Dep. 129: 4-23; and Anthony Decl. Ex. P (D007828-D007832).

**Plaintiff's Response to No. 73:** Admit.

74.    Plaintiff attached "background" to his April 12, 2021 email stating that he did not intend to complain to [Eikermann] about the past, well, at least not a lot", further stating that he "is pretty sure [his] loss of non-clinical time was just after the orthopedic injury [he] sustained, when the mattress flipped up and threw [him] against the chair." Anthony Decl. Ex. P (D007828-7832).

**Plaintiff's Response to No. 74:** Admit.

75.    On April 28, 2021, the morning of Plaintiff's meeting with Dr. Eikermann, Plaintiff sent an email to Dr. Grossman stating:

> I hope you can convince Dr. Eikermann to put me forward in this cycle. The grossly unfair preferences for certain people should be in the past, gone with the last chair. If I am not treated fairly by this Chair, I am prepared. My NJ license is reactivated, my Florida license just came through, and a chair I know quite well just invited me to apply for Vice Chair at his program.

*See* Anthony Decl. Ex. J (D008029-D008032).

**Plaintiff's Response to No. 75:** Admit.

76.    On April 28, 2021, Dr. Eikermann had his first meeting with Dr. Goldstein. At this meeting, Dr. Goldstein was "direct" and requested the following: (1) a promotion from Associate Professor to Professor on the Clinician Educator Track; (2) non-clinical time; (3) appointment to the Vice Chair of Faculty Development (the position which was held by Dr. Leff); and (4) reinstatement of an employee who was taken off leadership by Dr. Delphin. Anthony Decl. Ex. GG (D005100); and Eikermann Decl.¶8.

**Plaintiff's Response to No. 76:** Admit.

77.    Dr. Eikermann listened to Dr. Goldstein's requests, and advised Dr. Goldstein that he would look into them, discuss with other members of the Executive Team and get back to him. Eikermann Decl.¶10.

**Plaintiff's Response to No. 77:** Admit.

78.    At that time the members of the Executive Team were: Dr. Eikermann, Tracey Straker, Jonathan Leff, Andrew Felder, Naum Shaparin and Sujatha Ramachandran, Vice Chair for Education and Residency Program Director, Associate Professor of Anesthesiology. Eikermann Dep. 349:8-16; and Eikermann Decl. ¶11.

**Plaintiff's Response to No. 78:** Admit.

79.    After Plaintiff's meeting with Dr. Eikermann, he sent an email to Dr. Grossman advising her that Dr. Eikermann plans to discuss his promotion with the current vice chair.  He further stated "[t]he Vice chair and others in the dept. routinely insist on very strict criteria for people who are not in the club."   *See* Anthony Decl. Ex. J  (D008029).

**Plaintiff's Response to No. 79:** Admit that the cited document provides Plaintiff's impression of his April 28, 2021 meeting with Dr. Eikermann at that time, but deny that Plaintiff's impression reflected Dr. Eikermann's actual plans to discuss Plaintiff's promotion.

80.    During his deposition, Plaintiff testified that what he meant by "in the club" were "people who were from Columbia got preferences. People who were from Cornell got preferences" and "some preference was given to minorities and to women."  Pl. Dep. 150:14-151:14.

**Plaintiff's Response to No. 80:** Admit.

81.    On May 16, 2021, Plaintiff emailed Dr. Straker to advise her that his "grand rounds were a big hit."  Anthony Decl. Ex. HH (D005601).

**Plaintiff's Response to No. 81:** Deny.

The cited email actually states, "I will say my Grand Rounds *seems* to have been a *bit* hit." (emphasis added).

23

82.     During Dr. Eikermann's meetings with the Executive Committee, Dr. Eikermann learned the reasons why Dr. Goldstein did not receive the promotion in 2020 and why Dr. Delphin took away his non-clinical time.  He also learned about Dr. Goldstein's other company, and that Montefiore believed Dr. Goldstein was using non-clinical time to help further this company, as opposed to using his non-clinical time for the benefit of Montefiore.  Eikermann Decl. ¶12.

**Plaintiff's Response to No. 82:** Deny.

When Dr. Eikermann met with Plaintiff on April 28, 2021, Montefiore had already shared a lot of information with Dr. Eikermann about Plaintiff. While Paragraph 82 does not mention the dates on which Dr. Eikermann met with the Executive Committee or when he learned the contents of this statement, this is a highly important omission.

Multiple documents support Dr. Eikermann learning information about Plaintiff immediately after *and because* Plaintiff made a request for reasonable accommodation on April 19, 2021.[6] *See* Anthony Decl. Ex. Z (D000767-D000768).

Critically, instead of Defendants limiting their discussion to how to reasonably accommodate Plaintiff's request and discussion of necessary schedule changes due to Plaintiff's inability to take overnight call, Plaintiff's request **immediately** set off a series of discriminatory actions by Defendants (including Dr. Eikermann) against Plaintiff and caused Defendants to marshal every whisper of an issue they ever had with Plaintiff. Glatter Decl. Ex. 3 (D003912-D003934). This response to Plaintiff's request for a reasonable accommodation initiated the process through which—notwithstanding the absence of any new facts or events—the Defendants refused to submit Plaintiff for consideration for promotion in July 2021, initiated preparation of an FPPE in July 2021, and resulted in issuance of the FPPE on November 30, 2021, all of which creates material issues of fact regarding Plaintiff's subjection to discriminatory and retaliatory treatment following his reasonable accommodation request, including what Dr. Eikermann contemporaneously "learned" about Plaintiff from the Executive Committee. *See* Plaintiff's Material Facts 23-51.

Further the suggestion in No. 82 that Plaintiff's non-clinical time was taken away because he was using non-clinical time to help further his company, as opposed to using his non-clinical time for the benefit of Montefiore, is not borne out by the facts. *See* Plaintiff's Material Facts 2-8; Goldstein Decl. ¶ 23-31. Plus, Defendants' own No. 39 above explained the reason for taking away non-clinical time was related to the pandemic. Glatter Decl. Ex. 6 (D008025) and Pl. Dep. 114:1-116:17. The conflicting explanations Defendants provide

---

[6] Paragraph 8 of Dr. Eikermann's Declaration refers to his first meeting with Plaintiff occurring on April 28, 2021, and Paragraph 12 of the Eikermann Declaration states, *"Thereafter,* I learned the reasons why Dr. Goldstein did not receive a promotion in 2020 . . . ." Eikermann Decl. ¶12. This is misleading for the reasons detailed in Plaintiff's Response No. 82.

in Nos. 39 and 82 alone create a material issue of fact regarding why Defendants denied Plaintiff non-clinical time.

*See also* Plaintiff's Response No. 97, *infra*, inclusive of Dr. Eikermann's own statements which are dismissive of any concerns about the number of non-clinical days given to Plaintiff.

83.    Dr. Eikermann also learned about the prior complaints concerning Dr. Goldstein and that Dr. Goldstein was scheduled to receive formal coaching from Nancy Jacoby, an outside coach.    Anthony Decl. Ex. II (D008529-D008530); and  Eikermann Decl.¶13.

**Plaintiff's Response to No. 83:** Deny.

Anthony Decl. Ex. II (D008529-D008530) states only that Nancy Jacoby will be the coach for Dr. Goldstein and does not mention formal coaching.   Eikermann Decl.¶13 states that Dr. Eikermann was told about prior complaints but does not state who told Dr. Eikermann about the prior complaints or what he was told. Plaintiff's Response No. 82 details what "Dr. Eikermann learned about prior complaints concerning [Plaintiff]" following Plaintiff's April 19, 2021 request for reasonable accommodation based on disability and identifies material issues of fact regarding Plaintiff's subjection to discriminatory treatment following his reasonable accommodation request.

84.    Dr. Goldstein received two coaching sessions.  Pl. Dep. 346: 17-19.

**Plaintiff's Response to No. 84:** Admit.

85.    Dr. Eikermann discontinued Plaintiff's coaching sessions after Plaintiff's coach indicated that she believed the coaching would not be successful. Eikermann Dep. 298:19-300:16.

**Plaintiff's Response to No. 85:** Deny.

Plaintiff testified in Pl. Dep. 346: 17-19 that Dr. Eikermann cancelled the coaching sessions with no explanation but admit that Dr. Eikermann claims Nancy Jacoby indicated she did not think the coaching would be successful. In cancelling Plaintiff's professional and leadership coaching after only two sessions, Dr. Eikermann wrote on June 25, 2021, "As a consequence of recent events, and in consideration of the available career development resources in the Department, we have decided to put this engagement on hold. . . . Glatter Decl. Ex. 7 (D008529-D008544 at D008541). Plaintiff does not know to what "recent events" refers in the email. Goldstein Decl. ¶ 33.

86.    On June 2, 2021, Dr. Eikermann sent an email to Plaintiff, copying the Executive Committee, attaching a letter written by a patient complimenting the outstanding services provided

by Plaintiff. In this email, Dr. Eikermann states "Sheldon, I am very grateful for your excellent skills, dedication to detail, and human interactions you had with this patient." Anthony Decl. Ex. JJ (D008037).

**Plaintiff's Response to No. 86:** Admit.

87.    At the end of July through the beginning of September 2021, as a result of the receipt of employee complaints discussed above, repeated concerns about his attitude and communication style, his defensive behavior and lack of productivity, Dr. Eikermann began discussing with Dr. Leff, Mr. Felder, Ms. Poma, Dr. Straker, and Montefiore's Legal Department issuing Dr. Goldstein a Focused Professional Practice Evaluation ("FPPE"). Anthony Decl. Ex. KK (D006037-D006039); and Eikermann Decl. ¶16

**Plaintiff's Response to No. 87:** Deny.

An email chain from July 30, 2021 through August 2, 2021 among HR's Doris Poma, Dr. Eikermann and Dr. Leff reflects that Doris Poma forwarded Dr. Eikermann a template for the FPPE on July 30, 2021 and that Dr. Eikermann tasked Dr. Leff with completing the first draft of the FPPE by August 3, 2021. Glatter Decl. Ex. 8 (D006035-D006039).

There is no mention in this email chain about the reason for the FPPE. In fact, when placed into context, other than the now 7-month old January 8, 2021 incident, there were no other intervening complaints of any type. Instead, Defendants' preparation to place Plaintiff on an FPPE continued the pattern of creating a laundry list of old "issues" with Plaintiff in an effort to find a reason to subject him to adverse employment actions. This started on April 19, 2021, immediately following and in response to Plaintiff's reasonable accommodation request. *See* Plaintiff's Response No. 82 and Plaintiff's Material Facts Nos. 23-51.

