UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHELDON GOLDSTEIN,

                Plaintiff,

-against-

MONTEFIORE MEDICAL CENTER and
MATTHIAS EIKERMANN,

                Defendants.

Case No. 22-cv-06723

---

**DECLARATION OF PLAINTIFF SHELDON GOLDSTEIN IN FURTHER SUPPORT OF PLAINTIFF'S COUNTER-STATEMENT TO DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

      **SHELDON GOLDSTEIN, M.D.,** pursuant to 28 U.S.C. § 1746, hereby declares as follows:

      1.    I am the Plaintiff in this action and, in addition to the pleadings and other submissions in this action, submit this declaration (the "Goldstein Declaration" in further support of Plaintiff's Counter-Statement to Defendants'[1] Rule 56.1 Statement of Undisputed Material Facts ("Plaintiff's 56.1 Counter-Statement").

      2.    I am licensed to practice medicine in New York, New Jersey, and Florida, and I am board-certified in anesthesiology and internal medicine. I have a well-established career with over thirty (30) years of experience as an attending anesthesiologist.

---

[1] Defendants are Montefiore Medical Center ("Montefiore") and Matthias Eikermann ("Dr. Eikermann") (collectively referred herein as "Defendants").

1

3.     In November 2013, I began my employment by Defendant Montefiore Medical Center ("Montefiore") with the title/position of Attending Anesthesiologist and Associate Professor of Anesthesiology.

4.     During the course of my employment by Montefiore, I performed my services competently, faithfully, diligently, and in an outstanding manner. I was never subject to any disciplinary action, and I consistently received strong performance reviews.

5.     By 2020, I had worked for Montefiore for approximately seven (7) years and had worked hard to qualify for promotion from Associate Professor to Professor on the Clinician Educator Track.

6.     In June 2020, the Committee for Academic Promotions ("CAP")within Montefiore's Anesthesiology Department reviewed my application for promotion.

7.     It was the primary assessment of the CAP that, based upon the clinical educator promotion checklist, I was well-qualified for and close to a promotion, but that in addition to the eleven publications I had in 2020, I needed additional, peer-reviewed publications to receive promotion to Professor.

8.     In the ensuing months, I exceeded the identified publication requirement by publishing five additional PubMed-referenced, peer-reviewed publications and making various professional presentations. Glatter Decl. Ex. 9[2] (D005981-D006030 at D005993-D005994).

9.     Having fulfilled the requirements of the CAP, I submitted my materials for promotion in July 2021 where it seemed I would be on a path for promotion to Professor based on

---

[2] "Glatter Decl. Ex. __" refers to Exhibits attached to the Declaration of Denise Rubin Glatter, sworn to, January 31, 2025. Unless, specified, all other exhibit citations refer to Defendants Exhibits, including deposition transcripts and declarations, attached to Defendants' Rule 56.1 Statement of Undisputed Material Facts and accompanying Declaration of William Anthony.

the June 2020 feedback of the CAP and my accomplishment of a total of sixteen publications. Glatter Decl. Ex. 9 (D005981-D006030 at D005993-D005994).

### **I Sought a Reasonable Accommodation and Everything Changed**

10. My prospects for promotion and, indeed, my standing at Montefiore all changed when I sought a reasonable accommodation from Montefiore to be exempt from overnight call due to my disability of severe obstructive sleep apnea based on a documented medical need. This reasonable accommodation was necessary to assure regular sleep and wake patterns.

11. Through an April 19, 2021 letter from Dr. Michael Thorpy, I sought a reasonable accommodation based on disability which required I have regular sleep and wake patterns such that I not be taking overnight call. Dr. Thorpy directed the letter to Montefiore's Director, Division of Anesthesiology, Dr. Tracey Straker ("Dr. Straker"), and to the newly-appointed Chair of the Anesthesiology Department at Montefiore, Matthias Eikermann, M.D. ("Dr. Eikermann")(who assumed this role on April 15, 2021). The necessity for this reasonable accommodation was reaffirmed by Dr. Thorpy through correspondence on both July 1, 2021 and December 28, 2021, which was also directed to Dr. Straker and Dr. Eikermann, as well as Andrew Felder (the Unified Administrator of the Anesthesiology Department).

