UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHELDON GOLDSTEIN,

                Plaintiff,

    -against-

MONTEFIORE MEDICAL CENTER and
MATTHIAS EIKERMANN,

             Defendants.

22-CV-6723 (AT) (RFT)

**<u>OPINION & ORDER</u>**

---

**ROBYN F. TARNOFSKY, United States Magistrate Judge:**

Defendants Montefiore Medical Center ("Montefiore") and Dr. Mattias Eikermann (collectively, "Defendants") have moved for summary judgment on the employment discrimination claims against them brought by Plaintiff Dr. Sheldon Goldstein (ECF 66, Defs.' S.J. Mot.). Defendants also filed a motion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the expert reports and testimony of Dr. Edward A. Ochroch, who opines on Plaintiff's qualifications for promotion, the propriety of Plaintiff's exclusion from the promotion process, and the relative value of a promotion to clinical professor (ECF 81-1, Ochroch Report ¶ 11). (*See* ECF 79, Mot. To Exclude.) For the reasons set forth below, Defendants' motion to exclude Dr. Ochroch's report and testimony IS GRANTED IN PART AND DENIED IN PART as set forth herein.[1]

---

[1] "Because *Daubert* motions are nondispositive of the litigation, they are routinely determined by magistrate judges, subject to clear error review by the district judge." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-CV-4576 (DEH) (BCM), 2024 WL 1115944, at *3 n.4 (S.D.N.Y. Mar. 14, 2024); *see also Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 4d 530, 533 n.1 (S.D.N.Y. 2024).

**FACTUAL BACKGROUND**

The statement of facts for a *Daubert* motion to exclude expert opinions is generally drawn from the record, answers, and complaints. *See, e.g.*, *Navigators Ins. Co. v. Goyard, Inc.*, 608 F. Supp. 3d 44, 45 (S.D.N.Y. 2022) (citing to complaint and answer for background); *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 533 (S.D.N.Y. 2024) (citing to declarations, complaint, and insurance policy).[2] Courts may also look to any statements of undisputed material facts ("SUMF") and counter-statements of material facts ("CSUMF") for related summary judgment motions. *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 345 n.1 (S.D.N.Y. 2023) (deciding a *Daubert* motion based on facts from a SUMF); *LoanCare, LLC v. Dimont & Assocs., LLC*, No. 22-CV-9286 (MMG), 2025 WL 951585, at *1 n.1 (S.D.N.Y. Mar. 28, 2025) (same).

This case arises out of an action to recover damages against Defendants for alleged discrimination and harassment based on disability under the Americans with Disabilities Act of 1990 ("ADA"), the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). (*See* ECF 1, Compl. at 1.) Plaintiff maintains that Defendants "contrived and amplified minor matters into purported performance issues" in retaliation for Plaintiff seeking reasonable accommodation for his disability, which resulted in Plaintiff's voluntary resignation. (*See* ECF 73, Pl.'s CSUMF at 2-3.)

---

[2]     Unless otherwise indicated, this opinion and order omits internal quotation marks, alterations, and citations from quoted text.

Montefiore is a non-profit medical center and healthcare management company located in the Bronx, New York. (*See id.* ¶ 1.) Montefiore maintains a Non-Discrimination Against and Accommodation of Individuals with Disabilities Policy which provides a procedure for requesting accommodation and states that accommodations will be granted so long as they "do[ ] not pose a direct threat to the [individual] or others . . . and . . . do[ ] not cause an undue hardship on the conduct of Montefiore's business." (*Id.* ¶ 3.)

Montefiore hired Plaintiff on September 30, 2013 as a full-time physician and Professor in the Department of Anesthesiology at Albert Einstein College of Medicine ("Einstein"). (*See id.* ¶¶ 5-6.) Plaintiff was also the CEO of his own independent company, Coagulation Sciences, LLC. (*See id.* ¶ 7.) Until 2020, the Chair of the Department of Anesthesiology, Dr. Elise Delphin, gave Plaintiff an average of one day per month of non-clinical time. (*See id.* ¶¶ 8-9.)[3]

In 2020, Plaintiff applied for a promotion from Associate Professor to Professor on the Clinician Educator Track. (*See id.* ¶ 23.) Applicants are encouraged to submit a CV and a teaching portfolio to the Committee for Academic Promotions ("CAP") for consideration. (*See id.* ¶¶ 11-12, 14.) The CAP is composed of associate professors and professors at Einstein. (*See id.* ¶ 16.) The Chair of the CAP provides each member with "relevant materials regarding the process" and an applicant's submissions. (*See id.* ¶ 17.) Each member is assigned an applicant

---

[3]     Physicians in the Department of Anesthesiology are expected to work a certain number of clinical hours in the operating room, providing patient care. The non-clinical hours were provided to doctors for research and other tasks. (*See* ECF 60, Letter Mot. at 1.)

to review and present to the CAP with recommendations. (*See id.* ¶ 18.) Applicants are

evaluated according to a standardized educator checklist. (*See id.* ¶ 20.)