To underscore the significance of initiating the FPPE process at the end of July 2021, on July 1, 2021, Plaintiff reiterated his reasonable accommodation request that he should not be assigned overnight call (based on medical necessity and documented disability) with a new letter from his physician, Dr. Thorpy. Anthony Decl. Ex. DD (D000774-D000775). Within three weeks of this renewed reasonable accommodation request, on July 23, 2021, about a week before the 2021 Department promotion committee meeting, Dr. Leff sent an email to Dr. Eikermann entitled, "promotions committee," and wrote, "Also, attached is Sheldon Goldstein's CV and TP … We can discuss how to proceed (or not) whatever you want." Glatter Decl. Ex. 9(D005981-D006030 at D005981).

Just a week after Dr. Leff's July 23, 2021 email suggesting Plaintiff's promotion request would not be considered, a July 30, 2021 email shows that Doris Poma forwarded Dr.

Eikermann a template for the FPPE on July 30, 2021 and that Dr. Eikermann tasked Dr. Leff with completing the first draft of the FPPE by August 3, 2021.  Glatter Decl. Ex. 8 (D006035-D006039).

Other than vaguely referring to the same events as were raised following Plaintiff's April 19, 2021 request for reasonable accommodation, no intervening events—beyond Plaintiff's renewed July 1, 2021 request for reasonable accommodation—occurred. This point is further emphasized by Dr. Eikermann's deposition testimony in which he could not identify any complaints prior to September 10, 2021, claimed there were many complaints about Plaintiff, including his communication style, but Defendants never produced documents to support such complaints other than the January 8, 2021 incident and a later November 1, 2021 incident. (Anthony Decl. Ex. Eikermann Depo. 351:4-367:6), which is discussed *infra*.

Similarly, Dr. Leff, when asked about the basis for the FPPE, testified, "Yeah, all I know is there was an HR, something that got elevated, an operating room issue, with one of the surgeons. I believe it was an obstetrician – I'm sorry a gynecological case, and there were some questions about professionalism and behavior in that setting that did get brought up." (Leff Depo. 181:20-183:21). Dr. Leff's vagueness is surprising given that Dr. Eikermann assigned Dr. Leff the task of drafting the FPPE. Further, on July 30, 2021, Dr. Leff asked, "Ok… As you stated, we will need the list of clinical and behavioral complaints from HR?" Glatter Decl. Ex. 8 (D006035-D006039 at D006038).

In the end Dr. Eikermann testified that the FPPE had "no specific examples of any alleged misconduct on the part of [Plaintiff]." Despite the request of Plaintiff's counsel for production of "documentation of each incident or alleged incidents concerning complaints made about [Plaintiff]" Defendants produced no other evidence. (Eikermann Depo. 353:15-20).

This omission is all the more significant because the form of FPPE provided by Ms. Poma on July 30, 2021 states, "***We need to add all of the HR complaints.***" Glatter Decl. Ex 8(D006035-D006039 at D006036) (emphasis in original). Despite this instruction, no HR complaints were ever added to the FPPE, presumably because none existed.

The foregoing creates material issues of fact as to the true reasons for initiating preparation of the FPPE at the end of July 2021 and r*efusing to even submit* Plaintiff for consideration for promotion, mere weeks after Plaintiff renewed his reasonable accommodation request on July 1, 2021 and in the absence of any complaints against Plaintiff, other than the 7-month old GYN complaint which Defendants revived following Plaintiff's April 19, 2021 initial request for reasonable accommodation based on disability.

88.    As Dr. Eikermann was still relatively new, he decided to hold off issuing the FPPE until he was able to personally evaluate Dr. Goldstein's work performance, attitude and

interactions over an extended period of time.  Anthony Decl. Ex. LL (D008517-D008523); and

Eikermann Decl.¶17.

**Plaintiff's Response to No. 88:** Deny.

Dr. Eikermann's September 13, 2021 email (Anthony Decl. Ex. LL D008517) states only that he was considering the option to "perhaps put the FFPE on hold, and use it just as an escalation option – if another meeting with him fails." Anthony Decl. Ex. LL (D008518-D008523) is redacted, and Plaintiff cannot determine whether or not it supports this statement. While Plaintiff admits Dr. Eikermann's declaration states he decided to hold off on issuing the FPPE until he "was able to personally evaluate Dr. Goldstein's work performance, attitude and interactions over an extended period of time" in Eikermann Decl.¶17, this explanation does not hold up to scrutiny.

Instead, the FPPE, which is for the purpose of "creating a clear description of the length of performance and substance of it and areas for improvement" (Eikermann Dep. 327:15-328:6) was permitted to linger for four months from its initial drafting prior to the time it was given to Plaintiff on November 30, 2021. Indeed, the first sentence of the draft from Ms. Poma referred to issues which "require immediate attention." Glatter Decl. Ex. 8. The reality is that Defendants were waiting for some event to occur involving Plaintiff based on which they could bootstrap the FPPE. In the absence of any other intervening events (*see* Plaintiff's Response No. 87), on November 2, 2021, Defendants received an e-mail from Dr. Nicole Nevadunsky with a purported complaint about Plaintiff. Additional details about this incident involving Dr. Nevadunsky follow in Plaintiff's Response No. 104.

89.    Around the same time, Dr. Eikermann was also having discussions with Dr. Jeffrey

Weiss, Senior Vice President for Medical Affairs and Montefiore's Legal Department to decide

whether Dr. Goldstein's application for promotion should be considered as a result of his personnel

issues.  Anthony Decl. Ex. LL (D008517-D008523); and Eikermann Decl. ¶18.

**Plaintiff's Response to No. 89:** Deny.

The unredacted portion of Anthony Decl. Ex. LL (D008517-D008523) does not support this statement, but admit that Dr. Eikermann makes this statement in Eikermann Decl. ¶18. Defendants' failure to *even consider* Plaintiff for promotion was highly irregular.  *See* Plaintiff's Material Facts 39-41.

The failure to consider Plaintiff for promotion is causally connected with his request for reasonable accommodation, not due to any "personnel issues," none of which are documented in late July 2021. Instead, the only thing that was clearly documented was Plaintiff's April 19, 2021 and July 1, 2021 requests for reasonable accommodation and Defendants' retaliatory conduct immediately thereafter. *See* Plaintiff's Response Nos. 82, 87, and 88.

**Plaintiff's October 3, 2021 Meeting with Dr. Eikermann, Dr. Leff and Dr. Straker**

90.    On October 3, 2021, Plaintiff secretly tape recorded his meeting with Dr. Eikermann, Dr. Leff and Dr. Straker. Pl. Dep. 332:7-333:8; 335:16-24; 336:2-12;  Eikermann Decl.¶¶19-20; and Anthony Decl. Exs. MM (Audio); and NN (Goldstein Recording TR000051-TR000085).

**Plaintiff's Response to No. 90:** Admit.

91.    Plaintiff testified at his deposition that he recorded the conversation because "over time Eikermann's behavior suggested that he was targeting me and potentially manufacturing false claims about me and I did not trust him."  Pl. Dep. 336:13-17.

**Plaintiff's Response to No. 91:** Admit.

92.    Plaintiff, when asked at his deposition, if he believed Dr. Eikermann was aggressive during the October 3, 2021 meeting, Plaintiff first stated yes, and then changed his response to "I don't know that I would use the word aggressive, I would use the word unpleasant to the point of nasty, or just incorrect." Pl.  Dep. 337:21-23; 341:20-342:2.

**Plaintiff's Response to No. 92:** Deny.

Plaintiff stated that he believed Dr. Eikermann was aggressive during the conversation and discussed the conduct that he believed to be aggressive. Pl.  Dep. 337:21-341:19. After listing Dr. Eikermann's aggressive behavior, Plaintiff was asked "what other type of aggressive behavior did Eikermann show you at this meeting?" Pl.  Dep. 341:21-22. Dr. Goldstein qualified the "other," additional conduct from Dr. Eikermann in Pl.  Dep. 341:23-342:2 as unpleasant to the point of nasty or just incorrect but did not change his earlier response.

93.    Plaintiff's response, however, as to why he believed Dr. Eikermann was being aggressive, was "he said things were contrary to fact, clearly indicating that he was targeting me and trying to manufacture claims to exit me from the department." Pl.  Dep. 337:24-338:10.

**Plaintiff's Response to No. 93:** Admit, but clarify that this statement is incomplete.

Dr. Goldstein's response as to why he believed Dr. Eikermann was being aggressive starts

at Pl. Dep. 337:21 and continues to Pl. Dep. 341:17 wherein Plaintiff lists Dr. Eikermann's aggressive behavior.

94.     During this October 3, 2021 meeting, Dr. Eikermann highlighted Plaintiff's strengths stating that Plaintiff was a great clinician, very experienced, good clinician scientist, and talented with research.    Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 4:4-9; 17; 5:1-3).

**Plaintiff's Response to No. 94:** Admit.

95.     Dr. Eikermann also informed Plaintiff at this October 3, 2021 meeting that he would not be considered for promotion in 2021.  Pl. Dep. 342:20-343:2; and Eikermann Decl. ¶21.

**Plaintiff's Response to No. 95:** Admit.

96.     Contrary to Plaintiff's deposition testimony, Dr. Eikermann never "boasted" or stated during this meeting that "I prevented you from being promoted", nor did Dr. Eikermann "make clear that he was the only who was responsible for it."  Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085).

**Plaintiff's Response to No. 96:** Deny.

Dr. Eikermann suggested that the decision not to promote Dr. Goldstein was his alone. Anthony Decl. Ex. NN at TR000075. Dr. Eikermann later stated that he kept the fact that Dr. Goldstein was not going to get a promotion from Dr. Leff who is a member of the executive committee. Anthony Decl. Ex. NN at TR000075. Dr. Eikermann's claim that Dr. Leff did not previously know about the decision to not promote Plaintiff until October 3, 2021 creates a material issue of fact because it is critical to showing that once Plaintiff sought reasonable accommodations due to disability on April 19, 2021, which were reiterated on July 1, 2021, Plaintiff was subjected to retaliation, including, but not limited to, Defendants' failure to promote him:

- On July 23, 2021, about a week before the 2021 Department promotion committee meeting, Dr. Leff sent an email to Dr. Eikermann entitled, "promotions committee," and wrote, "Also, attached is Sheldon Goldstein's CV and TP … We can discuss how to proceed (or not) whatever you want." Glatter Decl. Ex. 9  (D005981-D006030 at D005981).

- Dr. Leff testified the anesthesia department's committee on appointment and promotions did not consider Dr. Goldstein's CV and teaching portfolio in 2021 and

that Dr. Eikermann made this decision. Dr. Leff Depo.: 177:2-179:3.

*See also* Plaintiff's Response No. 89.

97.    Dr. Eikermann informed Plaintiff of Montefiore's concern with respect to his significant amount of non-clinical days, and the potential conflict of interest with Plaintiff's company, indicating that Plaintiff should not use Montefiore's resources to promote Plaintiff's own company. Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 5:10-25; 7:15-9:1).