12. I believe I was subject to discrimination following my request.

13. Through the course of this litigation, I learned that as soon as I made this request, Defendants marshalled and weaponized all of their opinions about me and distorted relevant facts pertaining to me, initiating a series of events resulting in a failure to even consider me for promotion in July 2021, initiation of a performance plan against me (called a Focused Professional Practice Evaluation, or "FPPE") in July 2021, and issuance of the FPPE against me on November 30, 2021 (the latter once Defendants had a "complaint" off of which they could

3

bootstrap the FPPE)—all of which undermined my status at Montefiore and indicated to me that Montefiore would terminate my employment on the date stated in the FPPE, April 15, 2022. Although my position is set forth in great detail in the accompanying Plaintiff's 56.1 Counter-Statement and related submissions, through this Goldstein Declaration I provide additional information not otherwise available in supporting documents.

**January 8, 2021 GYN Incident**

14. On January 8, 2021, I worked on a case involving a patient who required an echocardiogram (a matter I discussed the preceding day with the attending physician). I was surprised when the OB/GYN resident asked to bring the patient to the operating room without the necessary test. I discussed the matter with the attending physician and told the OB/GYN resident that the echocardiogram was about to be performed. After that, we would be in the operating room in about thirty (30) minutes. There were no raised voices or profanity in this exchange. Based on this sequence, a MIDAS report (through Montefiore's anonymous reporting system) was submitted by the OB/GYN resident.

15. In the following days and weeks Montefiore's HR Department investigated the January 8, 2021 incident (*this one event* is referred to as both GYN Complaint and the MIDAS complaint in Defendants' 56.1 Statement). My understanding is that Human Resources spoke with multiple people. And, on or about February 2021, a Human Resources employee called me and told me Human Resources concluded, I "could have spoken more nicely to the OB/GYN resident." I never received any writing from Human Resources or anyone else in connection with the January 8, 2021 incident nor did Defendants ever produce anything in the course of this litigation.

4

16. This appeared to be the end of the matter. Indeed, two months *after* the January 8, 2021 incident, in the Biennial Medical Staff Member/Provider Evaluation, signed by the Anesthesiology Department Chair, Naum Shaparin, on March 9, 2021, I was rated "excellent" in all categories, including appearance/professional demeanor, interpersonal relations, and professional ethics/integrity. Glatter Decl. Ex. 2 (D000071-D000075). In fact, my professionalism has never been questioned during my time at Montefiore, including in connection with denial of my 2020 promotion.

17. I later learned that Defendants refocused attention on the January 8, 2021 incident immediately after Dr. Thorpy's April 19, 2021 request on my behalf for reasonable accommodations (in the form of no overnight call duties) due to medical necessity.

**Montefiore Call Assignments**

18. Consistent with the reasonable accommodation Dr. Thorpy requested on my behalf, there were certain Montefiore call assignments that I could no longer be given due to my medical necessity and my inability to take overnight call. Montefiore Anesthesia Department has a variety of different types of call assignments.

19. Among the assignments that were not consistent with my medically necessary reasonable accommodation of no overnight call was a type called "W3," referring to "3rd call" at Montefiore's Weiler Hospital. This meant one would arrive at Weiler Hospital by 12:00 pm with the requirement to keep one's phone on until the following morning. In practice, this meant a physician could be called until 7:00 am the following morning and need to return to Weiler Hospital during the night—the equivalent of an overnight call in violation of my reasonable accommodation. Though a W3 assignment was less likely to be called back in the middle of the night, I have been required to return to Weiler Hospital while on this type of call at 1:30 am.