Dr. Naum Shaparin was assigned to present Plaintiff to the CAP. (*See id.* ¶ 26.) Dr.

Shaparin recommended that Plaintiff not be considered for promotion, which the CAP

unanimously supported, but was "blocked" by Dr. Delphin. (*See id.* ¶ 27.) On July 15, 2020, the

Chair of the CAP, Dr. Leff, emailed Plaintiff notifying him of the committee's decision and

explaining that Plaintiff needed more peer-reviewed publications to be promoted. (*See id.*

¶¶ 29-30.) On August 25, 2020, Plaintiff emailed Dr. Leff asking the CAP to reconsider, but Dr.

Leff maintained that the "decision was unanimous and . . . final." (*See id.* ¶¶ 31-32.) Plaintiff did

not file a complaint relating to this decision. (*See id.* ¶ 33.)

In 2021, Plaintiff again applied for promotion to Professor on the Clinician Educator

Track, but the CAP never reviewed his materials. (*See id.* ¶¶ 34-35.)

In January 2021, Dr. Delphin retired, and Dr. Shaparin replaced her as interim Chair of

the Anesthesiology Department. (*See id.* ¶ 36.) Plaintiff emailed Dr. Shaparin requesting to

deliver two "Grand Rounds" talks to better situate him for promotion. (*See id.* ¶¶ 37-38.)

Plaintiff then met with Dr. Shaparin to request non-clinical time, which Dr. Shaparin denied,

citing the pandemic. (*See id.* ¶ 39.) This decision upset Plaintiff, especially when he learned that

"others were receiving non-clinical time," and Plaintiff emailed his frustrations to Dr. Tracey

Straker, Plaintiff's direct supervisor. (*See id.* ¶¶ 10, 40-42.) Plaintiff included in that email a

request to be "ke[pt] off overnight call through March" while he waited for a forthcoming

medical evaluation that would allow him to "push for no overnight call." (*Id.* ¶ 41.)

4

On April 12, 2021, Plaintiff emailed Dr. Shaparin and Dr. Straker asking Dr. Shaparin to petition the CAP to consider his application for a 2021 promotion off-cycle from the rest of the applicants. (*See id.* ¶ 44.) In his email, Plaintiff acknowledged that his May 2020 request for promotion had been denied. (*See id.* ¶ 45.) Dr. Shaparin denied Plaintiff's request, informing him that he should re-apply like everyone else in the coming months for the 2022 cycle. (*See id.* ¶ 46.)

In January 2021, Defendants received a report through Montefiore's anonymous reporting system detailing an incident of Plaintiff's inappropriate behavior towards staff (the "January 8 Incident"). (*See id.* ¶¶ 47-49.) Plaintiff began his coaching plan on May 4, 2021, after returning from a vacation or other absence. (*See id.* ¶ 51.)

On April 19, 2021, Plaintiff requested not to take overnight calls as a reasonable accommodation for his chronic sleep apnea. Montefiore granted the reasonable accommodation request. (*See id.* ¶ 58.) Plaintiff did not take any overnight calls in May, June, or July 2021, instead substituting late calls and weekend calls for overnight calls. (*See id.* ¶¶ 59-62.) In July 2021, after a department administrator emailed Plaintiff to ask if Plaintiff could be put back on overnight calls, Plaintiff's doctor emailed Defendants informing them that Plaintiff should not take overnight call due to his sleep apnea. (*See id.* ¶¶ 63-64.) However, Plaintiff had been scheduled by lottery a year prior to work two overnight shifts in January 2022. (*See id.* ¶ 66.) When asked by Defendants, Plaintiff confirmed his commitment to fulfilling those two previously scheduled obligations. (*See id.* ¶¶ 67-71.)

Dr. Eikermann became the Chair of the Anesthesiology Department on April 15, 2021. (*See id.* ¶ 72.) On April 28, 2021, Plaintiff met with Dr. Eikermann and requested "(1) a promotion . . . to Professor on the Clinician Educator Track; (2) non-clinical time; (3) appointment to the Vice Chair of Faculty Development . . . ; and (4) reinstatement of an employee who was taken off leadership by Dr. Delphin." (*Id.* ¶¶ 73, 76.) Dr. Eikermann advised Plaintiff that he would discuss these requests with the executive team, and subsequently, in June, Dr. Eikermann forwarded a complimentary email about Plaintiff to the executive team. (*See id.* ¶¶ 77, 86.)