**Plaintiff's Response to No. 97:** Deny.

Dr. Eikermann states that Dr. Goldstein had 128 nonclinical days in the last few years but does not state that Montefiore is concerned about that number or that the number of nonclinical days is significant. Dr. Eikermann is deliberately evasive about the span of time used to calculate that number after Dr. Goldstein asks about it (reference to the FPPE issued on November 30, 2021 supports this number was over the course of eight (8) years, an average of 16 days per year or a little over one day per month).[7]  Then, Dr. Eikermann dismissed the number of nonclinical days as insignificant stating "and that's fine.  I am – we were all getting nonclinical days." (Anthony Decl. Ex. NN at TR000057, at pp. 6:2-3.) Dr. Eikermann denied that he or Montefiore had concerns that Dr. Goldstein's company was a conflict of interest and admitted that Montefiore knew about and approved Dr. Goldstein's company upon hiring him. (Anthony Decl. Ex. NN atTR000058-TR000059, at pp. 7:15 – 8:18).  Dr. Eikermann's concern with the conflict of interest issue appears to be that Montefiore was not benefitting more from Dr. Goldstein's company and therefore did not want to use Montefiore resources for it. NN (Anthony Decl. Ex. NN at TR000058-TR000059, at pp. 7:15 – 8:23.)

Further, Plaintiff's 2013 employment contract specifically acknowledged Plaintiff could work for his company, Coagulation Sciences, LLC. Glatter Decl. Ex. 5(D007838-D007853 at D007841).  Montefiore benefitted in many ways from Plaintiff's non-clinical time over the preceding eight (8) years as 39 of 44 of Plaintiff's research presentations and all  of his seven peer-reviewed publications were not related to Plaintiff's company. *See* Goldstein Decl.¶¶ 29-30; Glatter Decl. Ex. 9 (D005981-D006030 at D005993-D005994). Moreover, all of Plaintiff's work for his company was *before* Dr. Eikermann started at Montefiore on April 15, 2021. Goldstein Decl.¶ 28; Glatter Decl. Ex. 5(D007838-D007853 at D007852). After Dr. Eikermann arrived, Plaintiff not only did not do any research related to his company, within months of Dr. Eikermann's arrival, Plaintiff officially closed out two Montefiore Institutional Review Board ("IRB") approved research projects related to his

---

[7] *See* the unsigned FPPE dated September 10, 2021 Anthony Decl. Ex. TT (D000508-D000510) and another, later, different signed version of that letter dated October 3, 2021. Glatter Decl. Ex. 10 (D006645-D006647). *See also* Plaintiff's Response No. 114., *infra.*

company because of his concern Dr. Eikermann would take action against him. .The IRB is the medical school committee that reviews research studies to confirm they are appropriate, ethical, and safe for patients. Due to Plaintiff's relationship to his company, the IRB was required to—and in fact, did—monitor his research due to potential conflict of interest. On two separate occasions independent, third parties selected by the IRB reviewed Plaintiff's research, documentation, and data and confirmed its accuracy and the absence of any modification of lab results by Plaintiff. Goldstein Decl.¶ 27; *see also* Glatter Decl. Ex. 5(D007838-D007853) (various documents reflecting Montefiore's awareness of, support for, and IRB approval of Plaintiff's work for Coagulation Sciences, LLC and reflecting that Plaintiff halted this work at Dr. Eikermann's request at D007852)

*See also* Plaintiff's Response Nos. 82 and 116.

98.     Dr. Eikermann then raised concerns regarding Plaintiff's professionalism and how he responds to feedback, stating "some people perceive [Plaintiff's] response as sometimes not as nice or even aggressive.  Pl. Dep. 343:2-7; Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 9:1-9, 13-15).

**Plaintiff's Response to No. 98:** Deny and provide full context in which Dr. Eikermann states:

> So try – try to be consistently professional. So you know, there were the reports, the clinical report – one clinical report when there was this issue with a resident in – in the – in the PACU. And so – and it is – some people perceive your response as sometimes not as nice or even aggressive. And that is perception, as you know. Really, the truth is only in the eye of the observer, and there is no really black and gray and it's more – grayer.  The truth is in the – in the gray areas."

Anthony Decl. Ex. NN at TR000058-TR000059, at pg. 9:7-18.

Dr. Eikermann does not seem too concerned, appears to again be referring to the same January 8, 2021 incident, and identifies no other "complaints" or "incidents." In addition, no issues with Plaintiff's professionalism had been raised in the past, Goldstein Decl. ¶ 16, including in connection with denial of his 2020 promotion. Glatter Decl. Ex. 1 (D000931-D000951 at 931-932 and 950-951); Glatter Decl. Ex. 4 (D002589-D002590).  Indeed, in his most recent March 9, 2021 Biennial Medical Staff Member/Provider Evaluation, two months *after* the January 2021 GYN Complaint (also referred to as the MIDAS "complaint") and rated Plaintiff "excellent" in all categories, including appearance/professional demeanor, interpersonal relations, and professional ethics/integrity. Glatter Decl. Ex. 2 (D000071-D000075).

Significantly, Dr. Eikermann refers to no other specific incidents other than the January 8, 2021 GYN resident issue and describes HR issues as "bullshit" 90% of the time. Anthony Decl. Ex. NN at TR000065, at pg. 14:7-16.)

99.    Dr. Eikermann advised Plaintiff to meet with him every three months and that he would try to help him, stating "and you can count in [sic] me that I will support you." Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp.10:16-21).

> **Plaintiff's Response to No. 99:** Admit, but clarify that while these were Dr. Eikermann's words to Plaintiff in this October 3, 2021 meeting, Dr. Eikermann's actions over the preceding months, including, but not limited to, July 2021 actions preventing Plaintiff from being submitted for promotion and initiating the FPPE process reflect the emptiness of Dr. Eikermann's "support." *See* Plaintiff's Response Nos. 87, 88, and 89.

100.    In response, Plaintiff stated "I'm appreciative of meeting with you about every three months. I think that would be terrific." Plaintiff was also "pleased" that Dr. Eikermann gave him some ideas about how to ensure he would get promoted next year." Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 13:1-7).

> **Plaintiff's Response to No. 100:** Admit. *But see* Plaintiff's Response Nos. 87, 88, and 89. Further, Plaintiff was looking to leave the meeting without giving Dr. Eikermann any other reason to contrive a performance issue because Plaintiff believed Dr. Eikermann was looking for a reason to terminate Plaintiff. Goldstein Decl. ¶ 38.

101.    At the end of the conversation, Dr. Eikermann informed Plaintiff that he told Dr. Leff not to send Plaintiff a rejection letter for this year, because he wanted to meet with Plaintiff and he specifically stated: "we support you and whatever you feel that we really deeply care about you because we think you are good and you're—you're a resources. We don't want to lose you. We want to help you. Anthony Decl. Exs. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at pp. 24: 15-18; 25:11-12).

> **Plaintiff's Response to No. 101:** Deny.
>
> Dr. Eikermann states that he did not want to tell "Johnny" [Dr. Leff] about Dr. Goldstein not being promoted and then states that he wanted to "bring this in the – in a concept where you feel that we support you." NN (Goldstein Recording TR000051-TR000085 at pp. 24: 23-25; 25:2-9). Dr. Eikermann's statements are, at best, not candid, and, at worst, lies. The cited transcript portions are not consistent with the relevant facts supporting that both Dr. Eikermann and Dr. Leff knew at the end of July 2021 that Plaintiff would not be promoted. *See also* Plaintiff's Response Nos. 89 and 96.

102.    While Dr. Eikermann recognized Plaintiff's objective qualifications, he advised Plaintiff that he could not be promoted if he had ongoing performance issues.  Anthony Decl. Ex. MM (audio); and NN (Goldstein Recording TR000051-TR000085 at p. 25:20-22).

> **Plaintiff's Response to No. 102:** Admit but clarify that Dr. Eikermann told Dr. Goldstein "if you have those kind of things going on, you're not getting promoted," and "you cannot have performance issues ongoing in a promotion scenario…" NN (Goldstein Recording TR000051-TR000085 at p. 25:11-25).
>
> Plaintiff further disputes whether there were in fact any performance issues. *See* Plaintiff's Response Nos. 87, 88, and 89.

103.    At no time during this conversation did Dr. Eikermann raise his voice, become aggressive, call him names, and/or refer to Plaintiff's disability.  Anthony Decl. Ex. MM (audio).

> Plaintiff's Response No. 103: Deny. Dr. Eikermann was aggressive in his haste to issue the FFPE to Dr. Goldstein for a complaint that Dr. Eikermann did not properly investigate.  Dr. Eikermann repeatedly states that Dr. Goldstein has too many complaints against him. Anthony Decl. Ex. NN (TR000003 at p. 3:3-23, TR000011 at p. 11:4-9, TR000019 at p. 19:19-20) and that Dr. Eikermann concluded that the new complaint against Dr. Goldstein by Dr. Nevadunsky had been substantiated Anthony Decl. Ex. NN (TR000004 at p. 4: 6-8, 4: 14-17) without a proper investigation. Dr. Eikermann did not interview Dr. Goldstein as part of the investigation Anthony Decl. Ex. NN (TR000004 at p. 4:9-10).  Dr. Eikermann did not interview the witness, Preetha Matthews) that Dr. Goldstein repeatedly asked Dr. Eikermann and others to interview. Anthony Decl. Ex. NN (TR000013 at p. 13:17 – 14:2). Dr. Eikermann stated that Dr. Goldstein's chance of promotion was based on the "one endpoint" of "no more complaints than average." Anthony Decl. Ex. NN (TR000020 at p. 20:17-23).   Then Dr. Eikermann suggested that even frivolous complaints against Dr. Goldstein would count against his promotion and complaints filed by Dr. Goldstein would also count against him. Anthony Decl. Ex. NN (TR000023 at p. 23:2-11, TR000025 at p. 25:24 – p.26:5).

**Montefiore Receives Another Employee Complaint Regarding Plaintiff**

104.    On November 2, 2021, Dr. Nicole Nevadunsky emailed a complaint about Plaintiff's inappropriate behavior towards her, residents and a sub-intern during a November 1, 2021 procedure. She also attached statements from those that witnessed the incident.  *See* Anthony Decl. OO (D000624-627); and Eikermann Decl.¶22.

**Plaintiff's Response No. to 104**: Admit that Dr. Nevadunsky sent an email, but deny that Plaintiff engaged in any inappropriate behavior towards her or anyone else.