20. Likewise, "M2" referred to late call at Montefiore's Moses Hospital, typically meaning working from 12:00 pm and keeping one's phone on until 7:00 am the next morning. While it was not common to be called back to Moses Hospital when assigned to M2, it was more likely than W3. Accordingly, I was upset when I was assigned three days in a row of M2 in February 2022 in violation of my medically necessary reasonable accommodation, especially because holiday weekend M2 calls are full 24-hour calls, which is different than a weekday M2 call. In other words, I could potentially be on call for 72 hours with only brief breaks in between.

21. In either circumstance, a W3 or an M2 assignment would interfere with a regular sleep-wake pattern and I should have no longer been assigned to either due to my documented medical need, but, because I was concerned that I was subject to imminent termination following the issuance of the FPPE on November 30, 2021, I accepted these assignments during the 2021 holiday season, January 2022, and February 2022. Indeed, several of these assignments were WorP call which is a true overnight call. This type of call starts at 5:30 pm weekdays or 7:00 pm weekends and holidays and one is required to keep their phone on and be immediately available all night until 7:00 am the next morning. This is designated on the relevant call schedule with a "P" for "PM."

22. Given my documented medical need, I understood I might need to do—and in fact did—more weekend daytime call assignments in order to fill my call obligations to Montefiore, including accepting many W3 calls.

**Following My Request For Reasonable Accommodation, Defendants Compiled a Multitude of Criticisms of Me**

*Non-Clinical Time, Coagulation Sciences, LLC, and Publications*

23. With my request for reasonable accommodation, among the information Defendants marshalled was a contrived claim that I had used my non-clinical time since 2013 to help my company, Coagulation Sciences, LLC. This is demonstrably false.

24. As an initial matter, Montefiore agreed to an arrangement in my 2013 employment agreement and other contemporaneous documents permitting me to do work for my company.

25. Regardless, all of the research connected with Coagulation Sciences, LLC went through and was approved by Montefiore's Institutional Review Board ("IRB").

26. The IRB is the medical school committee that reviews research studies to confirm they are appropriate, ethical, and safe for patients.

27. Due to my relationship to Coagulation Sciences, LLC, the IRB was required to—and in fact, did—monitor my research due to potential conflict of interest. On two separate occasions independent, third parties reviewed my research documentation and data, and confirmed its accuracy and the absence of any modification of lab results by me. The first review was conducted by Nair Singh, M.D., at the request of Dr. Ellise Delphin, Chair of Anesthesiology. The second review was conducted on June 6, 2017 by Kathy O'Connor, R.N. Quality Management Analysis, Einstein IRB (West Campus), someone selected by the IRB.

28. Further, all of my work for my company was *before* Dr. Eikermann started at Montefiore on April 15, 2021. Within months of Dr. Eikermann's arrival at Montefiore, and out of concern he would take action against me, I closed out two Montefiore IRB approved research projects.

29. During the time I was at Montefiore, none of my peer-reviewed publications related to work for Coagulation Sciences, LLC. Glatter Decl. Ex. 9 (D005981-D006030 at D005993-D005994).

30. Of the forty-four (44) presentations I made during my tenure at Montefiore, 39 of 44 were not related to Coagulation Sciences, LLC Glatter Decl. Ex. 9 (D005981-D006030 at D005999-D006002).[3]

31. Due to my work for Coagulations Sciences, LLC, Montefiore received "work-in-kind" because I trained a resident and medical students in translational research methods and my work on these issues was presented at the International Anesthesia Research Society and the Society for the Advancement of Blood Management meetings with Montefiore and its Einstein Medical School names featured at the top of promotional posters. Glatter Decl. Ex. 9 (D005981-D006030 at D006000 )

32. Further, after I was denied promotion in June 2020, I had five additional publications, and by the time of the next (2021) promotion cycle I had a total of sixteen[4] publications, of which twelve were the more prestigious Peer-Reviewed, PubMed-referenced for which I was the lead author of eight of the latter category[5] Glatter Decl. Ex. 9 (D005981-D006030 at D005993-D005994).[6]

*Cancellation of Professional and Leadership Coaching*

---

[3] It appears that some information that was included in my 2021 CV does not appear in the version of the document that Dr. Leff sent to Dr. Eikermann. As necessary, I reserve the right to present a correct version of my 2021 CV which was submitted in 2021 to the CAP.