In early July 2021, Plaintiff's doctor reiterated Plaintiff's reasonable accommodation request. (*See id.* ¶ 87.) In late July, members of the executive team, including Dr. Eikermann, began discussing issuing Plaintiff a Focused Professional Practice Evaluation ("FPPE"), but Dr. Eikermann wanted to meet with Plaintiff personally first. (*See id.* ¶¶ 87, 88.)

On October 3, 2021, Plaintiff secretly recorded a meeting with Drs. Eikermann, Leff, and Straker, because Plaintiff believed that Dr. Eikermann "was targeting [him] and potentially manufacturing [a] false claim about [him]." (*Id.* ¶¶ 90-91.) At the meeting, Dr. Eikermann praised Plaintiff's work as a clinician, scientist, and researcher but informed Plaintiff that he would not be considered for promotion in 2021. (*See id.* ¶¶ 94-95.) Dr. Eikermann told Plaintiff "to meet with him every three months" so that Dr. Eikermann could "help him" on the path to promotion. (*Id.* ¶¶ 99-100.) Dr. Eikermann further advised Plaintiff that although he was objectively qualified, "he could not be promoted if he had ongoing performance issues." (*See id.* ¶ 102.)

6

On November 2, 2021, Dr. Nicole Nevandunsky emailed a complaint accusing Plaintiff of "inappropriate behavior" towards her and a sub-intern during a procedure the day prior. She stated that Plaintiff "treated them in a pejorative manner" and referenced Plaintiff's "track record of poor professionalism." (*Id.* ¶¶ 104-105.) Several days later, Dr. Mikhail Chernov, former Associate Professor of Anesthesiology and Clinical Site Director, emailed Plaintiff a copy of the complaint and asked him to respond in writing. (*See id.* ¶ 106.) Plaintiff responded with several "brief points" refuting the complaint and then later filed his own HR report against Dr. Nevandunsky on November 29, 2021. (*See id.* ¶¶ 108, 110.)

On November 30, 2021, Plaintiff secretly recorded another meeting with Drs. Eikermann and Straker and Mr. Andrew Felder, a department administrator, in which Dr. Eikermann discussed the complaint against Plaintiff; Dr. Eikermann stated that Plaintiff had "too many complaints" against him and "cannot have more." Plaintiff agreed. (*Id.* ¶¶ 111-13.) During this meeting, Dr. Eikermann presented Plaintiff with an FPPE. (*See id.* ¶¶ 114-16.) Dr. Eikermann also reiterated his commitment to supporting Plaintiff. (*See id.* ¶ 118.) After the meeting, Plaintiff emailed Dr. Eikermann thanking him for the advice and promising to "complete the courses [he] suggested." (*Id.* ¶ 121.)

Plaintiff emailed Dr. Straker on January 2, 2022, informing her of a recent success in the operating room, and Dr. Eikermann later forwarded that email to the executive committee. (*See id.* ¶¶ 124-25.) On February 1, 2022, Plaintiff provided Dr. Eikermann with a written update on his progress with the FPPE, in which Plaintiff referenced their "good conversation"

on January 19, 2022. (*See id.* ¶¶ 126, 128.) On February 13, 2022, Plaintiff provided his notice of resignation effective April 13, 2022. (*See id.* ¶ 130.)

**PROCEDURAL HISTORY**

Plaintiff filed a complaint initiating this action on August 8, 2022, seeking monetary damages for workplace discrimination in the form of back pay, front pay, and compensatory damages; attorneys' fees; punitive damages; an award of costs; and interest. (*See* ECF 1, Compl. at 9.) Defendants filed their answer on October 7, 2022, asserting, among other defenses, that Plaintiff failed to state a claim upon which relief could be granted. (*See* ECF 14, Answer at 6.)