The document Defendants attach referring to this incident (Anthony Decl. Ex OO) is incomplete, and a more complete November email chain is attached as Glatter Decl. Ex. 11(D00622-D000636) which also provides Plaintiff's account of the relevant event, including that this was not an issue of professionalism, but appears to be a disagreement about a medical procedure, including whether Dr. Nevadunsky punctured the patient's liver causing substantial bleeding. In fact, a nurse who was present, Preetha Mathews, memorialized her November 8, 2021 conversation with Dr. Mikhail Chernov, former Associate Professor of Anesthesiology and Clinical Site Director (and Plaintiff's supervisor), which creates material issues of fact about Dr. Nevadunsky's perspective on this incident. In her email, Ms. Mathews wrote, with her typos, syntax, and punctuation preserved:

> As per our conversion this evening, here is an explanation of  what happened in Room8 on November1st with Dr Nevadunsky &Dr Abdelnabi. I came to the room at 650pm took over from Precious. As I was taking over , patient started bleeding heavily and procedure became hectic& very chaotic. The surgery team didn't tell us what exactly happened and we all came to know that some inadvertent thing had happened at that point. During that time, Willie& I was counting and the team grabbed laps from the mayostand &packed the belly without telling me or Willie. When I asked about it Dr Abnelnabi & Dr Nevadunsky started arguing with me back&forth. At  that time Dr Goldstein raised his voice because he already had asked me to send an ABG which probably didn't catch my attention. Other than that I never heard him raising his voice or behaving inappropriately. He was very helpful during the whole procedure and did his best to take care of that pt. Dr Goldstein didn't delay the case at all.

Glatter Decl. Ex. 12 (D008524).

Moreover, instead of Plaintiff engaging in any inappropriate behavior, the full story is that Dr. Nevadunsky tore the patient's liver in two places causing a massive hemorrhage (which is consistent with Ms. Mathews' account that the patient started bleeding heavily and that "some inadvertent thing has happened"). Further, Dr. Nevadunsky left eleven (11) foreign objects inside the patient's abdomen without counting the number of objects (which is consistent with Ms. Mathews statement, "Willie & I was [sic] counting"). Glatter Decl. Ex. 11 (D000622-D000636) Because Dr. Nevadunsky insisted on closing the patient, the number of objects was only identified because the patient needed to be reopened because of continued bleeding. *See* Glatter Decl. Ex. 11 (D000622-D000636).The anonymous emails in this sequence are likely from the resident and attending doctors whom Dr. Nevadunsky supervises who likely supported her perspective.

These conflicting accounts of the November 1, 2021 Nevadunsky "incident" raise material issues of fact regarding whether this was Dr. Goldstein engaged in any "inappropriate" behavior or whether this was more accurately a dispute about a medical procedure.

105.    More specifically, Dr. Nevadunsky stated that Plaintiff "treated them in a pejorative manner, demanding IV fluid bags, products throughout the case and orders to be executed in the emergency room before he would allow the patient to be brought up, including administration of a K-centra." In addition, she stated "sadly he has had a track record of poor professionalism." *Id.* at D000627.

> **Plaintiff's Response to No. 105:** Admit Dr. Nevadunsky wrote these statements. *But see* Plaintiff's Response No. 104 which more completely provides context for and questions the accuracy of these statements.
>
> It is not clear to what Dr. Nevadunsky's reference to Plaintiff having a "track record of poor professionalism" refers. If it refers only to the January 8, 2021 GYN complaint, this incident was never thoroughly documented and was followed by Plaintiff receiving the highest ratings in his March 9, 2021 Biennial Medical Staff Member/Provider Evaluation Glatter Decl. Ex. 2 (D000071-D000075). The evaluation was signed by the Anesthesiology Department Chair, Naum Shaparin, on March 9, 2021, two months *after* the January 2021 GYN Complaint (also referred to as the MIDAS "complaint") and rated Plaintiff "excellent" in all categories, including appearance/professional demeanor, interpersonal relations, and professional ethics/integrity. Glatter Decl. Ex. 2 (D000071-D000075). *See* Plaintiff's Response No. 50.
>
> These conflicting accounts of the November 1, 2021 Nevadunsky "incident" raise material issues of fact regarding whether there was any professionalism issue with Plaintiff or whether the November 1, 2021 event was more accurately a dispute about a medical procedure.

106.    On November 4, 2021, Dr. Mikhail Chernov*, former Associate Professor of Anesthesiology and Clinical Site Director, emailed the complaint to Plaintiff and asked him to respond in writing. *Id.* at D000624.

> **Plaintiff's Response to No. 106:** Admit, noting the cited page is part of a more complete email chain. *See* Glatter Decl. Ex. 11(D000622-D000636).

107.    Plaintiff responded a few hours later to Dr. Chernov, copying Dr. Straker, stating that he was heading for a conference for the weekend and may not respond until Monday or Tuesday of the following week. *Id.* at D000624.

> **Plaintiff's Response to No. 107:** Admit, noting the cited page is part of a more complete email chain. *See* Glatter Decl. Ex. 11 (D000622-D000636).

108.    Plaintiff, however, did provide some "brief points" refuting the complaint and stated that he was going to report Dr. Nevadunsky to both MIDAS (the anonymous reporting procedure) and HR. *id*.

**Plaintiff's Response to No. 108:** Admit, noting the cited page is part of a more complete email chain. *See* Glatter Decl. Ex. 11 (D000622-D000636).

109.    On November 9, 2021, Plaintiff provided his written response to Dr. Nevadunsky's complaint. Anthony Decl. Ex. PP (D000631-D000636).  Plaintiff did not accept responsibility for anything that occurred, instead stating "all the problems in the OR were caused by Dr. Nevadunsky. *id.*

**Plaintiff's Response to No. 109:** Deny.

Dr. Goldstein sent several responses to Dr. Nevadunsky's complaint between November 4, 2021 and November 9, 2021. Glatter Decl. Ex. 11 (D000622-D000636).  Dr. Goldstein submitted a written response labeled "Final Response Nevadunsky" on November 9, 2021 to Dr. Chernov and Dr. Straker.  In his Final Response, Dr. Goldstein pointed out that Dr. Nevadunsky's use of an incident (presumably the January 2021 GYN complaint) that happened a year ago to claim a "track record of poor professionalism" was inappropriate and provided evidence that Dr. Nevadunsky's version of the events was inaccurate and may have been biased due to Dr. Nevadunsky's own mistake puncturing the patient's liver in two places. *See also* Plaintiff's Response No. 104, including the account of a nurse, Ms. Mathews. Glatter Decl. Ex. 12 (D008524).

110.    Thereafter, on November 29, 2021, Plaintiff filed a complaint both with MIDAS and Human Resources, regarding Dr. Nevadunsky's complaint stating that Dr. Nevadunsky's complaint included multiple statements that were clear defamation.  Plaintiff Dep. 160:1-17; and Anthony Decl. Ex. QQ (D006981-D006982).

**Plaintiff's Response to No. 110:** Admit.

**Plaintiff's November 30, 2021 Meeting With Dr. Eikermann, Dr. Straker and Mr. Felder**

111.    On November 30, 2021, Plaintiff once again, secretly tape recorded his meeting with Dr. Eikermann, Dr. Straker and Mr. Felder.  Plaintiff Dep. 172:23-173:1;  Eikermann

Decl.¶23-24; Anthony Decl. Exs. RR (audio); and SS (Goldstein Recording TR000001-TR000050).

**Plaintiff's Response to No. 111:** Admit.

112.    During this November 30, 2021 meeting, Dr. Eikermann did not call Plaintiff names, curse at him, refer to his disability or speak to him in an aggressive manner.  Pl. Dep. 181:13-19; and Ex RR (audio).

**Plaintiff's Response to No. 112:** Admit but clarify that Dr. Goldstein testified that Dr. Eikermann was aggressive and threatened to fire him without any prior discussion about terminable conduct. Pl. Dep. 181:20 – 182:5.

113.    Dr. Eikermann, however discussed the complaint filed against Plaintiff by Dr. Nevadunsky's, and  stated that Plaintiff had "too many complaints", and that he "cannot have more complaints, to which Plaintiff responded "No, I agree with you there." Anthony Decl.  Exs. RR (audio); and SS (Goldstein Recording TR000001-TR000050 at p. 7:9-15).

**Plaintiff's Response to No. 113:** Admit but clarify that Dr. Eikermann previously admitted to Dr. Goldstein that, when it comes to HR Complaints, "I have a big heart for people who have HR problems because I've had lots of HR problems in my life…" "I know that in 90 percent of the cases this is bullshit… Typically what you hear is exaggerated…the real task is not getting written up, so that's the real task." (Goldstein Recording TR 000064 at p. 14:7-16). And, "It is not always about, you know, each complaint, and we spoke about this last time. There is always at least 30 percent of whatever, a certain percentage, which is unfair." *See also* Plaintiff's Response No. 99.

Further, after commencing preparation of the FPPE in July 2021, and holding issuance of the FPPE in the absence of any other intervening basis to issue the FPPE, Dr. Nevadunsky's November 2, 2021 email provided Dr. Eikermann with the stake to which he could ground the FPPE in the absence of any other issues with Plaintiff's performance.  *See also* Plaintiff's Response Nos. 87, 88, and 89. Accordingly, there are material issues of fact regarding whether there were any intervening performance issues since the January 2021 GYN Complaint, which had seemed contemporaneously resolved. *See* Plaintiff Response Nos. 50, 82, and 98.

114.    Dr. Eikermann then presented Plaintiff with the FPPE, dated September 10, 2021, which included a Performance Improvement Plan to help remediate these issues.  Plaintiff Dep. 177:13-15; 180: 20-181:7; Anthony Decl. Ex. TT (D000508-D000510); and Eikermann Decl.¶25.

**<u>Plaintiff's Response to No. 114</u>:** Deny.

Defendant produced two separate versions of the FPPE, one dated September 10, 2021 (Anthony Decl. Ex. TT D000508-D000510) and another, later, different version of that letter dated October 3, 2021 Glatter Decl. Ex. 10 (D006645-D006647). Plaintiff was presented the September 10, 2021 version in his deposition (which was marked as Exhibit 31) and asked if this was the evaluation he was given. Plaintiff responded, "I believe so," but was not shown at his deposition the later version dated October 3, 2021 or made aware that two different versions of the letter exist. (Plaintiff Dep. 180:14 – 181:11.)

Review of these two versions of the FPPE reveals critical differences:

- The September 10, 2021 version of the FPPE is unsigned (Anthony Decl. Ex. TT D000508-D000510), but the October 3, 2021 version is signed by Dr. Eikermann Glatter Decl. Ex. 10 (D006645-D006647 at D006647).