[4] A seventeenth publication was published in October 2021, so I believe I had an acceptance letter at the time I submitted myself for promotion in July 2021, and sixteen publications appeared on the materials submitted for promotion. *See* Glatter Decl. Ex. 9.

[5] In contrast to me, one of the other candidates who was promoted in 2021, Dr. Sujatha Ramachandran, had the minimum of ten publications. Of her nine Peer-Reviewed, PubMed-referenced articles and one book chapter, she was lead author of just one (a case report) in the promotion materials she submitted in 2021. *See* Glatter Decl. Ex. 18.

[6] Like me, Dr. Amaresh Vydyanathan was held back from promotion in 2020, and the CAP provided guidance to him about his efforts. In 2020, he was told he was not promoted because he had not delivered any invited lectures. Akin to my need for additional publications, Dr. Vydyanathan accomplished additional invited lectures following denial of his 2020 promotion and was elevated to full Professor in 2021. I accomplished the prescribed number of publications in 2021 and was not even submitted for promotion. Another 2021 candidate, Dr. Sujatha Ramachandran was promoted to Professor in 2021 even though she had had not delivered a single invited lecture during her career. This is noteworthy as I had delivered 32 invited lectures nationally and internationally.

33. I was scheduled for professional coaching in May 2021, but after just two sessions Dr. Eikermann wrote me on June 25, 2021 and stated, "As a consequence of recent events, and in consideration of the available career development resources in the Department, we have decided to put this engagement on hold. . . ." Glatter Decl. Ex. 7 (D008529-D008544 at D008541).Dr. Eikermann never told me what "recent events" led to cancellation of my coaching.

**October 3, 2021 Meeting**

34. Following the resolution of the January 8, 2021 incident, I had not been subject to any direct criticism, whether formal or informal. Plus, two months *after* the January 8, 2021 incident, in my March 9, 2021 Biennial Medical Staff Member/Provider Evaluation, signed by the Anesthesiology Department Chair, Naum Shaparin, I was rated "excellent" in all categories, including appearance/professional demeanor, interpersonal relations, and professional ethics/integrity. Glatter Decl. Ex. 2 (D000071-D000075).

35. Accordingly, I was very surprised on October 3, 2021, when, in a meeting with Dr. Eikermann, Dr. Tracy Straker, and Dr. Jonathan Leff, I was told to "try to be consistently professional" and reference was made to what seemed to be the January 8, 2021 incident nine months before. Anthony Decl. Ex. NN (Goldstein Recording TR000051-TR000085 at TR000058-TR000059, at pg. 9:7-18.)

36. Dr. Eikermann referred to no specific event other than the seemingly long-resolved January 8, 2021 incident and he proceeded to describe Human Resources issues as "bullshit" 90% of the time." NN Anthony Decl. Ex. NN (Goldstein Recording TR000051-TR000085 at pg. 14:7-16.).

37. In the absence of any specific wrongdoing, I was also told that I would not be promoted in the 2021 cycle.

38. I left the meeting shaken and uncertain about what I had purportedly done wrong in the intervening months and in the absence of any identification of specific incidents or documented Human Resources complaints, I was simply looking to leave the meeting without giving Dr. Eikermann any other reason to contrive a performance issue because it appeared to me Dr. Eikermann was looking for a reason to terminate me.

**November 30, 2021 Meeting and Issuance of FPPE**

39. Following the October 3, 2021 meeting, I was concerned when a November 30, 2021 meeting was scheduled with Dr. Eikermann, Dr. Straker, and Mr. Felder.

40. My concerns were well-founded because I was again subjected to unfounded claims of having "too many complaints" against me. The reference to "too many complaints" was apparently reference to one complaint: the November 2, 2021 email sent by Dr. Nicole Nevadunsky regarding a surgical procedure of November 1, 2021.