On January 24, 2024, Your Honor referred this case to a magistrate judge for general pretrial services and non-dispositive motions. (*See* ECF 32, Order of Reference.) Your Honor later amended the order to include dispositive motions in anticipation of a summary judgment motion. (*See* ECF 65, Am. Order of Reference.) After the close of discovery, Defendants moved for summary judgment, seeking dismissal of all claims. (*See* ECF 66, Defs.' S.J. Mot. at 1.) Plaintiff submitted his opposition papers on January 31, 2025, claiming that disputed issues of material fact preclude summary judgment. The parties' summary judgment motions were fully briefed by February 28, 2025. (*See* ECF 67, Defs.' SUMF; ECF 68, Defs.' Mem. in Supp. of S.J. ("Defs.' S.J. Mem."); ECF 69, Decl. of William J. Anthony in Supp. of S.J. ("Anthony Decl."); ECF 70, Decl. of Matthias Eikermann in Supp. of S.J. ("Eikermann Decl."); ECF 71, Decl. of Tracy Straker in Supp. of S.J. ("Straker Decl."); ECF 72, Pl.'s Mem. in Opp. of Defs.' Mot. for Summ. J. ("Pl.'s S.J. Opp."); ECF 73, Pl.'s CSUMF; ECF 74, Decl. of Sheldon Goldstein in Opp. to S.J.

("Goldstein Decl."); ECF 75, Decl. of Denise Rubin Glatter in Opp. to S.J. ("Glatter Decl."); ECF 76, Defs.' Reply in Supp. of S.J. ("Defs.' S.J. Reply").)

Defendants subsequently filed a *Daubert* motion to exclude the expert report and deposition testimony of Dr. Ochroch. (*See* ECF 79, Mot. To Exclude.) The *Daubert* motion was fully briefed by April 4, 2025. (ECF 80, Defs.' Mem. in Supp. of Mot. To Exclude ("Defs.' Ochroch Mem."); ECF 81-1, Ochroch Report; ECF 81-2, Ochroch Dep.; ECF 83, Pl.'s Mem. of Law in Opp. to Mot. To Exclude Ochroch Rep. and Testimony ("Pl.'s Ochroch Opp."); ECF 84, Defs.' Reply Mem. in Supp. of Mot. To Exclude ("Defs.' Ochroch Reply").) Your Honor referred the disposition of the *Daubert* motion to me for resolution. (*See* ECF 82, Am. Order of Reference.)

## LEGAL STANDARDS GOVERNING *DAUBERT* MOTIONS

Trial courts serve as gatekeepers for expert evidence and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "The party seeking to introduce the expert testimony bears the burden of establishing by a preponderance of the evidence that the proffered testimony is admissible." *Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 503-04 (S.D.N.Y. 2018) (citing *Daubert*, 509 U.S. at 592). Although a district court has "broad discretion to carry out this gatekeeping function," *Navigators Ins. Co. v. Goyard, Inc.*, 608 F. Supp. 3d 44, 47 (S.D.N.Y. 2022), "exclusion remains the exception rather than the rule." *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 250 (S.D.N.Y. 2022), *on reconsideration in part*, No. 16-CV-0740 (JMF), 2022 WL 3018104 (S.D.N.Y. July 29, 2022).

Under Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert and other scientific or technical testimony or testimony based on specialized knowledge:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires that "expert testimony rest on knowledge, a term that connotes more than subjective belief or unsupported speculation." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590). In assessing the admissibility of expert testimony under Rule 702, courts consider three factors: "(1) the qualifications of the expert to testify as to a particular matter, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's testimony as to a particular matter will assist the trier of fact)." *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17-CV-7636 (JPC) (BCM), 2022 WL 902465, at *6 (S.D.N.Y. Mar. 28, 2022) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)).

## I.    Expert Qualifications

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

"If an expert's training and experience are in a field closely related to the subject matter of the proposed testimony, that showing may be sufficient to meet Rule 702's qualification standards in appropriate circumstances." *In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *4 (S.D.N.Y. July 28, 2017).

## II.    Reliability of the Expert's Opinion

After concluding that a witness is qualified as an expert, a court then examines whether "the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015) (quoting *Daubert*, 509 U.S. at 597). "If the expert's testimony does not rest on traditional scientific methods, the court may permit testimony where a proposed expert witness bases her testimony on practical experience rather than scientific analysis." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016).

"An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). Expert opinions should be excluded when the flaw in the expert's reasoning or methodology is "large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) ("Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, have been relied upon by appellate courts as grounds for rejection of expert testimony."). Courts "must focus on the principles and methodology employed by the expert,

without regard to the conclusions the expert has reached." *Amorgianos*, 303 F.3d at 266.

Nonetheless, "conclusions and methodology are not entirely distinct from one another";

"nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and a

court may exclude expert testimony if it determines that "there is simply too great an analytical

gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146

(1997).

      "As the Second Circuit has noted, district courts should presume expert evidence is

reliable." *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) (citing

*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)). "[D]oubts about whether an expert's

testimony will be useful should generally be resolved in favor of admissibility . . . ." *In re

Zyprexa*, 489 F. Supp. 2d at 285 (quoting *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir.

1992)).