- The October 3, 2021 version of the document coincides with the date of the October 3, 2021 meeting with Dr. Eikermann, Dr. Leff, and Plaintiff, suggesting an intention to issue it at that meeting and a failure to do so or a contemporaneous update to the FPPE following the October 3, 2021 meeting. There is no explanation for why the FPPE would be dated September 10, 2021, yet provided nearly 2.5 months later on November 30, 2021. When Dr. Eikermann provided Plaintiff with an FPPE at the November 30, 2021 meeting, he referred to holding it back at the October 3, 2021 meeting Anthony Decl. Ex. SS at TR000006-TR000007, at pp. 6:18-7:6

- The last paragraph of the unsigned, September 10, 2021 version of the FPPE (Anthony Decl. Ex. TT D000508-D000510 at D000510), provided, "[a]t the end of the FPPE Performance Improvement Plan implementation, your progress will be reviewed with your mentor and Departmental senior leadership no later than **July, 2022**." In the last paragraph, of the signed, October 3, 2021 version of the FPPE, **the date is moved up by three (3) months to April 15, 2022**. Glatter Decl. Ex. 10 (D006645-D006647 at D006647).

- This last point (regarding the date for follow up) is critical and supports the conclusion that the October 3, 2021 version of the FPPE is the one that was actually presented to Plaintiff on November 30, 2021. Rather than setting up to a 10-month period (through July 2022), the October 3, 2021 version set a date just 4.5 months away for review of his progress. This explains the immediate pressure that Plaintiff felt regarding the viability of his position. Given the fleeting feedback Dr. Goldstein received following issuance of the signed November 30, 2021 FPPE, combined with the 60-day notice period to voluntarily terminate his employment and avoid further damage to his career that a manufactured "for cause," involuntary termination would trigger, Plaintiff felt compelled to give notice of his resignation on February 13, 2022. Goldstein Decl. ¶ 47 and Goldstein Decl. Ex. 15; Anthony Decl. Ex. BBB (D000507).

It is also unclear whether the October 3, 2021 version was prepared before or after the

October 3, 2021 meeting with Plaintiff. This is because the transmitting email has a timestamp of October 3, 2021 at 9:22 pm which would appear to be after the October 3, 2021 meeting. *See* Glatter Decl. Ex. 10 (D006645-D006647 at D006645). The question arises whether there was another meeting planned for October 4, 2021 at 9:00 am, which, seemingly never came to pass.

The conflicting versions of the FPPE create a material issue of fact regarding which version of the document was presented to Plaintiff. This question has a critical impact on, among other things, Plaintiff's constructive discharge claim.

115.    As set forth in the FPPE, there were concerns regarding Plaintiff's communication style, and lack of acknowledgement when approached with negative feedback.  Anthony Decl. Ex. TT (D000508-D000510).

**Plaintiff's Response to No. 115**: Deny.

This language does not appear anywhere in the October 3, 2021 version of the FPPE, which instead states, "The areas of ongoing concern fall into areas of professionalism and communication." Glatter Decl. Ex. 10  (D006645-D006647 at D006646). This reference does appear in the unsigned, September 10, 2021 version of the FPPE, which, at the end of the second paragraph provides, "There have been concerns regarding your communication style when there is a disagreement with a colleague and your lack of acknowledgment when approached with negative feedback." Anthony Decl. Ex. TT (D000508-D000510 at D000508). Significantly, in his Biennial Medical Staff Member/Provider Evaluation, Plaintiff received an "excellent" in all categories, including appearance/professional demeanor, interpersonal relations, and professional ethics/integrity. Glatter Decl. Ex. 2 at (D000071-D000075), nor were any of these issues raised in connection with denial of his 2020 promotion. Glatter Ex. 1 at (D000931-D000951 at 931-932 and 950-951); Glatter Decl. Ex. 4(D002589-D002590).

There is a material issue of fact regarding the scope of the FPPE which arises from the underlying material issue of fact regarding what version of the FPPE was actually provided to Plaintiff.

116.    The FPPE also provided that upon review of Plaintiff's academic productivity related to research efforts, leadership had determined that the majority of his allocated non-clinical time had not resulted in a sustained number of peer reviewed publications commensurate with an eight-year timeframe and there were also concerns surrounding a conflict of interest with his other company (Coagulation Sciences LLC).  Both of these topics previously were addressed with

Plaintiff at the October 3, 2021 meeting. *See* Anthony Decl. Exs. TT (D000508-D000510); MM

(audio); and NN (Goldstein Recording TR000051-TR000085).

**Plaintiff's Response to No. 116:** Admit the FPPE included such statements, but deny that the statements are accurate.

In fact, during the October 3, 2021 meeting Dr. Eikermann addressed the topic of nonclinical hours and dismissed them as insignificant stating "and that's fine. I am – we were all getting nonclinical days." NN (Goldstein Recording TR000057 at pg. 6:2-3. *See also* Plaintiff's Response No. 97 detailing the foundational inaccuracy of these accusations regarding Plaintiff's non-clinical time and in connection with Coagulation Sciences, LLC when they were first raised on October 3, 2021. Further, reference to the CV Plaintiff submitted for promotion consideration reflects sustained, academic productivity because, in addition to seven new peer-reviewed publications (2020-2021), from 2013-2021, he had numerous external (invited) and internal (Montefiore) lectures, poster presentations, academic abstracts, and formal mentoring activities. *See* Glatter Decl. Ex. 11 (D005981-D006030).

117.    The Performance Improvement Plan, included the following expectations and

interventions:

1.  Plaintiff would not be assigned non-clinical time for the 2021-2022 academic year, and it was expected that he would focus solely on clinical work, except for his survey project.
2.  Plaintiff  would collaborate with his mentee and complete his advanced survey project.
3.  There will be no other mentoring of faculty and trainees in areas where there is a potential conflict of interest with the company Coagulation Sciences LLC.
4.  Plaintiff would not be considered a candidate for promotion to Professor of Anesthesiology during the coming year.
5.  Plaintiff was required to take and complete courses in Effective Communication, Workplace Conflict and Mastering Emotional Intelligence within six months.

*See* Anthony Decl. Ex. TT (D000508-D000510).


**Plaintiff's Response to No. 117:** Deny.

The signed October 3, 2021 FPPE which was actually provided to Plaintiff did not include the points as stated above. While these are the points reflected in the text of the unsigned September 10, 2021 version of the FPPE (Anthony Decl. Ex. TT D000508-D000510), the points in the signed October 3, 2021 version of the FPPE (which was actually presented to Plaintiff) are different. The signed FPPE dated October 3, 2021

contains different language in a different order and omits the language about Dr. Goldstein not being considered a candidate for promotion during the coming year. Glatter Decl. Ex. 10 ( D006645-D006647 at D006646-D006647).

118.    During the November 30, 2021, meeting, Dr. Eikermann told Plaintiff that he would support him and that Plaintiff can go to him with issues. Pl. Dep. 187:11-14; and Eikermann Decl. ¶26.

**Plaintiff's Response to No. 118:** Admit, but clarify that Plaintiff did not believe Dr. Eikermann would support him and believed Dr. Eikermann would immediately fire Plaintiff. Pl. Dep. 185:11-23.

Further, Dr. Eikermann's words are not consistent with his actions in preceding months in which he blocked Plaintiff's consideration for promotion and initiated the FPPE in the end of July 2021. *See* Plaintiff's Response Nos. 87, 88, and 89.

119.    Dr. Eikermann also explained to Plaintiff that he did not stay in the chain of commands when he reported Dr. Nevadunsky to the Chief of Human Resources. While, Plaintiff can report someone to HR, when it comes to a specific medical issue he should go through Dr. Eikermann, which was confirmed by Mr. Felder. Anthony Decl. Exs. RR (audio); and SS (Goldstein Recording TR000001-TR000050 at pp. 23: 24; 24:1-12; 25:2-4).

**Plaintiff's Response to No. 119:** Deny.

While Dr. Eikermann did utter the referenced statements, Mr. Felder did not say Plaintiff should not have submitted the report to HR. Instead, Mr. Felder referred to the HR officer's response, "So I don't know exactly what was sent to HR, but for a clinical issue, her response appropriately is to send it to somebody else." Anthony Decl. Ex. SS (TR000001-TR000050, at pp. 25:2-4). Also, Plaintiff repeatedly told Dr. Eikermann and Mr. Felder that his complaint about Dr. Nevadunsky was not about a specific medical issue, but an issue of defamation or false report and therefore an appropriate reason for Plaintiff to go directly to HR. Anthony Decl. Ex SS TR000001-TR000050, at p. 24:6 – 25:7; Glatter Decl. Ex. 11 (D000622-D000633 at D000622-D000624).

120.    Mr. Felder further explained to Plaintiff that there are "absolutely" times to go to HR. Pl. Dep. 188: 8-13 and Anthony Decl. Exs. RR (audio); and SS (Goldstein Recording TR000001-TR000050 at p. 28:13-18).

**Plaintiff's Response to No. 120:** Deny.

Cited testimony from Plaintiff's deposition transcript does not support cited fact. Further, Exs RR and SS reveal that Mr. Felder specifically stated "and it's not to say like there is no space for going to HR. There's no appropriate time to go to HR. That's not the case. I mean, absolutely there are – you know, you can file an anonymous compliance complaint …"

121.    After the November 30, 2021 meeting, Plaintiff emailed Dr. Eikermann, copying Dr. Straker and Mr. Felder stating "I will gladly complete the courses you suggested. Furthermore I appreciate that you offered to provide some direct tips as necessary to help me move forward and upward." Anthony Decl. Ex. UU (D007857).

**Plaintiff's Response to No. 121:** Admit.

122.    Following the November 30, 2021 meeting, Plaintiff and Dr. Eikermann communicated regularly via email, telephone and in person. *See e.g.* Anthony Decl. Exs. VV (D007015-D007018); WW (D007123-D007124); XX (D007173-D007174); YY (D007252-D007253); and Eikermann Decl. ¶27.

**Plaintiff's Response to No. 122:** Deny.

The cited materials include some communications between Plaintiff and Dr. Eikermann, but these are not evidence of the two "communicating regularly." Further, the cited evidence only presents a few e-mail communications (including relating to forwarding documents to one another) – and does not evidence any telephone or in person communications (though they do discuss plans to have meetings – the cited evidence does not clarify that any such planned in-person meeting were actually held). Plaintiff testified that they communicated two or three times following delivery of the FPPE on November 30, 2021. Pl. Dep. 205:24-207:4.

123.    Plaintiff made an effort to take the requisite courses, even seeking out courses on his own, and Dr. Eikermann continued to express his support stating "we are committed to helping you develop your full professional potential in our Department." Anthony Decl. Ex. VV (D007015-D007018).

**Plaintiff's Response to No. 123:** Admit Plaintiff made every effort to take the requisite course and that in an e-mail to Dr. Goldstein, cc'ing Tracey Straker, Andrew Felder and Bintu Sissoho, dated December 30, 2021, Dr. Eikermann stated, inter alia, "we are committed to helping you develop your full professional potential in our Department."

However, Defendants' prior actions do not support the veracity of these statements. *See* Plaintiff's Response Nos. 87, 88, and 89.