41. Though material issues of fact surrounding the November 1, 2021 incident are detailed at length in Plaintiff's 56.1 Counter-Statement, I was never presented with any formal conclusions about this incident—let alone any written documented conclusions by Montefiore's Human Resources—other than what Dr. Eikermann verbally relayed to me at the November 30, 2021 meeting. In fact, I am not aware of an investigation being conducted despite my alerting Human Resources to this event and my understanding of Human Resources's obligation to investigate all complaints it receives. Glatter Decl. Ex. 11 (D000622-D000636).

42. Further, no one discussed the November 1, 2021 incident with me before Dr. Eikermann drew his conclusions about the November 1, 2021 incident and issued an FPPE to me which listed an April 15, 2022 date by which my progress would be reviewed.

**I Believed I Would Be Terminated On Or Before April 15, 2022**

10

43. My concern that I would be terminated on or before April 15, 2022 was due to (i) what were a series of baseless, undocumented accusations against me at both the October 3, 2021 and November 30, 2021 meetings, (ii) Dr. Eikermann's statement at the November 30, 2021 meeting that I was "the person who has a Focused Faculty Practice Evaluation which means you do not meet expectations," (Anthony Decl. Ex SS, TR000022 and 23:9-11) and I should submit complaints to Drs. Eikermann and Straker, rather than Human Resources (Anthony Decl. Ex SS at TR000023-TR000029, 23:2-29: 22), and (iii) the April 15, 2022 date appearing in the FPPE dated October 3, 2021 (D006645-D006647) by which my "progress would be reviewed . . . ." and, if I failed to meet expectations, made any complaints to Human Resources, or had any other performance issues, I would be "subject to disciplinary action, including potential loss of employment."

44. Notwithstanding the reference in the FPPE to being scheduled to meet with Dr. Eikermann on a recurring basis, just one, ten-minute meeting occurred on January 19, 2022 (nearly two months after the November 30, 2021 meeting), with, to my recollection, no others scheduled and little interaction with Dr. Eikermann (including Dr. Eikermann not attending my Grand Rounds in January, 2022).

45. In addition, despite the ongoing need for reasonable accommodation due to disability, I was never taken off the schedule for overnight call during the 2021 Holiday season, plus I was assigned additional overnight calls in January 2022, plus three days in a row of M2 in February 2022 in violation of my medically necessary reasonable accommodation. Despite my medical needs, I felt extreme pressure to accept these overnight call assignments or risk termination.

Document Ref: WPMUV-UBYRR-BRP5C-XSHBD    Page 11 of 12

46. By February 2022, this pattern of baseless accusations and retaliatory actions against me created an unbearable situation such that I believed I would inevitably be terminated "for cause" on or before April 15, 2022.

47. Accordingly, in order to avoid further damage to my career resulting from involuntary, for cause termination, on February 13, 2022, I provided 60 days' written notice of resignation of my employment with Montefiore based on my understanding of Montefiore's Human Resources Policy and Procedure Manual, Resignation Notice, Policy Number: 11-10, Issued on August 1, 1969, and Reviewed/Revised on December 18, 2020, a true and correct copy of which is attached hereto as Exhibit 15.

48. When I left Montefiore, I did not have a new position.

Dated: New York, New York
      January __, 2025
   2025-01-30

*Sheldon Goldstein*
_____
SHELDON GOLDSTEIN

# Signature Certificate

Reference number: WPMUV-UBYRR-BRP5C-XSHBD

| Signer | Timestamp | Signature |
|---|---|---|
| **Sheldon Goldstein** <br> Email: goldsheld@aol.com | | |
| Sent: | 30 Jan 2025 21:33:15 UTC | *Sheldon Goldstein* |
| Viewed: | 30 Jan 2025 21:38:22 UTC | |
| Signed: | 30 Jan 2025 21:38:46 UTC | |
| **Recipient Verification:** | | IP address: 24.146.245.136 |
| ✔ Email verified | 30 Jan 2025 21:38:22 UTC | Location: The Bronx, United States |

Document completed by all parties on:
30 Jan 2025 21:38:46 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.