## III.    Relevance of the Expert's Opinion

      The third prong of a Rule 702 analysis asks whether the expert's testimony "will help the

trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see

Washington,* 105 F. Supp. 3d at 307-08. This prong requires an assessment of whether the

testimony is relevant to the issues in the case. *See, e.g.*, *Daubert*, 509 U.S. at 591 (explaining

that the third prong "goes primarily to relevance"). Under Rule 401 of the Federal Rules of

Evidence, evidence is relevant if it has a "tendency to make a fact more or less probable than it

would be without the evidence." Fed. R. Evid. 401.

In deciding whether expert testimony will be helpful to the factfinders, the Court must assess whether the testimony "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[E]xpert testimony may help a jury understand unfamiliar terms and concepts," but "[i]ts use must be carefully circumscribed . . . . "). While an expert "may opine on an issue of fact within the jury's province," an expert "may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294; *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

Courts therefore exclude expert testimony that "provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court." *Highland Cap. Mgmt. L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005). Courts also exclude expert testimony that "supplant[s] the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), a*brogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011); *see also LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (rejecting an expert's report that "d[id] no more than counsel for the plaintiff w[ould] do in argument, i.e., propound a particular interpretation of [the] defendant's conduct"); *Scott*, 315 F.R.D. at 46-49 (finding that experts are not permitted to testify about the parties' motivations or intentions or to state ultimate legal conclusions).

Similarly, an expert should not be permitted to opine on the "comparative qualifications of the plaintiff[ ]" where the testimony is "brief and simple" such that a jury could understand the evidence without expert analysis. *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 161 (2d Cir. 2012) (excluding testimony where the expert merely summed up plaintiff's qualifications and compared them to qualifications of others who were promoted instead).

## IV.    Federal Rule of Evidence 403

Expert testimony must comport with Rule 403, which allows for the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

<u>DISCUSSION</u>

## I.    Background and Opinion of Dr. Ochroch

Plaintiff offers Dr. Ochroch as a medical school promotions expert whose testimony is relevant to: (1) Plaintiff's qualifications for promotion to Professor on the Clinical Educator Track; (2) the propriety of excluding Plaintiff from the promotion process; and (3) the relative value of a promotion to Professor of Anesthesiology. (*See* ECF 83, Pl.'s Ochroch Opp. at 3.) Plaintiff argues that Dr. Ochroch's opinions would help the factfinders understand "the world of academic medicine promotions," the "significance of [Defendants] not even considering Plaintiff for promotion" in violation of school policy, and the role of "Dr. Eikermann's interference . . . in the promotion process." (*Id.* at 16.)

14

Dr. Ochroch is a board-certified anesthesiologist and has worked exclusively as a faculty member at the University of Pennsylvania in the Department of Anesthesiology for the past nineteen years. (*See* ECF 81-1, Ochroch Report at 1-2.) In that time, Dr. Ochroch has served as chair of the Departmental Committee on Appointments and Promotions, overseeing and serving on "numerous committees on appointments and promotions." (*Id.* at 2.) In forming his opinions, Dr. Ochroch relied in part on Plaintiff's CV and teaching portfolio, *Suggested Guidelines for Promotion to Senior Rank – Clinician-Educator Track* (published by Einstein), a letter from Dr. Leff to the CAP, deposition testimony of Drs. Eikermann and Leff, and publicly available information from Einstein's website. (*See id.* at 3-4.)

Dr. Ochroch opines that: (1) Plaintiff "met all the requirements set forth on the Clinical Educator Checklist for promotion to Clinical Professor in 2021"; (2) Plaintiff "should have been recommended by the Departmental Committee on Appointments and Promotions if Dr. Eikermann had not interfered"; (3) "Dr. Eikermann's interference" in the promotion process "was a violation of the Suggested Guidelines for Promotion to Senior Rank"; and (4) given the value of promotion, "by preventing [Plaintiff] from being considered for promotion . . . Dr. Eikermann diminished [Plaintiff's] reputation, limited his employment opportunities, excluded him from consideration for administrative positions, and precluded him from receiving a significant annual increase in wages." (*Id.* at 7-10.)