124.    On January 2, 2022,  Plaintiff emailed Dr. Straker advising her of a recent success in the operating room and that Dr. Eikermann acknowledged it as well.  Anthony Decl. Ex. ZZ (D008173-D008174).

**Plaintiff's Response to No. 124:** Admit that on January 2, 2022 Dr. Goldstein emailed Dr. Straker forwarding her an e-mail from Dr. Mark A. Menegus, Director of the Cardiac Catheterization Laboratory, thanking Dr. Goldstein for his help on a matter, noting that "[w]e could never have done that without you" and that the patient is "doing well."

125.    Dr. Straker responded letting Plaintiff know that Dr Eikermann had sent this to the Executive Committee.  *Id.*

**Plaintiff's Response to No. 125:** Admit.

126.    On February 1, 2022, over two months after the November meeting, Dr. Goldstein provided Dr. Eikermann a written response to the FPPE.  Anthony Decl. AAA (D000516-D000518).

**Plaintiff's Response to No. 126:** Admit that on February 1, 2022, Dr. Goldstein provided Dr. Eikermann with a letter addressing, inter alia, the letter that Dr. Eikermann handed to him on November 30, 2021, but deny that this is a "response" because it also provides progress updates.

Plaintiff further denies to the extent Defendants deem Plaintiff to have "responded" the unsigned September 10, 2021 FPPE (Anthony Decl. Ex. TT D000508-D000510), rather than the signed October 3, 2021 version of the FPPE. Glatter Decl. Ex. 10 (D006645-D006647). Moreover, there was no requirement that Plaintiff formally respond to the FPPE in any manner, so the reference to a response "over two months after the November meeting" implies Plaintiff was somehow tardy in providing this non-mandatory writing.

127.    Plaintiff's written response focused on how his use of non-clinical time benefited Montefiore and why there was no conflict of issue with him being the CEO of his company.  *Id.*

**Plaintiff's Response to No. 127:** Deny as reference to the cited document reflects that a number of issues were addressed, including, but not limited to, Plaintiff's well-received Grand Rounds lectures, his January 19, 2022 conversation with Dr. Eikermann, use of non-clinical time, presentation of scientific posters, purported conflicts of interest

involving Plaintiff's company, completion of communications training, teaching efforts, peer-reviewed publications, and exam results.

128.    He also referenced "the good conversation" he had with Eikermann on January 19, 2022 and the positive feedback he received from the Grand Rounds which he delivered after receipt of the FPPE, undermining his allegation that Dr. Eikermann prevented him from speaking during grand rounds as alleged in his Complaint paragraph 37(h).  *Id.* and Pl. Dep. 206:8-16.

> **Plaintiff's Response to No. 128:** Deny that the Grand Rounds referred to in the cited deposition testimony was the occasion on which Dr. Eikermann prevented Plaintiff from speaking because Dr. Eikermann was not present at the January 2022 Grand Rounds. Goldstein Decl. ¶ 44.
>
> Admit that Plaintiff testified he had a "good conversation" with Dr. Eikermann on January 19, 2022.

129.    Nowhere in his written response does Plaintiff discuss his problems dealing with others or accepting feedback.  Anthony Decl. AAA (D000516-D000518).

> **Plaintiff's Response to No. 129:** Deny.
>
> Plaintiff references attaching certificates reflecting completion of courses pertaining to communications training. On December 30, 2021, Dr. Eikermann agreed Plaintiff should take courses entitled, "Team Communication Skills and Managing Conflicts," and "Emotional and Social Intelligence." The course descriptions indicate a total of 24 hours would be required to complete these course. Glatter Decl. Ex. 13 (D000519-D000522).

**Goldstein Resigns**

130.    On February 13, 2022, Plaintiff provided Dr. Eikermann with his notice of resignation effective April 13, 2022.  Anthony Decl. BBB (D000507);  and Eikermann Decl. ¶28.

> **Plaintiff's Response to No. 130:** Admit, but clarify that Plaintiff gave 60 days' notice of an April 13, 2022 resignation date aligned with the signed October 3, 2021 FPPE stating," your progress will be reviewed with your mentor and Departmental senior leadership no later than April 15th, 2022."  Glatter Decl. Ex. 10 (D006645-D006647); *see also* Goldstein Decl. ¶ 47 and Goldstein Decl. Ex. 15.
>
> Based on the manner in which events proceeded in the October 3, 2021 and November 30, 2021 meetings with Dr. Eikermann, (among others), the baseless, undocumented accusations to which Plaintiff was subject in these meetings (including, but not limited to use of non-clinical time over the course of eight (8) years and unfounded allegations of

conflicts of interest involving his company (despite IRB clearance of these projects), the one-sided response to the November 1, 2021 issue with Dr. Nevadunsky, the accompanying claim he was not supposed to make any complaints to HR, the lack of meaningful communication with Dr. Eikermann, and the retaliatory assignment of overnight call to him, Plaintiff truly believed he would be terminated on April 15, 2021. So, to avoid further harm to his career that a termination would cause, he decided to resign. Accordingly, there are material issues of fact regarding whether Plaintiff was subject to constructive discharge. *See* Plaintiff's Response Nos. 87, 88, 89, 92. 97, 99, 113, and 114; Goldstein Decl. ¶¶ 43-46; Plaintiff's Material Facts 56-61, *infra*.

131.    When Dr. Eikermann inquired as to Dr. Goldstein's plans after Montefiore, he mentioned he had a few job opportunities, including one in Florida, but had not made any decisions.  Eikermann Decl. ¶29.

**Plaintiff's Response to No. 131:** Admit this is what Plaintiff stated to Dr. Eikermann, but he did not have any specific opportunity lined up.  Goldstein Decl. ¶ 48.

132.    Dr. Eikermann never advised Plaintiff that he was searching for a basis to terminate his employment, as alleged in his Complaint.  Complaint at ¶ 37(g); Pl. Dep., 245:16-18; and Eikermann Decl. ¶30.

**Plaintiff's Response to No. 132:** Deny. Dr. Eikermann did not make this specific statement, however, his actions supported he was searching for a basis on which to terminate Plaintiff's employment. *See* Plaintiff's Response Nos. 87, 88, 89, 92, 97, 99, 113, and 114.

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiff's Material Fact 1.    In November 2013, Plaintiff began his employment by Defendant Montefiore Medical Center ("Montefiore") with the title/position of Attending Anesthesiologist and Associate Professor of Anesthesiology. Goldstein Decl. ¶ 3.

Plaintiff's Material Fact 2.    From the outset of his employment, Montefiore was aware of and approved of the work he performed for his company, Coagulation Sciences, LLC, and it was specifically referenced in his 2013 offer letter. *See* Glatter Decl. Ex. 5 (D007838-D007853 at D007841).

Plaintiff's Material Fact 3.    All of the research connected with Coagulation Sciences, LLC went through and was approved by Montefiore's Institutional Review Board ("IRB") Goldstein Decl. ¶¶ 23-31; Glatter Decl. Ex. 5 (D007838-D007853).

Plaintiff's Material Fact 4.    The IRB is the medical school committee that reviews research studies to confirm they are appropriate, ethical, and safe for patients. Goldstein Decl. ¶ 26.

Plaintiff's Material Fact 5.    The IRB was required to—and in fact, did—monitor Plaintiff's research due to potential conflicts of interest. On two separate occasions, independent, third parties selected by the IRB reviewed his research, documentation, and data and confirmed its accuracy and the absence of any modification of lab results by Plaintiff. Goldstein Decl. ¶ 27; Glatter Decl. Ex. 5 (D007838-D007853).

Plaintiff's Material Fact 6.    During the time Plaintiff was at Montefiore, not one of his seven, peer-reviewed publications related to work for Coagulation Sciences, LLC. Goldstein Decl.

¶ 29; Glatter Decl. Ex. 9 (D005981-D006030 at D005993-D005994).

  <u>Plaintiff's Material Fact 7.</u> Of the thirty-nine (39) presentations he made during his tenure at Montefiore, 39 of 44 were not related to Coagulation Sciences, LLC. Goldstein Decl. ¶ 30; Glatter Decl. Ex. 9 (D005981-D006030 at D005999-D006000).

  <u>Plaintiff's Material Fact 8.</u> Montefiore received "work-in-kind" pertaining to Coagulation Sciences, LLC as Plaintiff trained a resident and medical students in related, relevant research methods, and Plaintiff's work on these issues was presented at International Anesthesia Research meetings with Montefiore and the Einstein Medical School names featured at the top of promotional posters. Goldstein Decl. ¶31 ;Glatter Decl. Exs. 5 (D007838-D007853) and 9 (D005981-D006030 at D006000).

  <u>Plaintiff's Material Fact 9.</u> During the course of his employment by Montefiore, Plaintiff performed his services competently, faithfully, diligently, and in an outstanding manner. He was never subject to any disciplinary action and received excellent performance reviews. Goldstein Decl. ¶¶ 4, 16.

**Plaintiff Applies for Promotion in 2020**

  <u>Plaintiff's Material Fact 10.</u> After seven years of employment at Montefiore, in 2020, Plaintiff sought promotion from Associate Professor to Professor on the Clinician Educator Track. Pl. Dep. 81:16-82:3 and Goldstein Decl. ¶¶ 5-7.

  <u>Plaintiff's Material Fact 11.</u> The Committee for Academic Promotions ("CAP") in the Anesthesia Department found that, "[w]hile Dr. Goldstein technically meets all guidelines, he needs at least 5-6 more recent publications." Glatter Decl. Ex. 1 (D000931-D000951 at D000932) and Glatter Ex. 4 (D002589-D002590).

Plaintiff's Material Fact 12.    With denial of his promotion in June 2020, no reference was made to any issues with Plaintiff's (i) performance and overall productivity (other than needing to publish data he collected), (ii) use of his non-clinical time or any conflicts between his work with Montefiore and Coagulation Sciences, LLC, or (iii) professionalism and communication, including his communication style with colleagues. Glatter Decl. Ex.1 (D000931-D000951 at 931-932 and 950-951); Glatter Decl. Ex. 4 (D002589-D002590).

Plaintiff's Material Fact 13.    Shortly thereafter, Dr. Goldstein published seven additional publications, and by the time of the next promotion cycle Dr. Goldstein had sixteen publications. Goldstein Decl. ¶ 32; Glatter Decl. Ex. 9 (D005981-D006030 at D005993-D005994).

**January 8, 2021 Incident Which Montefiore's HR Promptly Resolves**

Plaintiff's Material Fact 14.    On January 8, 2021, Plaintiff had an exchange in the Ambulatory Surgical Unit ("ASU") with an OB/GYN resident regarding an echocardiogram that needed to be performed before a patient could be operated upon (the January 8, 2021 incident"). Pl. Dep. 116:18-122:20.