## II.    Dr. Ochroch's Qualifications

Defendants argue that Dr. Ochroch is unqualified to serve as an expert witness because "[b]eing an anesthesiologist[ ] does not make him an expert in the promotion process at

Montefiore"; that his experience with the academic promotion process is limited to his employment at the University of Pennsylvania; and that "the promotion process at the University of Pennsylvania [is not] an area of expertise." (ECF 84, Defs.' Ochroch Reply at 2.) Defendants also point out that Dr. Ochroch "has never published on this topic, has never given public presentations, and . . . has never given expert testimony" on academic promotion prior to the current litigation. (*See id.*)

Plaintiffs counter that Dr. Ochroch's thirty years of experience as an anesthesiologist, multiple leadership positions in the University of Pennsylvania's Department of Anesthesiology, and service on "numerous committees on appointments and promotions" satisfy the requirements for an expert witness under Rule 702. (*See* ECF 83, Pl.'s Ochroch Opp. at 7.)

"Courts in the Second Circuit liberally construe the expert qualifications requirement," meaning they generally do not exclude expert testimony provided that "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question." *See I.M. v. United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019). Dr. Ochroch's experience as a member and chair of the University of Pennsylvania's committee on appointments and promotion is reasonably closely related to the promotion process at Einstein. I therefore conclude that Dr. Ochroch satisfies the *Daubert* inquiry into his qualifications as an expert.

## III.    Reliability of Dr. Ochroch's Opinions

When determining reliability of an expert witness, "the court should consider whether the expert's opinion: (i) is grounded in sufficient facts or data; (ii) is the product of reliable

16

principles and methods; and (iii) indicates that the witness has applied the relevant principles and methods reliably to the facts of the case." *Bennett v. Target Corp.*, No. 16-CV-5816 (ADS) (SIL), 2018 WL 5784354, at *5 (E.D.N.Y. Nov. 5, 2018). Generally, "expert testimony is not admissible" when the witness fails to show it is "connected to existing data by anything other than the *ipse dixit* of the expert." *King v. Wang*, 14-CV-7694 (LJL), 2021 WL 5237195, at *20 (S.D.N.Y. Nov. 9, 2021). Where the witness relies primarily on experience, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* Anything less amounts to "simply taking the expert's word for it." *Id.*

A.    Assessment of Dr. Goldstein's Qualifications for Promotion

As to Dr. Ochroch's opinion that Dr. Goldstein met Einstein's requirements for a promotion to Clinical Professor in 2021 (*see* ECF 81-1, Ochroch Report at 7), Defendants note that, in assessing Plaintiff's qualifications, Dr. Ochroch relies exclusively on his experience, the Clinical Educator Checklist published by Einstein, and Plaintiff's CV and teaching portfolio. (*See* ECF 80, Defs.' Ochroch Mem. at 4-7.) Defendants contend that this opinion is unreliable because Dr. Ochroch provides no analysis, does not ground the conclusion in facts or a reliable methodology, and impermissibly substitutes his own views for those of the promotion committee. (*See id*. at 7-12.)

A "district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles

and methods reliably to the facts of the case." *Amorgianos*, 303 F.3d at 265. However, the

Supreme Court has declared that the reliability inquiry for expert testimony is "flexible," and

that depending on the nature of the testimony, reliability concerns may focus on different

factors. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (explaining that expert

testimony may rest "upon scientific foundations, the reliability of which [may] be at issue," or

"the relevant reliability concerns may focus upon personal knowledge or experience," and

concluding that because there are "many different kinds of experts," there are "many different

kinds of expertise"); *see also Nicholas v. Bratton*, 376 F. Supp. 3d 232, 289 (S.D.N.Y. 2019)

("These factors . . . are not exclusive or unyielding . . . .").

      "In cases where experts draw a conclusion from a set of observations based on

extensive and specialized experience, the method [they employ] is the application of

experience to facts." *Scott*, 315 F.R.D. at 50. Such testimony is testable under *Daubert* in the

sense that it is "provable (or disprovable) by equivalent testimony by experienced participants

in the industry." *Mahony v. JJ Weiser & Co., Inc.*, No. 04-CV-2592 (VM) (HBP), 2007 WL

3143710, at *6 (S.D.N.Y. Oct. 25, 2007). In such cases, courts often look to the expert witness'

experience to determine their reliability. *See, e.g., Am. Empire Surplus Lines Ins.*, 743 F. Supp.

3d at 535, 541-42 (finding expert testimony reliable where an insurance expert applied "30

years" of experience to the facts); *Pension Comm. of Univ. of Montr. Pension Plan v. Banc of

Am. Sec., LLC*, 691 F. Supp. 2d 448, 464-65 (S.D.N.Y. 2010) (finding expert testimony on custom

and practice in the hedge fund industry reliable where the expert witness has performed due

diligence on a many hedge funds); *Seneca Ins. Co. v. Wilcock*, No. 01-CV-7620 (MHD), 2007 WL

415141, at *9 (S.D.N.Y. Feb. 5, 2007) (finding that a "long-time insurance industry executive['s]" testimony on the meaning of the words "loss" and "claim" in the insurance industry was reliable).