Plaintiff's Material Fact 15.    Following this exchange, the OB/GYN resident filed a MIDAS report, which is a Montefiore communication portal where safety issues can be reported. Pl. Dep. 121:9-19. Anthony Decl. Ex. U (D000650-D000651).

Plaintiff's Material Fact 16.    On January 9, 2021, Montefiore's Kimberly Acevedo, a Registered Nurse a Clinical Data Analyst, Quality Management forwarded the report regarding the January 8, 2021 incident to others at Montefiore. Anthony Decl. Ex. T (D002940).

Plaintiff's Material Fact 17.    On January 11, 2021, Adam Yedlin  (an Assistant Professor

of Anesthesiology), reviewing the January 8, 2021 incident, wrote to Plaintiff, "I have looked very closely at all of the details in the chart and I just wanted to get your side of the story. I see that case was postponed from the day prior due to severe anemia and that you put a lot of time and effort into coordinating the proper care for this patient on the next day, including consulting with heme, assuring blood transfusion and H/H/f/u, and detailed discussion with the surgeon about surgical approach, etc. I am not entirely clear in terms of what happened on day of surgery in your interaction with the GYN resident and surgeon if you could please clarify this. It seems there might have been a miscommunication that made things worse." Anthony Decl. Ex. T (D002935).

Plaintiff's Material Fact 18.    On January 12, 2021, Kiri Mackersey (an Assistant Professor of Anesthesiology), in reference to the January 8, 2021 incident wrote, "[g]iven that there is some doubt about what exactly was said, and that no patient harm or discomfort occurred, I think it prudent to avoid immediate escalation." Anthony Decl. Ex. T (D002938-D002939).

Plaintiff's Material Fact 19.    On January 13, 2021, Andrew Felder, Unified Administrator for the Anesthesia Department, wrote regarding the January 8, 2021 incident, "HR reviewed the complaint and does not want to lead the process. . . . we (anesthesia) will get involved after the HR interview/investigation. The HR interview will occur within the next couple days." Anthony Decl. Ex. T (D002937).

Plaintiff's Material Fact 20.    On January 19, 2021, other anesthesiologists were discussing Dr. Goldstein's response to the January 8, 2021 incident. Anthony Decl. Ex. V (D007789-D007790).

Plaintiff's Material Fact 21.    Plaintiff heard nothing more about the January 8, 2021 incident other than HR calling him at some point and telling him he "could have spoken more

nicely." He was not subject to any discipline in connection with the January 8, 2021 incident. Pl. Dep. 122:4-20. Goldstein Decl. ¶ 15.

**Plaintiff Receives a Stellar Performance Review**

Plaintiff's Material Fact 22.    Plaintiff received a Biennial Medical Staff Member/Provider Evaluation. The evaluation was signed by the Anesthesiology Department Chair, Naum Shaparin, on March 9, 2021, two months *after* the January 8, 2021 incident and rated Plaintiff "excellent" in *all* categories, including appearance/professional demeanor, interpersonal relations, and professional ethics/integrity. Glatter Decl. Ex. 2 (D000071-D000075).

**Defendants Immediately Retaliate Against Plaintiff Following His Request for Reasonable Accommodation Based on Medical Necessity**

Plaintiff's Material Fact 23.    On April 19, 2021, through a letter emailed by his physician, Dr. Michael Thorpy, to Dr. Straker and Dr. Eikermann, Plaintiff sought a reasonable accommodation due to medical necessity, such that he could not be taking overnight call because, after a recent illness, he required regular sleep wake patterns for optimal health.  Anthony Decl. Ex. Z (D000767-D000768).

Plaintiff's Material Fact 24.    When Dr. Eikermann received Dr. Thorpy's letter, it was four days into his tenure as Chair of the Anesthesiology Department. Eikermann Dep. 44:14-25; and Eikermann Decl. ¶6.

Plaintiff's Material Fact 25.    Critically, instead of Defendants limiting their discussion to how to accommodate Plaintiff, his request **immediately** set off a series of discriminatory and retaliatory actions against Plaintiff by Defendants, including marshalling every whisper of an issue they ever had with Plaintiff and sharing this information with Dr. Eikermann.  Glatter Decl. Ex. 3

(D003912-D003944).

Plaintiff's Material Fact 26.    Defendants' response to Plaintiff's request for a reasonable accommodation initiated the process through which—notwithstanding the absence of any new facts or events—the Defendants (i) refused to submit Plaintiff for consideration for promotion in July 2021, (ii) initiated preparation of an FPPE at the end of July 2021, and (iii) waited until November 30, 2021 to issue the FPPE. The foregoing creates material issues of fact regarding Plaintiff's subjection to discriminatory and retaliatory treatment following his reasonable accommodation request, including what Dr. Eikermann contemporaneously "learned" about Plaintiff from the Executive Committee in response to Plaintiff's reasonable accommodation request. Glatter Decl. .Ex. 10 (D006645-D006647 and Anthony Decl. Ex. DD (D000774-D00775)'

Plaintiff's Material Fact 27.    Within an hour of receipt of Plaintiff's accommodation request, Dr. Leff,[8] wrote to, among others, Dr. Eikermann that, "Dr. Goldstein continues to be a challenge on multiple fronts. This situation is challenging since he was able to have an Einstein physician write a letter on his behalf. . . ." Glatter Decl. Ex. 3 (D003912-D003944) at D003913.

Plaintiff's Material Fact 28.    The next day (April 20, 2021), as reflected in Department Executive Committee Meeting minutes (at which Dr. Eikermann, among others, was present) (i) Dr. Goldstein was discussed and his HR file and employment contract were subject to review Glatter Decl. Ex. 3 (D003912-D003944 at= D003930-D003931) and (ii) Andrew Felder, Unified Administrator for the Department, emailed Microsoft Teams invites to HR's Doris Poma and Dr. Goldstein with the subject, "Complaint Follow-Up – Dr. Sheldon Goldstein." In the absence of any other intervening issues, this request revived the previously January 8, 2021 incident. Glatter

---

[8] Dr. Leff was the Vice Chair, Faculty & Academic Affairs within Dr. Goldstein's Department. *See* Paragraph 12, *supra*.

Decl. Ex. 3 (D003912-D003944 at D003919-D003923).[9]

Plaintiff's Material Fact 29.   Two days later (April 21, 2021), Mr. Felder sent an email entitled, "goldstein" to undisclosed recipients listing: "Pattern of comm styles, Want to help advance success, Invest in your success, Exec coaching, Communication and de-escal[a]tion, Building more cohesive team, 6 month exec coa[ch] hi[m]. 2/month Every other week 1 hours, GYN complain[t] partially substantiated." Glatter Decl. Ex. 3 (D003912-D003944 at D003932).

Plaintiff's Material Fact 30.   Four days later (April 23, 2021), Dr. Leff sent Dr. Eikermann letters from the prior promotion cycle (in which Dr. Goldstein was denied promotion). Glatter Decl. Ex. 3 (D003912-D003944 at D003943-D003944).

Plaintiff's Material Fact 31.   The foregoing paragraphs recounting Defendants' response to Plaintiff's reasonable accommodation request reflect the immediate retaliation to which Plaintiff was subject and how, why, and when Dr. Eikermann learned about Plaintiff—in response to Plaintiff's April 19, 2024 accommodation request—not *after* first meeting with Plaintiff on April 28, 2024 as falsely implied by Eikermann Decl. ¶¶ 8-12. *See* Plaintiff's Response No. 82, *supra.*

**On July 1, 2021, Plaintiff Renews His Request for Reasonable Accommodation Based on Medical Necessity and Is Subject to Further Retaliation**

Plaintiff's Material Fact 32.   On July 1, 2021, Plaintiff reiterated his reasonable accommodation request that he could not be assigned overnight call (based on medical necessity and documented disability) with a new letter from his physician, Dr. Thorpy. Anthony Decl. Ex. DD (D000774-D000775).

---

[9] The Executive Committee notes do not make any reference to discussion of Dr. Goldstein's "other company," presumably a reference to Coagulation Sciences, LLC. *See* Goldstein Decl. ¶¶ 23-31.

Plaintiff's Material Fact 33.    When Plaintiff submitted his materials to be considered for promotion in 2021, he had fulfilled—and exceeded—the guidelines of the CAP in 2020 by accomplishing a total of sixteen publications. Goldstein Decl. ¶ 32; Glatter Decl. Ex. 9 (D005981-D006030 at D005993-D005994) and *compare with* 2020 CAP Committee minutes, transcript, and feedback Glatter Decl. Ex. 1 (D000931-D000951 at 931-932 and 950-951); Glatter Ex. 4 (D002589-D002590). Further, reference to the CV Plaintiff submitted for promotion consideration reflects sustained, academic productivity because, in addition to seven new peer-reviewed publications (2020-2021), from 2013-2021, he had numerous external (invited) and internal (Montefiore) lectures, poster presentations, academic abstracts, and formal mentoring activities. *See* Glatter Decl. Ex. 11 (D005981-D006030).

Plaintiff's Material Fact 34.    Nonetheless, within three weeks of Plaintiff's renewed reasonable accommodation request, on July 23, 2021, just one week before the 2021 Department promotion committee meeting, Dr. Leff sent an email to Dr. Eikermann entitled, "promotions committee," and wrote, "Also, attached is Sheldon Goldstein's CV and TP … We can discuss how to proceed (or not) whatever you want." Glatter Decl. Ex. 9 (D005981-D006030 at D005981).

Plaintiff's Material Fact 35.    One week after Dr. Leff's email suggesting Plaintiff's promotion request would not be considered, Doris Poma forwarded Dr. Eikermann a template for the FPPE on July 30, 2021 and Dr. Eikermann tasked Dr. Leff with completing the first draft of the FPPE by August 3, 2021. Glatter Decl. Ex  8 (D006035-D006039).

Plaintiff's Material Fact 36.    When deposed, neither Dr. Eikermann, nor Dr. Leff could identify any complaints about Plaintiff that supported issuance of the FPPE. (Eikermann Depo. 351:4-367:6; Leff Depo. 181:20-183:21).

Plaintiff's Material Fact 37.    Dr. Eikermann testified that the FPPE had "no specific examples of any alleged misconduct on the part of [Plaintiff]." (Eikermann Depo. 353:15-20).

Plaintiff's Material Fact 38.    The omission of *any* examples of misconduct is all the more significant because the form of FPPE provided by Ms. Poma on July 30, 2021 states, "***We need to add all of the HR complaints.***" Glatter Decl. Ex. 8 (Ex. D006035-D006039 at D006036 (emphasis in original). Despite this instruction, no HR complaints were ever added to the FPPE, presumably because none existed.