Dr. Ochroch has thirty years of experience as an anesthesiologist, has held numerous leadership positions in the University of Pennsylvania's Department of Anesthesiology, and has served many committees on appointments and promotions. (*See* ECF 81-1, Ochroch Report at 1-2.) In light of Dr. Ochroch's experience and the "well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely,* 414 F.3d at 395, I conclude that Dr. Ochroch's opinion that Dr. Goldstein met Einstein's qualifications for promotion is reliable.

B.    Assessment of Dr. Eikermann's Role

As to Dr. Ochroch's opinion that Dr. Eikermann "contaminated the entire process" in deciding Plaintiff was not eligible for promotion in 2021 (ECF 81-1, Ochroch Report at 8-9), Defendants suggest that Plaintiff improperly seeks to use Dr. Ochroch to present the factual narrative from Plaintiff's perspective. (*See* ECF 84, Defs.' Ochroch Reply at 5.) Defendants are correct that a party may not present an expert to make "simple inferences drawn from uncomplicated facts," which do not help the jury and serve only to buttress Plaintiff's case. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551; *see also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 462 (S.D.N.Y. 2014) (excluding portions of an expert's testimony that merely summarized and interpreted documents readily understandable to the jury). Dr. Ochroch, in opining on Dr. Eikermann's role in Einstein's decision not to consider Plaintiff for

promotion, performs just that impermissible function. Jurors can rely on the additional industry

context provided by Dr. Ochroch to reach their own conclusions about whether Dr. Eikermann

contaminated the promotion process.

Additionally, an expert may not opine on "motivation or intent" without "dispositive

support." *Scott*, 315 F.R.D. at 46-47; *see also Highland Cap. Mgmt.,* 379 F. Supp. 2d at 469

(finding inadmissible expert testimony that interjected into the record the expert's "speculation

regarding the state of mind and motivations of certain parties" and "inferences that [the

expert] dr[ew] from other evidence in the case"); *Sharkey v. J.P. Morgan Chase & Co.*, 978 F.

Supp. 2d 250, 253-54 (S.D.N.Y. 2013) (holding that an expert witness could not testify as to

whether the plaintiff had a reasonable belief that the defendants' client was engaging in money

laundering). Here, Dr. Ochroch offers no support beyond his own speculation that Dr.

Eikermann's decision to not consider Plaintiff for promotion in 2021 reflected a purposeful

effort to exclude Plaintiff. (*See* ECF 81-1, Ochroch Report at 8-9.)

For the reasons set forth above, I conclude that Dr. Ochroch's opinion on Dr.

Eikermann's role in the failure to promote Plaintiff in 2021 is unreliable, so that the portions of

Dr. Ochroch's report on Dr. Eikermann's role are excluded, and Dr. Ochroch is not permitted to

testify on that topic.

    C    <u>Assessment of the Value of a Promotion and Effects of Being Denied a Promotion</u>

As to Dr. Ochroch's opinions on the value of a promotion to Clinical Professor and the

negative consequences of not being promoted, Defendants argue that Dr. Ochroch lacks the

necessary knowledge and experience to testify on these topics. (*See* ECF 80, Defs.' Ochroch Mem. at 11.)

However, Dr. Ochroch provides data on the benefits associated with a promotion to Clinical Professor: he explains that promotion to that level at the University of Pennsylvania comes with an "added six percent of salary[ ] or approximately $25,000" in addition to increased retirement benefits; and he notes that "[o]ther institutions pay as much as $30,000 annually for a promotion to Clinical Professor." (*See* ECF 81-1, Ochroch Report at 9.)

Dr. Ochroch also describes the less easily quantified professional ramifications of promotion to Clinical Professor: more job opportunities, eligibility for "internal and external administrative positions" such as department chair, and additional opportunities to lecture and publish. (*Id.*) And Dr. Ochroch discusses the "negative consequences of not being promoted," stating a physician who fails to be promoted within ten years is presumed "inferior or incompetent or both"; Dr. Ochroch concludes that because Plaintiff was not promoted to Clinical professor, his reputation suffered, his employment opportunities were limited, he was ineligible for administrative positions, and he did not receive significant annual wage increases. (*See id.* at 9-10.)