**The Failure to Consider Plaintiff for Promotion in 2021 Was Highly Irregular**

Plaintiff's Material Fact 39.    Despite the 2020 determination that, "[w]hile Dr. Goldstein technically meets all guidelines, he needs at least 5-6 more recent publications," Glatter Decl. (Ex. 1 D000931-D000951 at D000932); Glatter Ex. 4 (D002589-D002590) and Plaintiff exceeding this standard by accomplishing a seven publications (Goldstein Decl. ¶ 32; Glatter Decl. Ex. 9 (D005981-D006030 at D005993-D005994)), he was not only not promoted in 2021, but *he was not even considered for promotion.* Dr. Leff Depo.: 177:2-179:3.

Plaintiff's Material Fact 40.    The failure to even *consider* Plaintiff for promotion in 2021 was highly irregular and raises genuine issues of material fact. Plaintiff's expert witness, Dr. Edward Andrew Ochroch, noted in his expert report that, "[i]n my nearly three decades in academic medicine, I have never heard of any physician being excluded from consideration for promotion by a committee on appointments and promotions, and Dr. Leff, the Anesthesia Department's Vice Chair of Professional Affairs, is not aware of any physician other than Dr. Goldstein having been excluded from consideration for a promotion by a committee on appointments and promotions." Glatter Decl. Ex. 14 (Expert Report of Edward Andrew Ochroch,

M.D., dated March 18, 2024, at ¶ 31.)

Plaintiff's Material Fact 41.    Dr. Leff confirmed he was not aware of any other person being *excluded* from consideration by the committee on appointment and promotions. Dr. Leff testified:

> Q Just so it's clear, because you gave a long answer to a fairly simple question. I just want to know, has there been any person other than Dr. Goldstein that's been excluded from the consideration of the anesthesia department's committee on appointment and promotions after submitting a CV and teaching portfolio?
>
> A Yeah, not to my knowledge.

Leff Depo. at 185:10-18.

### Dr. Eikermann Tells Plaintiff He Will Not Be Promoted at October 3, 2021 Meeting

Plaintiff's Material Fact 42.    On October 3, 2021, Plaintiff met with Dr. Eikermann, Dr. Leff, and Dr. Straker. Without relying on any documented issues with Plaintiff, beyond the long-resolved January 8, 2021 incident, Dr. Eikermann verbally identified a number of issues regarding Plaintiff's use of non-clinical days, his work for Coagulations Sciences, LLC, his professionalism, and his publications. He also told Plaintiff he does not want him working with mentees on blood management issues. (TR 000051-TR 000085). *See also* Plaintiff's Response Nos. 96, 97, 98.

Plaintiff's Material Fact 43.    At this same October 3, 2021 meeting, Dr. Eikermann first told Plaintiff he would not be promoted to full professor. (24:23-25 at TR 000075)

Plaintiff's Material Fact 44.    Plaintiff left the meeting with the feeling that, despite the lack of substantive evidence or demonstrable complaints against him, Defendants' were determined to terminate him. Goldstein Decl. ¶ 38.

### Defendants Deliver the FPPE to Plaintiff at a November 30, 2021 Meeting

<u>Plaintiff's Material Fact 45.</u>    Plaintiff attended a meeting with Dr. Eikermann, Dr. Straker, and Mr. Felder on November 30, 2021. Anthony Dec. Ex. SS (TR 000001-TR 000050).

<u>Plaintiff's Material Fact 46.</u>    Dr. Eikermann referred to managing relationships with colleagues and professionalism, but none of the other issues raised on October 3, 2021 were further discussed, let alone documented. *See generally*   Anthony Dec. Ex. SS (TR 000001-TR 000050, including at TR000010-TR000011, 10:24-11:2).

<u>Plaintiff's Material Fact 47.</u>    At this meeting, Plaintiff was accused of having "too many complaints" against him, but this was actually a reference to *one* complaint: a November 2, 2021 email sent by Dr. Nicole Nevadunsky regarding a dispute which arose during a November 1, 2021 medical procedure. Anthony Dec. Ex. SS (TR 000001-TR 000050 at TR000002-TR000006, 6:15-16)  and Goldstein Decl. ¶ 40.

<u>Plaintiff's Material Fact 48.</u>    Plaintiff was never presented with any formal conclusions about the November 1, 2021 incident—let alone any written documented conclusions by Montefiore's HR—other than what Dr. Eikermann verbally relayed to him at the November 30, 2021 meeting. Goldstein Decl. ¶ 41.

<u>Plaintiff's Material Fact 49.</u>    Dr. Eikermann did not speak to all relevant witnesses, including a nurse, Preetha Mathews, who memorialized her November 8, 2021 conversation with Dr. Mikhail Chernov, former Associate Professor of Anesthesiology and Clinical Site Director (and Plaintiff's supervisor), which creates material issues of fact regarding Dr. Nevadunsky's perspective on this incident and describes Plaintiff as not delaying the case or behaving inappropriately during the subject procedure. Glatter Decl. Ex. 12 (D008524).

Plaintiff's Material Fact 50.    No one discussed the November 1, 2021 incident with Plaintiff before Dr. Eikermann drew his conclusions about the November 1, 2021 incident and issued an FPPE to Plaintiff which listed an April 15, 2022 date by which his progress would be reviewed. Anthony Decl. Ex. SS (TR 000001-TR 000050 at TR000004, 4:4-10 and TR000023, 23:2-8); Goldstein Decl. ¶ 42.

Plaintiff's Material Fact 51.    Dr. Eikermann told Plaintiff that the FPPE "means you do not meet expectations." Anthony Decl. Ex. SS (TR 000001-TR 000050 at TR000023, 23:9-11).

**There Is a Genuine Issue of Material Fact Concerning the Conflicting Versions of the FPPE**

Plaintiff's Material Fact 52.    Dr. Eikermann provided Plaintiff with an FPPE at the November 30, 2021 meeting after holding it back at the October 3, 2021 meeting Anthony Decl. Ex. SS (TR 000001-TR 000050 at TR000006-TR000007, 6:18-7:6).

Plaintiff's Material Fact 53.    Without explaining why, Dr. Eikermann described the FPPE as "a little outdated," but containing things for Plaintiff to consider. Anthony Decl. Ex. SS (TR 000001-TR 000050 at TR000008, 8:17-24).

Plaintiff's Material Fact 54.    The last paragraph of the unsigned, September 10, 2021 version of the FPPE Anthony Decl. Ex. TT (D000508-D000510), provided, "[a]t the end of the FPPE Performance Improvement Plan implementation, your progress will be reviewed with your mentor and Departmental senior leadership no later than **July, 2022**." Notably, this was *not* the FPPE that was presented to Plaintiff. In the last paragraph, of the signed, October 3, 2021 version of the FPPE, **the date is moved up by three (3) months to April 15, 2022**. Glatter Decl. Ex.10 (D006645-D006647 at D006647). Thus, the FPPE actually furnished to Plaintiff set a date just 4.5 months away for review of Plaintiff's progress. This explains the *immediate* pressure that Plaintiff

felt regarding the viability of his position and his belief he was subject to inevitable termination.

Plaintiff's Material Fact 55.    It follows that the relevant FPPE is the signed October 3, 2021 version Glatter Decl. Ex. 10 (D006645-D006647), not the unsigned September 10, 2021 version on which Defendants rely. *See* Plaintiff's Response No. 114, *supra.*

**Plaintiff Believed He Would Inevitably Be Terminated On Or Before April 15, 2022**

Plaintiff's Material Fact 56.    Plaintiff's belief that he would be subject to inevitable, involuntary "for cause" termination on or before April 15, 2022 was, among other reasons, due to (i) a series of undocumented, baseless accusations against him at both the October 3, 2021 and November 30, 2021 meetings, which had never previously been identified to him (including when he was denied promotion in June 2020) *See* Plaintiff's Material Fact Nos. 42-51; (ii) Dr. Eikermann's statement at the November 30, 2021 meeting that he was "the person who has a Focused Faculty Practice Evaluation which means you do not meet expectations," (November 30, 2021 Transcript at TR000022 and 23:9-11); and (iii) the April 15, 2022 date appearing in the signed October 3, 2021 FPPE (Glatter Decl. Ex. 10 (D006645-D006647)) by which his "progress would be reviewed . . . ." and, if he failed to meet expectations or had any other performance issues, he would be "subject to disciplinary action, *including potential loss of employment*." (emphasis added).

Plaintiff's Material Fact 57.    In addition, notwithstanding the reference in the FPPE to being scheduled to meet with Dr. Eikermann on a recurring basis, just one, ten-minute meeting occurred on January 19, 2022 (nearly two months after the November 30, 2021 meeting), with no others scheduled and little interaction with Dr. Eikermann (including Dr. Eikermann not attending Plaintiff's Grand Rounds in January 2022). Goldstein Decl. ¶ 44.

Plaintiff's Material Fact 58.    Further, despite the ongoing need for reasonable accommodation due to disability, Plaintiff was never taken off the schedule for overnight call during the 2021 Holiday season, plus he was assigned additional overnight call in January 2022, so he was also upset when he was assigned three days in a row of M2 call in February 2022 in violation of his medically necessary reasonable accommodation. Plaintiff felt extreme pressure to accept these overnight call assignments or risk termination. Goldstein Decl. ¶¶ 20-21, 45; Glatter Decl. Ex. 16.

Plaintiff's Material Fact 59.    On December 28, 2021, Dr. Thorpy had to send yet another letter to Defendants because it was medically necessary for Plaintiff not to take overnight call as he "requires a regular sleep-wake pattern" due to "chronic, severe obstructive sleep apnea . . . ." Anthony Decl. Ex. EE (D000779-D000780).

Plaintiff's Material Fact 60.    By February 2022, the pattern of baseless accusations and retaliatory actions recounted in Plaintiff's Material Facts 56-59 created an unbearable situation such that Plaintiff believed he would inevitably be terminated "for cause" on or before April 15, 2022, pursuant to the date listed in the FPPE. Goldstein Decl. ¶ 46 and Glatter Decl. Ex.10 (D006645-D006647 at D006647).

Plaintiff's Material Fact 61.    In order to avoid further damage to his career resulting from inevitable and involuntary "for cause" termination, on February 13, 2022, Plaintiff provided 60 days' written notice of resignation of his employment with Montefiore. Goldstein Decl. ¶ 47; Goldstein Decl. Ex. 15.

Plaintiff's Material Fact 62.    At the time he resigned, Plaintiff did not have a new position. Goldstein Decl. ¶ 48.

Dated: November 1, 2024
       New York, New York

                                      /s/  Denise Rubin Glatter

                                      Alex Granovsky (AG-6962)
                                      Denise Rubin Glatter (DG-7742)
                                      David Byrnes (6055172)
                                      GRANOVSKY & SUNDARESH, PLLC
                                      48 Wall Street, 11th Floor
                                      New York, NY  10005
                                      646-524-6001
                                      ag@g-s-law.com
                                      dglatter@g-s-law.com
                                      dbyrnes@g-s-law.com

                                      *Attorneys for Plaintiff*