As with Dr. Ochroch's opinions on Plaintiff's qualifications, his opinions on the value of a promotion to Clinical Professor (and the harm in not being promoted) rely on "a set of observations based on extensive and specialized experience." *Scott*, 315 F.R.D. at 50. Such testimony is testable under *Daubert* "by equivalent testimony by experienced participants in the industry." *Mahony*, 2007 WL 3143710, at *6, and a court may look to the expert witness's

experience to determine the reliability. *See, e.g.*, *Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d

at 541-42. Dr. Ochroch's extended career in medical academia supports the reliability of these

opinions. *See Scott*, 315 F.R.D. at 43, 50 ("In certain fields, experience is the predominant, if not

sole, basis for a great deal of reliable expert testimony.").

I therefore conclude that Dr. Ochroch's opinions on the value of promotion to the rank

of Clinical Professor and the professional harm Plaintiff suffered due to being denied the

promotion are reliable.

**IV.    Relevance of Dr. Ochroch's Opinions**

I turn next to the relevance of the opinions I have concluded are reliable. With respect

to Dr. Ochroch's opinions on Dr. Goldstein's qualifications for promotion, Defendants argue

that Plaintiff has failed to show that these opinions are based on the witness's expertise as

opposed to matters that the factfinders could understand without an expert's help. (*See* ECF 80,

Defs.' Ochroch Mem. at 12.) *See also United States v. Mendlowitz*, No. 17-CR-248 (VSB), 2021

WL 4892860, at *5 (S.D.N.Y. Oct. 20, 2021) ("Expert testimony that addresses lay matters which

[the trier of fact] is capable of understanding and deciding without the expert's help is

inadmissible."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551 (excluding testimony

where the expert relied on "simple inferences drawn from uncomplicated facts that serve only

to buttress plaintiff's theory of the case" and highlight a particular interpretation of the

defendant's conduct).

Here, Dr. Ochroch recites Plaintiff's credentials and opines that, based on Einstein's

promotion rubric, Plaintiff was qualified for promotion. (*See* ECF 81-1, Ochroch Report at 7.)

Defendants' argument that the factfinders could reach the same conclusion or not on their own (ECF 80, Defs.' Ochroch Mem. at 12) therefore has some force. However, Plaintiff's explanation that the factfinders will need assistance to understand "the world of academic medicine promotions" (ECF 83, Pl.'s Ochroch Opp. at 16) is also persuasive. I conclude that the factfinders would benefit from an explanation of how Dr. Goldstein's professional accomplishments fit within Einstein's promotion rubric and therefore that Dr. Ochroch's opinions on this subject are relevant and admissible. *See Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 403 (S.D.N.Y. 2013) (holding that, to the extent that an expert's testimony introduces industry-specific context to a jury, thus enabling the jury to reach inferences that would otherwise be unavailable, it is relevant); *see also SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 133 (2d Cir. 2006) (permitting experts to testify on industry-specific customs and practices).

Defendants do not claim that Dr. Ochroch's opinions on the value of promotion and the harm of failure to promote are also irrelevant. I conclude that the portion of Dr. Ochroch's testimony that I have determined to be reliable satisfies Rule 702's relevance requirement.

## V.    Dr. Ochroch's Opinions and Rule 403

Defendants also assert that Dr. Ochroch's report and testimony should be excluded under Rule 403 for being more prejudicial than probative due to Dr. Ochroch's heavy reliance on speculation rather than fact. (*See* ECF 80, Defs.' Ochroch Mem. at 14). This argument is substantially duplicative of Defendants' arguments on the reliability of Dr. Ochroch's opinions; and Rule 403 provides an additional basis for finding Dr. Ochroch's opinions on Dr. Eikermann's

motivation for and role in the failure to promote Plaintiff in 2021 to be inadmissible to the extent that they are unreliable. *See Nook v. Long Island R. Co.*, 190 F. Supp 2d. 639, 643 (S.D.N.Y. 2002) (striking an export report based on "assumptions and speculation" as more prejudicial than probative under Rule 403).

<u>CONCLUSION</u>

As set forth above, Defendants' motion to exclude Dr. Ochroch's report and testimony (ECF 79) is GRANTED IN PART, in that Dr. Ochroch's opinions relating to Einstein's failure to consider Plaintiff for promotion in 2021 and Dr. Eikermann's motivations for and role in the promotion process are stricken, and Dr. Ochroch may not testify about Dr. Eikermann's motivations or that Plaintiff would have been recommended for promotion in 2021 absent Dr. Eikermann's interference, and the portions of Dr. Ochroch's report on those topics are excluded; and the motion to exclude Dr. Ochroch's report and testimony is otherwise DENIED IN PART. The Clerk of Court is respectfully requested to terminate ECF 79.

Dated: September 25, 2025
New York, New York

SO ORDERED.

**ROBYN F. TARNOFSKY**
**United States Magistrate Judge**

24